1

2

3

4

5

6

7

8

Honorable Tiffany M. Cartwright

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9 | GENERAL CASUALTY COMPANY OF
WISCONSIN,

NO. 2:23-CV-00725-TMC

Plaintiff/Counterclaim
Defendant,

v.

REED HEIN & ASSOCIATES LLC d/b/a
TIMESHARE EXIT TEAM, a Washington
limited liability company; MAKAYMAX
INC., a Washington corporation; BRANDON
REED, individually; BRIAN and KERRI
ADOLPJ, a married couple,

Defendant/Counterclaim
and Third Party Plaintiffs.

v.

RSUI GROUP, INC., a Georgia corporation;
and RSUI INDEMNITY COMPANY, INC.,
a New Hampshire corporation,

Third Party Defendants.

DECLARATION OF CATARINA
FERREIRA IN SUPPORT OF THIRD
PARTY DEFENDANTS RSUI GROUP,
INC., AND RSUI INDEMNITY
COMPANY, INC.'S RESPONSE TO
COUNTERCLAIM AND THIRD-
PARTY PLAINTIFFS BRIAN AND
KERRI ADOLF'S MOTION FOR
SUMMARY JUDGMENT

I, Catarina Ferreira, hereby declare as follows:

I am one of the attorneys representing Defendants, RSUI Group, Inc., and RSUI

Indemnity Company (collectively RSUI), and I submit this Declaration upon personal

DECLARATION OF CATARINA FERREIRA IN SUPPORT OF THIRD PARTY
DEFENDANTS RSUI GROUP, INC., AND RSUI INDEMNITY COMPANY, INC.'S
RESPONSE TO COUNTERCLAIM AND THIRD-PARTY PLAINTIFFS BRIAN AND
KERRI ADOLF'S MOTION FOR SUMMARY JUDGMENT – 1

SCHEER.LAW PLLC
701 5TH AVE., STE 3860
SEATTLE, WA 98104
P: (206) 800-4070

knowledge and in support of RSUI's response to Counterclaim and Third-Party Plaintiffs Brian and Kerri Adolf's Motion for Summary Judgment;

1. Attached as **Exhibit 1** is a true and correct copy of the RSUI Policy from May 16, 2020, to May 16, 2021.

2. Attached as **Exhibit 2** is a true and correct copy of the RSUI Policy from May 16, 2021, to May 16, 2022.

3. Attached as **Exhibit 3** is a true and correct copy of the Complaint filed on February 4, 2020, by the Attorney General of Washington v. Reed Hein & Associates, LLC, et al, in King County Superior Court, Case No. 20-2-03141-1 SEA.

4. Attached as **Exhibit 4** is a true and correct copy of the Complaint filed on April 15 , 2021, by Philip and Rebeccah Isaacs v. Reed Hein & Associates, LLC, et al, in Snohomish County Superior Court, Case No. 21-2-01761-31.

5. Attached as **Exhibit 5** is a true and correct copy of the August 19, 2021, email from Panda Kroll to RSUI tendering the Siegrist and Isaac Complaints.

6. Attached as **Exhibit 6** is a true and correct copy of the August 23, 2021, letter from RSUI to Reed Hein & Associates, LLC.

7. Attached as **Exhibit 7** is a true and correct copy of Excerpts from Phil Krajec's Deposition Transcript, 1, 2, 8, 15-16, 18-19, 21-22, 26-27, 56, 59, 67, 78, 83-84.

8. Attached as **Exhibit 8** is a true and correct copy of the September 15, 2021, letter from RSUI to Reed Hein & Associates, LLC.

9. Attached as **Exhibit 9** is a true and correct copy of the Complaint filed on October 9, 2021, by Brian and Kerri Adolf v. Reed Hein & Associates, LLC, et al, in the United States District Court, Western District of Washington at Seattle, Case No. 2:21-cv-01378.

10. Attached as **Exhibit 10** is a true and correct copy of the October 29, 2021, letter from Philip Grajic to RSUI tendering the Adolf complaint.

DECLARATION OF CATARINA FERREIRA IN SUPPORT OF THIRD PARTY
DEFENDANTS RSUI GROUP, INC., AND RSUI INDEMNITY COMPANY, INC.'S
RESPONSE TO COUNTERCLAIM AND THIRD-PARTY PLAINTIFFS BRIAN AND
KERRI ADOLF'S MOTION FOR SUMMARY JUDGMENT – 2

SCHEER.LAW PLLC
701 5TH AVE., STE 3860
SEATTLE, WA 98104
P: (206) 800-4070

11. Attached as **Exhibit 11** is a true and correct copy of the January 4, 2022 letter from RSUI to Panda Kroll, Esq.

12. Attached as **Exhibit 12** is a true and correct copy of Excerpts from William Brockett's Deposition Transcript, 1-2, 6-10, 12-13, 17, 20-21, 24, 27, 32-33, 35, 42, 46, 64.

13. Attached as **Exhibit 13** is a true and correct copy of the June 15, 2023 Confession of Judgment and Judgment with Covenant not to Execute.

**I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON, THAT THE FOREGOING IS TRUE AND CORRECT.**

**DATED** this 15th day of December, 2025, at Seattle, Washington.

SCHEER.LAW, PLLC

*/s/ Catarina Ferreira*
Catarina Ferreira, WSBA No. 56291
*Attorneys for Defendants RSUI Group, Inc., and RSUI Indemnity Company, Inc.*

DECLARATION OF CATARINA FERREIRA IN SUPPORT OF THIRD PARTY DEFENDANTS RSUI GROUP, INC., AND RSUI INDEMNITY COMPANY, INC.'S RESPONSE TO COUNTERCLAIM AND THIRD-PARTY PLAINTIFFS BRIAN AND KERRI ADOLF'S MOTION FOR SUMMARY JUDGMENT – 3

SCHEER.LAW PLLC
701 5TH AVE., STE 3860
SEATTLE, WA 98104
P: (206) 800-4070

1

<u>CERTIFICATE OF SERVICE</u>

2

I certify under penalty of perjury under the laws of the State of Washington, that the

3

following is true and correct:

4

I am employed by the law firm of Scheer.Law PLLC.

5

At all times hereinafter mentioned, I was and am a citizen of the United States of

6

America, a resident of the State of Washington, over the age of eighteen (18) years, not a

7

party to the above-entitled action, and competent to be a witness herein.

8

On the date set forth below I served the document(s) to which this is attached, in the

9

manner noted on the following person(s):

10

| PARTY/COUNSEL | DELIVERY INSTRUCTIONS |
|---|---|
| **<u>CO/ Plaintiff</u>**<br>Kevin A. Michael<br>COZEN O'CONNOR<br>999 3rd Ave., Ste.1900<br>Seattle WA 98104<br>kmichael@cozen.com | **(   )  Via U.S. Mail<br>( X )  Via E-Mail<br>( X )  Via E-Service<br>(   )  Via Overnight Mail** |
| **<u>CO/ Plaintiff</u>**<br>Michael D. Handler<br>Daniel L Syhre<br>Sarah P. Pozzi<br>Forsberg & Umlauf, P.S.<br>401 Union Street, Suite 1400<br>Seattle, WA 98101<br>mhandler@foum.law ;<br>dsyhre@foum.law ;<br>spozzi@foum.law | **(   )  Via U.S. Mail<br>( X )  Via E-Mail<br>( X )  Via E-Service<br>(   )  Via Overnight Mail** |
| **<u>CO/ Third-Party Plaintiffs Adolphs</u>**<br>Gregory Albert,<br>Albert Law PLLC<br>3131 Western Ave, Ste 410<br>Seattle, WA 98121<br>greg@albertlawpllc.com | **(   )  Via U.S. Mail<br>( X )  Via E-Mail<br>( X )  Via E-Service<br>(   )  Via Overnight Mail** |

DECLARATION OF CATARINA FERREIRA IN SUPPORT OF THIRD PARTY
DEFENDANTS RSUI GROUP, INC., AND RSUI INDEMNITY COMPANY, INC.'S
RESPONSE TO COUNTERCLAIM AND THIRD-PARTY PLAINTIFFS BRIAN AND
KERRI ADOLF'S MOTION FOR SUMMARY JUDGMENT – 4

SCHEER.LAW PLLC
701 5TH AVE., STE 3860
SEATTLE, WA 98104
P: (206) 800-4070

| PARTY/COUNSEL | DELIVERY INSTRUCTIONS |
|---|---|
| **CO/ Third-Party Plaintiffs Adolphs**<br>Darrell L. Cochran<br>Christopher E. Love<br>Thomas B. Vertetis<br>William T. McClure<br>Pfau Cochran Veretis Amala PLLC<br>909 A Street, Suite 700<br>Tacoma, WA 98402<br>darrell@pcvalaw.com;<br>chris@pcvalaw.com;<br>tom@pcvalaw.com;<br>wmcclure@pcvalaw.com | **(   )  Via U.S. Mail**<br>**( X )  Via E-Mail**<br>**( X )  Via E-Service**<br>**(   )  Via Overnight Mail** |

DATED this 15th day of December, 2025 at Seattle, Washington.


/s/ Shiloh Angevine
Shiloh Angevine, Legal Assistant

DECLARATION OF CATARINA FERREIRA IN SUPPORT OF THIRD PARTY
DEFENDANTS RSUI GROUP, INC., AND RSUI INDEMNITY COMPANY, INC.'S
RESPONSE TO COUNTERCLAIM AND THIRD-PARTY PLAINTIFFS BRIAN AND
KERRI ADOLF'S MOTION FOR SUMMARY JUDGMENT – 5

SCHEER.LAW PLLC
701 5TH AVE., STE 3860
SEATTLE, WA 98104
P: (206) 800-4070

# EXHIBIT 1



RSUI Indemnity Company
**Corporate Office**
945 East Paces Ferry Rd.
Atlanta, GA  30326-1160

# PRIVATE COMPANY
# MANAGEMENT LIABILITY POLICY

**NOTICE:** THIS IS A CLAIMS MADE AND REPORTED POLICY THAT APPLIES ONLY TO THOSE **CLAIMS** FIRST MADE AGAINST THE **INSURED** DURING THE **POLICY PERIOD** THAT ARE REPORTED TO THE **INSURER** DURING THE **POLICY PERIOD**, OR EXTENDED REPORTING PERIOD (IF APPLICABLE) AND REPORTED IN ACCORDANCE WITH THIS POLICY'S REPORTING PROVISIONS.  THE LIMIT OF LIABILITY AVAILABLE TO PAY **LOSS** SHALL BE REDUCED OR TOTALLY EXHAUSTED BY PAYMENT OF **DEFENSE EXPENSES**.

### PLEASE READ YOUR POLICY CAREFULLY

## CLAIM NOTICE

Mail notices to:    **RSUI Group, Inc.**
**945 East Paces Ferry Rd.**
**Suite 1800**
**Atlanta, GA 30326-1160**

Fax notices to:    **(404) 231-3755**
**Attn: Claims Department**

E-mail notices to:    **reportclaims@rsui.com**

RSUI's Panel Counsel Finder: **Panel Counsel Link**

*A member of Alleghany Insurance Holdings LLC*

# PRIVATE COMPANY COMMON POLICY DECLARATIONS

**RSUI**

Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER | RENEWAL OF |
|---|---|---|
| N | PP687052 | NPP681598 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:    RSUI Indemnity Company (hereinafter referred to as the Insurer)

**ITEM 1.**    INSURED ORGANIZATION'S NAME AND MAILING ADDRESS              PRODUCER'S NAME AND ADDRESS

REED HEIN & ASSOCIATES, LLC
220 120TH AVENUE NE
BUILDING D
BELLEVUE, WA 98005

IN CONSIDERATION OF THE PAYMENT OF THE PREMIUM, IN RELIANCE UPON THE STATEMENTS HEREIN OR ATTACHED HERETO, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, THE INSURER AGREES TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**ITEM 2. POLICY PERIOD:**

FROM    5/16/2020    TO    5/16/2021    12:01 AM Standard Time at the Insured's address as stated herein

**ITEM 3. COVERAGE SECTIONS APPLICABLE TO POLICY:**

| | **Purchased** | **Shared Limit** | **Separate Limit** |
|---|---|---|---|
| A.  Directors and Officers Liability Insurance | ☒ Yes ☐ No | ☐ | ☒ |
| B.  Employment Practices Liability Insurance | ☒ Yes ☐ No | ☐ | ☒ |
|    1)  Third Party Liability Coverage | ☒ Yes ☐ No | | |
| C.  Fiduciary Liability Insurance | ☐ Yes ☒ No | ☐ | ☐ |

**ITEM 4. LIMIT OF LIABILITY:**

$    4,000,000              Aggregate Limit of Liability for All **Coverage Sections**

**ITEM 5. PREMIUM:**

$    41,690.00              Total Policy Premium for All Coverage Sections

**ITEM 6. POLICY FORM AND ENDORSEMENTS MADE A PART OF THIS POLICY AT THE TIME OF ISSUE:**
SEE SCHEDULE OF ENDORSEMENTS – RSG 240041 0118

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____    June 16, 2020 _____    _Kym Hadgek_____
                                                          DATE                          AUTHORIZED REPRESENTATIVE

# PRIVATE COMPANY DIRECTORS AND OFFICERS LIABILITY DECLARATIONS

**RSUI**

Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER |
|---|---|
| N | PP687052 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:    RSUI Indemnity Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED ORGANIZATION'S NAME

REED HEIN & ASSOCIATES, LLC

**ITEM 2. LIMIT OF LIABILITY:**

| | | |
|---|---|---|
| A.  Directors and Officers Limit of Liability | $ | 2,000,000 |
| B.  Additional Side-A Limit of Liability | $ | 500,000 |
| C.  Investigative Costs Sublimit of Liability | $ | 150,000 |

**ITEM 3. RETENTION:**

A. Directors and Officers Liability Retentions

| | | |
|---|---|---|
| 1)   Insuring Agreement A | $ | 0 |
| 2)   Insuring Agreement B | $ | 50,000 |
| 3)   Insuring Agreement C | $ | 50,000 |

**ITEM 4. PRIOR AND/OR PENDING LITIGATION DATE:**

Directors and Officers Prior and/or Pending Litigation Date:        05/01/2018

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____        _____        _____

                                                                              June 16, 2020
                                                                                   DATE                          AUTHORIZED REPRESENTATIVE

A member of Alleghany Insurance Holdings LLC

# PRIVATE COMPANY EMPLOYMENT PRACTICES LIABILITY DECLARATIONS

**RSUI**

Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER |
|---|---|
| N | PP687052 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:    RSUI Indemnity Company (hereinafter referred to as the Insurer)

**ITEM 1.** INSURED ORGANIZATION'S NAME

REED HEIN & ASSOCIATES, LLC

**ITEM 2. LIMIT OF LIABILITY:**

| | | |
|---|---|---|
| A. | Employment Practices Limit of Liability | $  2,000,000 |
| | (Including Third Party Liability, if purchased) | |
| B. | Workplace Violence Expenses Sublimit | $  100,000 |

**ITEM 3. RETENTION:**

A. Employment Practices Liability Retentions

| | | |
|---|---|---|
| 1) | Employment Practices Liability | $  100,000 |
| 2) | Third Party Liability Coverage | $  100,000 |

**ITEM 4. PRIOR AND/OR PENDING LITIGATION DATE:**

Employment Practices Prior and/or Pending Litigation Date:    05/01/2018

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

| Countersigned: _____ | June 16, 2020 | *Kym Hadgek* |
|---|---|---|
| | DATE | AUTHORIZED REPRESENTATIVE |

RSG 240043 0118

# PRIVATE COMPANY MANAGEMENT LIABILITY POLICY
# SUPPLEMENTAL DECLARATIONS

**RSUI**

POLICY NUMBER:    NPP687052

### SCHEDULE OF FORMS AND ENDORSEMENTS

| TITLE | FORM NUMBER |
|---|---|
| Washington Changes | RSG 203036 0118 |
| Washington Changes-Subrogation | RSG 202038 0118 |
| Disclosure Pursuance to Terrorism Risk Insurance Act | RSG 204123 0116 |
| Cap on Losses From Certified Acts of Terrorism | RSG 204198 0118 |
| **FORMS APPLICABLE TO MULTIPLE COVERAGE PARTS** | |
| Common Policy Terms and Conditions Coverage Section-Private Company | RSG 241001 0118 |
| Absolute Exclusion-Sexual Abuse with Allocation (EPL Clarification) | RSG 204192 0118 |
| Amended Notice of Claim or Circumstance-Specific Position Trigger | RSG 204151 0118 |
| Bilateral Extended Reporting Period | RSG 204080 0118 |
| Exclusion-Amended Bodily Injury and Property Damage | RSG 206118 0119 |
| Exclusion-Biometric Privacy Claims | RSG 206125 0120 |
| Exclusion-Prior Acts | RSG 206108 0118 |
| Exclusion-Specific Entities and Individuals | RSG 206114 0118 |
| Exclusion-Specific Litigation | RSG 206115 0118 |
| Extradition Coverage | RSG 204174 0118 |
| **FORMS APPLICABLE TO DIRECTORS & OFFICERS LIABILITY** | |
| Directors and Officers Liability Coverage Section-Private Company | RSG 241007 0118 |
| Absolute Contractual Exclusion | RSG 244018 0118 |
| Exclusion-Broadcasting, Advertising and Publishing | RSG 206105 0118 |
| Exclusion-Professional Errors and Omissions with Management Carve Back | RSG 246013 0118 |
| **FORMS APPLICABLE TO EMPLOYMENT PRACTICES LIABILITY** | |
| Employment Practices Liability Coverage Section-Private Company | RSG 241008 0118 |
| Sublimit-Defense Expenses-Wage and Hour Claims | RSG 204153 0118 |

RSG 240041 0118

RSUI INDEMNITY COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# WASHINGTON CHANGES

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A.  SECTION V. – CONDITIONS, F. Cancellation; Renewal Provision of the Common Policy Terms and Conditions Coverage Section is deleted in its entirety and replaced with the following:

**F.  Cancellation; Renewal Provision**

The **Insured Organization** shown in the Declarations may cancel this policy at any time by notifying the **Insurer** or the insurance producer in one of the following ways:

1.  Written notice by mail, fax or e-mail;

2.  Surrender of the policy or binder; or

3.  Verbal notice.

Upon receipt of such notice, the **Insurer** will cancel this policy or any binder issued as evidence of coverage, effective on the later of the following:

1.  The date on which notice is received or the policy or binder is surrendered; or

2.  The date of cancellation requested by the first **Insured Organization**.

This policy may only be cancelled by the **Insurer** in the event the **Insured Organization** fails to pay any premium when due.  In the event of non-payment of premium by the **Insured Organization**, the **Insurer** may cancel this policy upon ten (10) days written notice.  The **Insurer** will mail notice to the **Insured Organization's** address as shown in Item 1. of the Declarations Page and the **Insured Organization's** agent or broker.  The mailing of such notice as aforesaid shall be sufficient proof of notice.

The **Insurer** will give notice of cancellation to any other person shown in the policy to have an interest in any **Loss** which may occur thereunder.

If this policy is cancelled, the **Insurer** will send the **Insured Organization** any premium refund due.  If the **Insurer** cancels, the refund will be pro rata.  If the **Insured Organization** cancels, the refund will be at least 90% of the pro rata refund.  The cancellation will be effective even if the **Insurer** has not made or offered a refund.

The **Insurer** shall not be required to renew this policy upon its expiration.  The offer by the **Insurer** of renewal terms, conditions, Limit of Liability and/or premiums varying from those of the expiring policy shall not constitute a refusal to renew.

**Nonrenewal**

The **Insurer** may elect not to renew this policy by mailing or delivering written notice of nonrenewal, stating the reasons for nonrenewal, to the **Insured Persons** and the **Insured Organization** and the **Insured Organization's** agent or broker, at their last mailing addresses known to the **Insurer**.  The **Insurer** will mail or deliver these notices at least forty-five (45) days before the:

1.  Expiration of this policy; or

2.  Anniversary date of this policy if this policy has been written for a term of more than one year.

Otherwise, the **Insurer** will renew this policy unless:

---

1. The **Insured Organization** fails to pay the renewal premium after the **Insurer** has expressed willingness to renew, including a statement of the renewal premium, to the **Insured Organization** and the **Insured Organization's** insurance agent or broker, at least twenty (20) days before the expiration date; or

2. Other coverage acceptable to the **Insured Organization** has been procured prior to the expiration date of this policy.

**Premiums**

The **Insured Organization** shown in the Declarations Page is responsible for the payment of all premiums; and will be the payee for any return premiums the **Insurer** pays.

B. The following is added to SECTION V. – CONDITIONS, of the Common Policy Terms and Conditions Coverage Section:

**Transfer of The Insured's Rights and Duties Under This Policy**

The **Insured's** rights and duties under this policy may not be transferred without the **Insurer's** written consent except in the case of death of an individual named **Insured**.

If the **Insured** dies, the rights and duties will be transferred to their legal representative but only while acting within the scope of duties as their legal representative. Until the **Insured's** legal representative is appointed, anyone having proper temporary custody of the **Insured's** property will have the **Insured's** rights and duties but only with respect to that property.

C. Section V. – Conditions K. Authorization and Notices of the Common Policy Terms and Conditions Coverage Section is deleted in its entirety.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# WASHINGTON CHANGES - SUBROGATION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – CONDITIONS, J. Subrogation of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

**J.  Subrogation**

With respect to any payments made under this policy on behalf of any **Insured**, the **Insurer** shall be subrogated to the rights of recovery of such **Insured** to the extent of those payments.  The **Insured** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the **Insurer** to bring suit in the name of the **Insureds**. Any recoveries, less the cost of obtaining them, will be distributed as follows:

1.  To the **Insured Persons** and/or the **Insured Organization**, until they are reimbursed for any **Loss** that they sustain that exceeds the sum of the Limit of Liability and the Retention amount, if any;

2.  Then to the **Insurer**, until the **Insurer** is reimbursed for the payment made under this policy; and

3.  Then to the **Insured Persons** and/or the **Insured Organization**, until they are reimbursed for that part of the payment equal to the Retention amount, if any.

All other terms and conditions of this policy remain unchanged.

**RSUI INDEMNITY COMPANY**

**THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF THIS POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT.  THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THIS POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

### SCHEDULE*

| | |
|---|---|
| **Terrorism Premium** | **$0** |

**Additional information, if any, concerning the terrorism premium:**
**The portion of your premium for the policy term attributable to coverage for all acts of terrorism covered under this policy including terrorist acts certified under the Act is listed above.**

*Information required to complete this Schedule, if not shown above, will be shown in the Declarations Page.

## A. Disclosure of Premium

In accordance with the federal Terrorism Risk Insurance Act, as amended, the **Insurer** is required to provide the **Insured** with a notice disclosing the portion of the **Insured's** premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act.  The portion of the **Insured's** premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations Page.

As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

## B. Disclosure of Federal Participation in Payment of Terrorism Losses

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program.  Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020, of covered terrorism losses that exceeds the applicable **Insurer** retention.  However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

## C. Cap Insurer Participation in Payment of Terrorism Losses

If aggregate **Insured** losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met our **Insurer** deductible under the Terrorism Risk Insurance Act, the **Insurer** will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case **Insured** losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

**Policy No.:** NPP687052      **Effective:** 5/16/2020

RSG 204123 0116

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Terms and Conditions Coverage Section:

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met our insurer deductible under the Terrorism Risk Insurance Act, the **Insurer** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act to be an act of terrorism pursuant to such Act.  The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy, such as losses excluded by the Nuclear Exclusion.

All other terms and conditions of this policy remain unchanged.

**Policy No.:**  NPP687052      **Effective:**  5/16/2020

RSG 204198 0118



# www.RSUIextra.com

## Online Human Resource Loss Prevention Services for Directors and Officers Liability Policyholders

### Key Features

- Best Practice Help Line for call-in assistance
- Checklist database for lowering risk
- Links to important federal and state government sites
- Online library with up-to-date articles on productivity, leadership and loss prevention
- Sample Human Resource policies and forms
- Online reporting function allows the Site Administrator to monitor usage
- Online training modules designed for managers and supervisors with the ability to adapt programs to meet their own needs.  Best Practice training modules include:
  - Preventing Sexual Harassment
  - Preventing Discrimination
  - Preventing Wrongful Termination
  - Promoting Ethical Behavior

### How to get started

1. Designate a person to serve as the Site Administrator for your organization.
2. Go to *www.RSUIextra.com*.
3. Click the *Register* link on the left-hand side of the home page.
4. Enter your RSUI policy number as the Passcode/Organization Code (i.e. NHP123456).
5. Complete the Registration Information and click *Submit*.
6. You are now registered as the Site Administrator.

### Who is a Site Administrator?

A Site Administrator is often a person who works with personnel or legal matters and is the person who will oversee the use of *www.RSUIextra.com*.  A Site Administrator will have the ability to recruit and add other users as well as make training decisions.

### Questions?

Please call The McCalmon Group at (888) 712-7667 or click *CONTACT US* at *www.RSUIextra.com* on the upper right hand side of the home page.  You will be directed to The McCalmon Group for assistance.

*This site is administered by The McCalmon Group.*

RSG 204154 0716

# COMMON POLICY TERMS AND CONDITIONS
## COVERAGE SECTION (PRIVATE)
## PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning.  Refer to SECTION III. - DEFINITIONS.

In consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations hereinafter provided, the **Insurer** agrees:

**SECTION I. – COMMON POLICY TERMS AND CONDITIONS**

The Common Policy Terms and Conditions Section of this policy shall apply to all **Coverage Sections**.  Unless stated to the contrary in any **Coverage Section**, the terms and conditions of each **Coverage Section** of this policy shall apply only to that **Coverage Section** and shall not apply to any other **Coverage Section** of this policy.  If any provision in the Common Policy Terms and Conditions sections is inconsistent or in conflict with the terms and conditions in any **Coverage Section**, including any endorsements attached thereto, the terms and conditions of such **Coverage Section** or endorsement, shall supersede for the purposes of that **Coverage Section**.

**SECTION II. - COVERAGE EXTENSIONS**

**A.  Marital Estate**

This policy shall cover **Loss** arising from any **Claim** made against the lawful spouse or any legally recognized domestic partner of an **Insured Person** for **Claims** arising solely out of his or her status as the spouse or domestic partner of an **Insured Person** (where such status is derived by reason of statutory law or common law) where such **Insured Person** is entitled to coverage under this policy.  Such coverage shall extend to any **Claim** in which a recovery is sought from marital community property, property jointly held by the **Insured Person** and the spouse or domestic partner, or property transferred from the **Insured Person** to the spouse or domestic partner.

Provided, however, that this COVERAGE EXTENSION shall not extend coverage to any **Claim** for, arising from, based upon or attributable to any actual or alleged **Wrongful Act** of the spouse or domestic partner.

**B.  Extended Reporting Period**

If the **Insurer** shall refuse to renew this policy or the **Insured Organization** shall cancel or refuse to renew this policy, the **Insured Organization** shall have the right, upon payment of seventy five percent (75%) of the Full Annual Premium, to a period of three hundred and sixty five (365) days following the effective date of such cancellation or nonrenewal (herein referred to as the "Extended Reporting Period") in which to give written notice to the **Insurer** of any **Claim** first made against the **Insured** during said three hundred and sixty five (365) day period for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy.  As used herein, "Full Annual Premium" means the premium stated in Item 5. of the Common Policy Declarations Page and any additional premium(s) charged during the **Policy Period**.  The rights contained in this clause shall terminate unless written notice of such election together with the additional premium due is received by the **Insurer** at its address shown on the Declarations Page within thirty (30) days of the effective date of cancellation or nonrenewal.

The Extended Reporting Period is not cancelable and the additional premium charged shall be fully earned at the inception of the Extended Reporting Period.

The Limit of Liability available under the Extended Reporting Period is part of and not in addition to the Limit of Liability stated in Item 4. of the Declarations Page.

The rights contained in this clause shall not apply in the event of cancellation resulting from non-payment of premium.

**C.  Estates and Legal Representatives**

This policy shall cover **Loss** arising from any **Claim** made against the estates, heirs, legal representatives or assigns of an **Insured Person** who is deceased, or against the legal representatives or assigns of an **Insured Person** who is incompetent, insolvent or bankrupt, for the **Wrongful Act** of such **Insured Person**.

**SECTION III. - DEFINITIONS**

A.  **Application** means the application attached to and forming a part of this policy, including any materials submitted or requested in connection with such application within 12 months prior to the inception date of this policy, all of which are deemed a part of this policy.

B.  **Claim** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

C.  **Coverage Section** means, individually or collectively, the purchased coverage sections listed in Item 3. of the Declarations, including all endorsements attached thereto.

D.  **Defense Expenses** means reasonable and necessary legal fees and expenses incurred, with the **Insurer's** consent, by any **Insured** in defense of a **Claim**, including any appeal therefrom. **Defense Expenses**, however, shall not include:

    1.  Remuneration, overhead or benefit expenses associated with any **Insured Person**; or

    2.  Any obligation to apply for or furnish any appellate or similar bond.

E.  **Employment Practices Wrongful Act** shall have the meaning set forth in the Employment Practices Liability Coverage Section, whether or not purchased.

F.  **Fiduciary Wrongful Act** shall have the meaning set forth in the Fiduciary Liability Coverage Section, whether or not purchased.

G.  **Insured** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

H.  **Insured Organization** means:

    1.  The organization named in Item 1. of the Declarations Page and any **Subsidiary** existing prior to or at the inception date of this policy; or

    2.  Subject to SECTION V. - CONDITIONS, G. Merger, Consolidation or Acquisition of this policy, **Insured Organization** shall include any **Subsidiary** created or acquired after the inception date of this policy; or

    3.  In the event a bankruptcy proceeding shall be instituted by or against the foregoing entities, the resulting debtor-in-possession (or equivalent status outside the United States), if any.

I.  **Insured Person** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

J.  **Insurer** means the Company providing this insurance as shown on the Declarations Page.

K.  **Loss** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

L.  **Policy Period** means the period beginning at the inception date and ending at the expiration date stated in Item 2. of the Declarations Page or to any earlier policy cancellation or termination date.

M.  **Subsidiary** means any entity of which the **Insured Organization**, either directly or indirectly, or through one or more of its **Subsidiaries**:

    1.  Owns more than fifty percent (50%) of the voting stock and/or outstanding securities; or

    2.  Has the right to elect or appoint more than fifty percent (50%) of the voting directors, management committee members or members of the Board of Managers.

    A **Subsidiary** ceases to be a **Subsidiary** when the **Insured Organization** no longer owns more than fifty percent (50%) of the voting stock and/or outstanding securities, or no longer has the right to elect or appoint more than fifty percent (50%) of the voting directors, management committee members or members of the Board of Managers, or the means by which the **Insured Organization** is legally enabled to exercise fifty percent (50%) ownership or control is formally extinguished.

N.  **Wrongful Act** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

## SECTION IV. - EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

1. Alleging, arising out of, based upon or attributable to, directly or indirectly, the same or essentially the same facts underlying or alleged in any matter which, prior to the inception date of this policy, has been the subject of notice to any insurer of a **Claim**, or a potential or threatened **Claim**, or an occurrence or circumstance that might give rise to a **Claim** under any policy of which this insurance is a renewal or replacement or which it may succeed in time;

2. Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any nuclear reaction, nuclear radiation, or radioactive contamination, or any related act or incident;

3. Any **Telecommunications Claim**, as defined below.

   A **Telecommunications Claim** is any **Claim**:

   a. Arising from, based upon, attributable to, or in consequence of any proceeding against any **Insured** brought by the Federal Trade Commission or any other federal, state or local regulatory agency or other administrative body alleging the violation of any federal, state or local laws or regulation pertaining to unsolicited or non-consensual advertising, through faxes, telephone calls, texting or any other medium; and/or

   b. Arising from, based upon, attributable to, or in consequence of, any actual or alleged violation of:

      (1) The Fair Debt Collection Practices Act or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world;

      (2) The CAN-SPAM Act of 2003 or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world;

      (3) The Telephone Consumer Protection Act (TCPA) of 1991 or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world; or

      (4) Any other law, ordinance, regulation, statute or common law relating to any communication, distribution, publication, sending or transmission via telephone, telephone facsimile machine, computer or other telephonic or electronic devices.

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

## SECTION V. - CONDITIONS

### A. Duty to Defend

It shall be the right and duty of the **Insurer** to defend any **Claim** against any **Insured** for which coverage applies under this policy, and the **Insurer** shall have the right to appoint counsel of its choosing. No **Insured** may incur any **Defense Expenses**, admit liability for or settle any **Claim** or negotiate any settlement without the **Insurer's** prior written consent; such consent not to be unreasonably withheld. Any **Defense Expenses** incurred or settlements made without the prior written consent of the **Insurer** will not be covered under this policy. The **Insurer** shall have the right to appoint counsel, investigate and conduct negotiations and, with the consent of the **Insured**, to enter into the settlement of any **Claim** that the **Insurer** deems appropriate. If the **Insured** refuses to consent to a settlement acceptable to the claimant in accordance with the **Insurer's** recommendations, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed:

1. The amount for which the **Insurer** could have settled such **Claim** plus **Defense Expenses** incurred as of the date such settlement was proposed in writing by the **Insurer** ("Settlement Opportunity Amount"); plus

2. Seventy percent (70%) of covered **Loss** in excess of such Settlement Opportunity Amount subject to the policy's Limit of Liability.

In no event shall the **Insurer** be liable under this policy for more than the Limit of Liability shown in Item 4. of the Common Policy Declarations Page.

**B. Limit of Liability; Retention; Payment of Loss**

**1. Aggregate Limit of Liability**

Regardless of **Coverage Sections** purchased, as stated in Item 3. of the Common Policy Declarations Page, the amount shown in Item 4. of the Common Policy Declarations Page is the maximum aggregate limit that the **Insurer** will pay for all **Loss** under all **Coverage Sections** combined, arising out of any and all **Claims** first made against the **Insured** during the **Policy Period** and the Extended Reporting Period (if purchased) and reported in accordance with the terms and conditions of this policy.

The **Insurer** will have no obligation to pay **Loss** or to defend or continue to defend any **Claim** after the aggregate Limit of Liability, stated in Item 4. of the Common Policy Declarations Page, has been exhausted by payment of **Loss**.  **Defense Expenses** shall be part of and not in addition to the Limit of Liability and payment of **Defense Expenses** by the **Insurer** will reduce the Limit of Liability.

**2. Separate Limit of Liability**

Regardless of any Separate Limit(s) of Liability purchased, as stated in Item 3. of the Common Policy Declarations, the maximum limit of the **Insurer's** liability for all **Loss** for each applicable **Coverage Section** purchased shall not exceed the Separate Limit of Liability as stated in Item 2. of each applicable Declarations for each applicable **Coverage Section**.  Where two or more Separate Limits of Liability are or could be applicable to one **Claim** or series of interrelated **Claims** deemed to be a single **Claim** pursuant to Section V.B.4. below, the larger of the applicable Separate Limits of Liability shall apply, but in no event shall more than one Separate Limit of Liability apply to any **Claim** or series of interrelated **Claims** and in no event shall the Insurer be obligated to pay **Loss** or to defend or continue to defend any **Claim** after the Insurer has paid the applicable Separate Limit of Liability or the Aggregate Limit of Liability per Section V.B.1. of these Common Policy Terms and Conditions.

3.  As a condition precedent to coverage under this policy, the **Insured** shall pay with respect to each **Claim** the applicable Retention amount, as identified in Item 3. of the Declarations Page for each applicable **Coverage Section** or as otherwise identified.  The Retention amount shall be reduced solely by covered **Loss** and shall be applied to all **Loss**, including **Defense Expenses**, and the **Insurer** shall only be liable for the amount of **Loss** that is excess of the stated Retention amount.

4.  All **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events, or the same or related series of facts, circumstances, situations, transactions or events, shall be deemed to be a single **Claim** for all purposes under this policy, shall be subject to the Retention stated in Item 3. of the Declarations Page for each applicable **Coverage Section**, or other applicable Retention, and shall be deemed first made when the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

5.  In the event that a **Claim** implicates more than one Retention amount, then the largest of the applicable Retention amounts shall be applied, but in no event shall more than one Retention amount be applied to a **Claim**.

6.  Any Retention amount applicable to a **Claim** against an **Insured Person** shall apply where indemnification by the **Insured Organization** is permitted or required, regardless of whether the **Insured Organization** has agreed, failed or refused to indemnify such **Insured Person**, provided it shall not apply when indemnification cannot be made by the **Insured Organization** by reason of the **Insured Organization's** financial insolvency.

7.  The **Insurer's** duty to defend the **Insured** and pay **Defense Expenses** ends upon exhaustion of the Limit of Liability, which includes paying or tendering the Limit of Liability into court.

8.  Except for payment of **Defense Expenses**, the **Insurer** shall pay for **Loss** only upon final disposition of any **Claim**.

**C. Notice of Claim or Circumstance**

1.  If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Claim** is first made, it shall be a condition precedent to the **Insurer's** obligation to pay, that the **Insured** give written notice of such **Claim** to the **Insurer** as soon as practicable after such **Claim** is first made, but in no event shall such notice be given later than sixty (60) days after either the **Policy Period** expires or any earlier cancellation date of this policy.

2. If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Insured** first becomes aware of any facts or circumstances which may reasonably be expected to give rise to a **Claim** against any **Insured** for any **Claim** made against the **Insured** for any **Wrongful Act** occurring prior to the end of the **Policy Period**, and as soon as practicable thereafter, but before the expiration date or any earlier cancellation date of this policy, gives to the **Insurer** written notice, of such facts or circumstances along with the full particulars described below, then any **Claim** subsequently made against any **Insured** arising out of such facts or circumstances will be deemed first made during the **Policy Period**. The written notice shall include, at a minimum:

   a. The names or identity of the potential claimants and a detailed description of the specific alleged **Wrongful Act**; and

   b. The circumstances by which the **Insured** first became aware of the specific alleged **Wrongful Act**.

Further, if any **Claim** first made after the **Policy Period** expires is nonetheless deemed to be made during the **Policy Period** pursuant to Section V.B.4., then it is a condition precedent to coverage for such **Claim** that the **Insured** report it to the **Insurer** as soon as practicable.

**D. Cooperation**

In the event of a **Claim** or notice of circumstances under SECTION V. - CONDITIONS, C. Notice of Claim or Circumstance of this policy, the **Insured** will provide the **Insurer** with all information, assistance and cooperation that the **Insurer** reasonably requests, and will take no action, without the **Insurer's** prior written consent, that might prejudice the **Insured's** or the **Insurer's** position, potential or actual rights, or defense under this policy.

**E. Allocation**

If both **Loss** covered under this policy and loss not covered under this policy are jointly incurred either because a **Claim** includes both covered and non-covered matters or covered and non-covered causes of action or because a **Claim** is made against both an **Insured** and any other parties not insured by this policy, then the **Insured** and the **Insurer** shall use their best efforts to fairly and reasonably allocate payment under this policy between covered **Loss** and non-covered loss based on the relative legal exposures of the parties with respect to covered and non-covered matters or covered and non-covered causes of action.

If the **Insurer** and the **Insured** agree on an allocation of **Defense Expenses**, based on covered and non covered matters or persons, the **Insurer** shall advance **Defense Expenses** allocated to covered **Loss**. If there is no agreement on an allocation of **Defense Expenses**, the **Insurer** shall advance **Defense Expenses** that the **Insurer** believes to be covered under this policy until a different allocation is negotiated, arbitrated, or judicially determined.

Any negotiated, arbitrated or judicially determined allocation of **Defense Expenses** on account of a **Claim** shall be applied retroactively to all **Defense Expenses** on account of such **Claim**, notwithstanding any prior advancement to the contrary. Any advancement or allocation of **Defense Expenses** on account of a **Claim** shall not apply to or create any presumption with respect to the allocation of other loss on account of such **Claim**.

**F. Cancellation; Renewal Provision**

The **Insured Organization** may cancel this policy at any time by written notice or by surrender of this policy to the **Insurer** at its address shown on the Declarations Page.

This policy may only be cancelled by or on behalf of the **Insurer** in the event the **Insured Organization** fails to pay any premium when due. In the event of non-payment of premium by the **Insured Organization**, the **Insurer** may cancel this policy upon ten (10) days written notice. The **Insurer** will mail notice to the **Insured Organization's** address as shown in Item 1. of the Declarations Page. The mailing of such notice as aforesaid shall be sufficient proof of notice.

If the **Insured Organization** cancels this policy, the **Insurer** will retain the customary short rate proportion of the premium hereon.

The **Insurer** shall not be required to renew this policy upon its expiration. The offer by the **Insurer** of renewal terms, conditions, Limit of Liability and/or premiums varying from those of the expiring policy shall not constitute a refusal to renew.

If the **Insurer** decides not to renew this policy, the **Insurer** will mail or deliver to the **Insured Organization** written notice of non-renewal, stating the reasons for non-renewal, at least sixty (60) days prior to the expiration date of this policy.

Any notice of non-renewal will be mailed or delivered to the **Insured Organization's** last mailing address known to the **Insurer**. If notice is mailed, proof of mailing will be sufficient proof of notice.

**G. Merger, Consolidation or Acquisition**

1. If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets do not exceed twenty five percent (25%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place on or after the effective date of such creation or acquisition.

2. If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets exceed twenty five percent (25%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place within the first ninety (90) days after the date of such creation or acquisition. After this ninety (90) day period, the created or acquired **Subsidiary** shall no longer be deemed an **Insured Organization**, unless:

   a. Written notice of the **Subsidiary's** creation or acquisition has been provided to the **Insurer** by the **Insured Organization**, as soon as practicable, and in no event later than ninety (90) days after the date of the creation or acquisition;

   b. The **Insured Organization** has provided the **Insurer** with any additional information the **Insurer** may request;

   c. The **Insured Organization** has agreed to the terms, conditions, exclusions and additional premium charge as may be required by the **Insurer**; and

   d. The **Insurer**, at its sole discretion, has agreed in writing to extend the coverage of this policy to the created or acquired **Subsidiary**.

3. If during the **Policy Period**:

   a. The **Insured Organization** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

   b. Any person or entity or group of persons or entities acting in concert shall acquire an amount of more than fifty percent (50%) of the voting power for the election of directors of the **Insured Organization**;

   (either of the above events in 3. a. or b. are hereunder referred to as the "Transaction"),

   then this policy shall continue in full force and effect for any **Wrongful Act** occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the Transaction. This policy may not be cancelled after the effective time of the Transaction and the premium for this policy shall be deemed fully earned as of such time.

   The **Insured Organization** shall give the **Insurer** written notice of the Transaction as soon as practicable, but not later than thirty (30) days after the effective date of the Transaction.

**H. Representations**

The **Insured** represents that the information, particulars, documents, representations and statements contained in the **Application** are complete, true and accurate; are deemed incorporated into and constituting part of this policy; are material to the acceptance of the risk assumed by the **Insurer** under this policy. This policy is issued in reliance upon the truth of such representations. No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**. If any of the information, particulars, documents, representations and statements contained in the **Application** are untrue, this policy will be void with respect to any **Insured** who knew of such untruth.

**I. No Action Against Insurer**

No action may be taken against the **Insurer** unless, as a condition precedent thereto, there has been full compliance with all of the terms and conditions of this policy and until the amount of any **Insured's** obligation to pay **Loss** has been finally determined either by judgment against such **Insured** after adjudicatory proceedings, or by written agreement of the **Insured**, the claimant and the **Insurer**.

No **Insured** has any right under this policy to join the **Insurer** as a party to any **Claim** against an **Insured** to determine the liability of such **Insured**, nor shall the **Insurer** be impleaded by an **Insured** or his, her or its legal representative in any such **Claim**.

**J. Subrogation**

In the event the **Insurer** makes any payment under this Policy, the **Insurer** shall be subrogated to all of the rights of recovery of the **Insured**, who shall execute all papers and take all necessary actions to secure such rights, including the execution of any documents necessary to enable the **Insurer** to effectively bring suit in the name of an **Insured**.

**K. Authorization and Notices**

The **Insured Persons** agree that the **Insured Organization** shown in Item 1. of the Declarations Page acts on their behalf with respect to giving and receiving all notices and return of premium from the **Insurer**.

**L. Changes**

Notice to any agent or knowledge possessed by any agent or representations by persons acting on behalf of the **Insurer** do not effect a waiver or change in any part of this policy or estop the **Insurer** from asserting any right under the terms, conditions and limitations of this policy. The terms, conditions and limitations of this policy can only be waived or changed by written endorsement.

**M. Assignment**

Assignment of interest under this policy does not bind the **Insurer** without its prior written consent.

**N. Acceptance**

The **Insureds** agree that this policy, including the **Application** and any endorsements, constitutes the entire agreement between them and the **Insurer** relating to this insurance policy.

**O. Headings**

The description in the headings and sub-headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

**P. Governing Law Clause**

This policy shall, to the extent permitted by applicable law, be construed in accordance with the laws of the state or jurisdiction of incorporation or organization of the **Insured Organization** shown in Item 1. of the Declarations Page or, in the case of matters pertaining to a **Subsidiary**, the laws of the state or jurisdiction of incorporation or organization thereof.

**Q. Territory**

This policy shall apply to **Claims** made against any **Insured** anywhere in the world.

**R. Other Insurance**

Unless specifically stated otherwise, the insurance provided under this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written as specific excess insurance over the Aggregate Limit of Liability or Shared Limit of Liability provided by this policy. Any coverage otherwise available under any **Coverage Section** shall be specifically excess over any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary                                                                 President

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# ABSOLUTE EXCLUSION - SEXUAL ABUSE WITH ALLOCATION (EPL CLARIFICATION)

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section and the Employment Practices Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** in connection with that portion of any **Claim** (including but not limited to any derivative or representative class actions) made against any **Insured** alleging, arising out of, based upon or attributable to, or in any way involving, in whole or in part, any forcible physical or sexual assault, battery or molestation, including rape ("Matters Excluded"); provided that, regardless of any other terms or conditions in this Policy, including any endorsements, the covered and uncovered portions of **Loss** arising from any such **Claim** shall be allocated in accordance with this Policy's allocation provision.   It is understood and agreed that **Claims** including both **Employment Practices Wrongful Acts** and Matters Excluded shall be allocated **Claims** (partially covered) and that Matters Excluded go beyond, and are not considered to be **Employment Practices Wrongful Acts** or acts that trigger coverage under the Policy.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP687052     **Effective:** 5/16/2020

RSG 204192 0118

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# AMENDED NOTICE OF CLAIM OR CIRCUMSTANCE – SPECIFIC POSITION TRIGGER

This endorsement modifies insurance provided under the following:

### NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY
### PRIVATE COMPANY MANAGEMENT LIABILITY POLICY

SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

**C. Notice of Claim or Circumstance**

1. If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Claim** is first made, it shall be a condition precedent to the **Insurer's** obligation to pay, that the **Insured** give written notice of such **Claim** to the **Insurer** as soon as practicable after the **Insured's** <u>Chief Executive Officer, Chief Financial Officer, General Counsel, Risk Manager or Human Resources Director</u> first becomes aware of the **Claim**, but in no event shall such notice be given later than <u>sixty (60)</u> days after the expiration or earlier cancellation date of this Policy.

2. If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Insured** first becomes aware of any facts or circumstances which may reasonably be expected to give rise to a **Claim** against any **Insured** for any **Claim** made against the **Insured** for any **Wrongful Act** occurring prior to the end of the **Policy Period**, and as soon as practicable thereafter, but before the expiration date or any earlier cancellation date of this policy, gives to the **Insurer** written notice, of such facts or circumstances along with the full particulars described below, then any **Claim** subsequently made against any **Insured** arising out of such facts or circumstances will be deemed first made during the **Policy Period**.  The written notice shall include, at a minimum:

   a. The names or identity of the potential claimants and a detailed description of the specific alleged **Wrongful Act**; and

   b. The circumstances by which the **Insured** first became aware of the specific alleged **Wrongful Act**.

Further, if any **Claim** first made after the **Policy Period** expires is nonetheless deemed to be made during the **Policy Period** pursuant to Section V.B.4., then it is a condition precedent to coverage for such **Claim** that the **Insured** report it to the **Insurer** as soon as practicable.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP687052      **Effective:** 5/16/2020

RSG 204151 0118

RSUI INDEMNITY COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# BILATERAL EXTENDED REPORTING PERIOD

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION II. – COVERAGE EXTENSIONS, B. Extended Reporting Period of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

If the **Insurer** shall refuse to renew this policy or the **Insured Organization** shall cancel or refuse to renew this policy, the **Insured Organization** shall have the right, upon payment of <u>one hundred</u> percent (<u>100</u>%) of the Full Annual Premium, to a period of <u>one year</u> (<u>365</u>) days following the effective date of such cancellation or non-renewal (herein referred to as the "Extended Reporting Period") in which to give written notice to the **Insurer** of any **Claim** first made against the **Insured** during said <u>365</u> day period for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy.  As used herein, "Full Annual Premium" means the premium stated in Item 5. of the Common Policy Declarations Page and any additional premium(s) charged during the **Policy Period**.  The rights contained in this clause shall terminate unless  written notice of such election together with the additional premium due is received by the **Insurer** at the address shown on the Declarations Page within <u>thirty</u> (<u>30</u>) days of the effective date of cancellation or non-renewal.

The Extended Reporting Period is not cancelable and the additional premium charged shall be fully earned at the inception of the Extended Reporting Period.

The Limit of Liability available under the Extended Reporting Period is part of and not in addition to the Limit of Liability stated in Item 4. of the Declarations Page.

The rights contained in this clause shall not apply in the event of cancellation resulting from non-payment of premium.

All other terms and conditions of this policy remain unchanged.

**Policy No.:**  NPP687052      **Effective:**  5/16/2020

RSG 204080 0118

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – AMENDED BODILY INJURY AND PROPERTY DAMAGE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A.  SECTION IV. – EXCLUSIONS, 6. of the Directors and Officers Liability Coverage Section is deleted and replaced with the following:

6.  Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

B.  The first paragraph of SECTION IV. – EXCLUSIONS, 2. of the Employment Practices Liability Coverage Section is deleted and replaced with the following:

2.  Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly:

a.  Bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; provided, this EXCLUSION 2.a. will not apply to allegations of mental anguish or emotional distress made solely in connection with an **Employment Practices Claim** or a **Claim** for **Third Party Discrimination** and/or **Third Party Harassment**; or

b.  Damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP687052     **Effective:** 5/16/2020

RSG 206118 0119

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy. Please Read It Carefully.*

# EXCLUSION – BIOMETRIC PRIVACY CLAIMS

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section and Employment Practices Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** under this policy in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, any actual or alleged violation of **Biometric Privacy Information**.

For the purpose of this endorsement, **Biometric Privacy Information** is defined as the Biometric Information Privacy Act ("BIPA"), the California Consumer Privacy Act ("CCPA"), or any federal, state, municipal or local statutory biometric privacy law or any such similar law or statute anywhere in the world that governs or relates to the collection, use, safeguarding, handling, storage, retention or destruction of biometric identifiers, biometric data or biometric information of any kind, including but not limited to retina or iris scans, fingerprints, voiceprints or scans of hand or face geometry.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP687052    **Effective:** 5/16/2020

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – PRIOR ACTS

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Common Policy Terms and Conditions Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** that alleges, arises out of, is based upon or attributable to, directly or indirectly, in whole or in part, any actual or alleged **Wrongful Acts** which first occurred prior to May 1, 2018.

All other terms and conditions of this policy remain unchanged.

**Policy No.:**  NPP687052      **Effective:**  5/16/2020

RSG 206108 0118

RSUI INDEMNITY COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION - SPECIFIC ENTITIES AND INDIVIDUALS

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Common Policy Terms and Conditions Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** which is brought by or on behalf of the following entities or individuals:

Trevor Hein

including, but not limited to any **Claim** brought by any director, officer, heir, trustee or partner of the entity, or by any security holder thereof, whether such **Claim** is brought directly or derivatively.

All other terms and conditions of this policy remain unchanged.

**Policy No.:**  NPP687052     **Effective:**  5/16/2020

RSG 206114 0118

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – SPECIFIC LITIGATION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Common Policy Terms and Conditions Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon or attributable to, directly or indirectly, in whole or in part, the following litigation:

Tanya Freeman - Claim #258680

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP687052    **Effective:** 5/16/2020

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXTRADITION COVERAGE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A.  SECTION III. – DEFINITIONS, of the Common Policy Terms and Conditions Coverage Section is amended to include the following:

**Extradition** means any formal process by which an **Insured Person** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

B.  SECTION III. – DEFINITIONS, **B. Claim**, of the Common Policy Terms and Conditions Coverage Section is amended to include the following:

**Claim** also means any official request for **Extradition** of any **Insured Person**, return of an indictment (in the case of a criminal proceeding), or receipt or filing of a notice of charges.

C.  SECTION III. – DEFINITIONS, **D. Defense Expenses**, of the Common Policy Terms and Conditions Coverage Section is amended to include the following:

**Defense Expenses** also means reasonable and necessary fees, costs and expenses incurred through legal counsel and consented to by the **Insurer** resulting from an **Insured Person** lawfully:

a.  Opposing, challenging, resisting or defending against any request for or any effort to obtain the **Extradition** of that **Insured Person**; or

b.  Appealing any order or other grant of **Extradition** of that **Insured Person**.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP687052     **Effective:** 5/16/2020

RSG 204174 0118

# DIRECTORS AND OFFICERS LIABILITY
## COVERAGE SECTION (PRIVATE)
## PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning.  Refer to SECTION III. – DEFINITIONS in this Coverage Section or the Common Policy Terms and Conditions.

If purchased, as indicated in Item 3. of the Common Policy Declarations Page, and in consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:

## SECTION I. - INSURING AGREEMENTS

**Directors and Officers Liability**

**A.** With the **Insured Person**, that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of such **Insured Person** all **Loss** such **Insured Person** is legally obligated to pay, except and to the extent that the **Insured Organization** is required or permitted to indemnify such **Insured Person** for such **Loss.**

**B.** With the **Insured Organization,** that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** for which the **Insured Organization** is required or permitted to indemnify the **Insured Person**.

**C.** With the **Insured Organization,** that if a **Claim** for a **Wrongful Act** is first made against the **Insured Organization** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** the **Insured Organization** is legally obligated to pay.

Notwithstanding anything contained in this policy to the contrary, the coverage provided under SECTION I. INSURING AGREEMENTS A. and B. shall be non-rescindable by the **Insurer**.

## SECTION II. – COVERAGE EXTENSIONS

**A. Outside Board Extension**

This policy shall cover **Loss** arising from an **Insured Person** having served, at the direction of and with the consent of the **Insured Organization**, as Director, Officer, or Trustee for any eleemosynary corporation or other not for profit organization where such **Insured Person** is entitled to indemnification by the **Insured Organization**.

This COVERAGE EXTENSION shall be excess of any indemnification and/or insurance that may be permitted or provided by such eleemosynary corporation or organization, regardless of payment made by or on behalf of such eleemosynary corporation or organization, including but not limited to any other Director and Officer Liability Insurance or similar insurance provided for, to, or by any such eleemosynary corporation or organization.

**B. Additional Side-A Limit of Liability**

If a limit is shown in Item 2.B of the Directors and Officers Liability Declarations, then there shall be an addition to the maximum aggregate Limit of Liability available under this Directors and Officers Coverage Section.  This amount shall be in addition to the Limit of Liability as set forth in Item 2.A. of the Directors and Officers Liability Declarations Page and shall be available solely for **Loss** resulting from a **Claim** against any **Insured Persons** covered under SECTION I. INSURING AGREEMENT A. of this coverage section, and shall be subject to the following additional conditions:

(1) Any **Loss** resulting from a **Claim** against any **Insured Persons** covered under SECTION I. INSURING AGREEMENT A. of this Directors and Officers Coverage Section shall first be paid under the Limit of Liability as set forth in Item 2.A. of the Directors and Officers Liability Declarations Page, and such Limit of Liability must be completely exhausted by payment of **Loss** under SECTION I. INSURING

AGREEMENTS A., B., and/or C. of this Directors and Officers Coverage Section before **Loss** shall be paid under the additional Limit of Liability dedicated for **Insured Persons:** and

(2) The additional Limit of Liability dedicated for **Insured Persons** shall be excess of any insurance available that is specifically excess of this policy and such excess insurance must be completely exhausted by payment of **Loss** thereunder before the **Insurer** shall have any obligation to make any payment on account of the additional Limit of Liability dedicated for **Insured Persons**.

**C. Investigation Costs Sublimit of Liability**

The **Insurer's** maximum aggregate Limit of Liability for all **Loss** under this policy for all **Investigative Costs** shall be the Investigative Costs Sublimit of Liability as indicated in Item 2.C. of the Directors and Officers Liability Declarations Page. This sublimit shall be part of and not in addition to the amount set forth in Item 2.A. of the Directors and Officers Liability Declarations Page.

This policy shall cover **Loss** arising from all **Investigative Costs** which the **Insured Organization** shall become legally obligated to pay as a result of a **Shareholder Derivative Demand** first made during the **Policy Period** or Discovery Period, if applicable, against the **Insured Organization** for a **Wrongful Act** of an **Insured Person**.

**SECTION III. - DEFINITIONS**

**A. Claim**, either in the singular or the plural, means:

**1.** A written demand for monetary or non-monetary relief;

**2.** A civil, criminal, administrative, regulatory or arbitration proceeding, or arbitration demand for monetary or non-monetary relief which is commenced by:

    **a.** Receipt or service of a complaint or similar pleading;

    **b.** Return of an indictment or filing of information; or

    **c.** Receipt of a notice of charges;

**3.** A written request to an **Insured** to toll or waive a statute of limitations regarding a potential **Claim**, commenced by the receipt of such request by the **Insured**;

**4.** A civil, criminal, administrative or regulatory investigation of an **Insured Person** by the Securities Exchange Commission ("SEC") or similar state or foreign government authority, after the **Insured Person** is identified in a written "Wells" or other notice from the SEC or a similar state or foreign government authority that describes actual or alleged violations of laws by such **Insured Person**;

**B. Employee** means any past, present or future employee of the **Insured Organization**, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any full-time, part-time, seasonal and temporary employee of the **Insured Organization**. An individual who is leased or contracted to the **Insured Organization** shall also be an **Employee**, but only if the **Insured Organization** provides indemnification to such leased or contracted individual in the same manner as is provided to the **Insured Organization's** employees.

**C. Insured** means any **Insured Organization** and/or any **Insured Person**.

**D. Insured Person** means:

**1.** Any past, present or future director, officer, or **Employee**, management committee members or members of the Board of Managers of the **Insured Organization**; or

**2.** In the event the **Insured Organization** or a **Subsidiary** thereof operates outside the United States, then the term **Insured Person** also means those titles, positions or capacities for such foreign **Insured Organization** or **Subsidiary** that are equivalent to the positions of directors or officers in the United States.

**E. Investigative Costs** means reasonable costs, charges, fees (including attorneys' and experts' fees) and expenses incurred by the **Insured Organization**, its board of directors or any committee thereof in connection with the investigation or evaluation of any **Shareholder Derivative Demand**; provided, however, that **Investigative Costs** shall not include salaries, wages, benefits, expenses or fees of any director, officer or **Employee** of the **Insured Organization**.

**F. Loss** means damages, settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**. **Loss** (other than **Defense Expenses**) shall not include:

1. Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

2. Amounts owed under any contract, partnership, stock or other ownership agreement, or any other type of contract;

3. Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

4. The cost of creating or reinstating employment;

5. Any amounts owed to any **Employee** as wages, compensation, severance or benefits previously incurred or vested without regard to any **Claim**;

6. Civil or criminal fines or penalties;

7. Taxes, whether owed to or by any **Insured**;

8. Amounts, including **Defense Expenses**, arising out of, based upon or attributable to actual or alleged liability or costs incurred by any **Insured** to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person;

9. Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable.  For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

G. **Shareholder Derivative Demand** means any written demand by one or more shareholders of the **Insured Organization** made upon the board of directors of the **Insured Organization** to bring a proceeding in a court of law against any **Insured Person** for a **Wrongful Act**.

H. **Wrongful Act** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by:

1. An **Insured Person** acting in his or her capacity as such and on behalf of the **Insured Organization** or any matter claimed against them solely by reason of their status as an **Insured Person**; or

2. The **Insured Organization**.

## SECTION IV. - EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

1. Based upon, arising out of or attributable to any remuneration received by an **Insured**, or the granting of any remuneration to any **Insured**, without the previous approval of the stockholders or the Board of Directors, which remuneration is found to have been illegal; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** received remuneration to which such **Insured** was not legally entitled;

2. Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any criminal or deliberate fraudulent act; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** committed such criminal or fraudulent act;

3. Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the gaining of any profit or advantage to which an **Insured** was not legally entitled; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** gained profit or advantage to which such **Insured** was not legally entitled;

4. Alleging, arising out of, based upon or attributable to, in whole or part, any litigation involving any **Insured** that was commenced or initiated prior to, or was pending on or before the date referenced in Item 4. of the Directors and Officers Liability Declarations Page, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation;

5. Alleging, arising out of, based upon or attributable to any workers' compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law;

6.  For actual or alleged bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

7.  Alleging, arising out of, based upon or attributable to, in whole or in part, the performance or rendering of or failure to perform professional services, where such services are undertaken for others for a fee;

8.  For violation of any of the responsibilities, obligations or duties imposed by: The Fair Labor Standards Act (except the Equal Pay Act) or any state or local statutory or common law, regulation or ordinance that governs payment or administration of wages, hours worked, or employee entitlements; the Employee Retirement Income Security Act of 1974; the National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; the Consolidated Omnibus Budget Reconciliation Act; the Occupational Safety and Health Act; any rules or regulations of any of the foregoing promulgated thereunder and amendments thereto; or any similar provisions of any federal, state or local statutory or common law that govern the same subject matter governed by the laws referenced in this section even if particular laws have some additional or different provisions; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

9.  Brought by or on behalf of any **Insured**, or which is brought by any security holder of the **Insured Organization**, whether directly or derivatively, unless such **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **Insured**.  Provided, however, this EXCLUSION shall not apply to:

    a.  Any **Claim** brought by an **Insured Person**, where such **Claim** is in the form of a cross-claim or a third-party claim for contribution or indemnity, which is part of and results directly from a **Claim** that is not otherwise excluded by the terms of this policy;

    b.  Any **Claim** brought by the examiner, trustee, receiver, liquidator or rehabilitator (or any assignee thereof) of such **Insured Organization**, in or after any bankruptcy proceeding by or against an **Insured Organization**;

    c.  Any **Claim** brought by any past director, officer, trustee, manager or equivalent executives of the **Insured Organization** who have not served as a director, officer, trustee, manager or equivalent executive for at least three (3) years prior to the date such **Claim** is first made, but only if the **Claim** is brought and maintained totally independent of and without the solicitation, assistance, active participation or intervention of the **Insured Organization** or any **Insured Person** not described in this paragraph 9.c;

    d.  Any **Claim** brought by an **Employee** of the **Insured Organization** who is not or was not a director or officer of the **Insured Organization** and where such **Claim** is brought by such **Employee** only in their capacity as a stockholder and independently of assistance from **Insureds**, except those expressly as noted in section 9.c., above; or

    e.  Any instigation of or involvement in any **Claim**, or solicitation, assistance, active participation or intervention by any **Insured** whistleblower under Section 806 of the Sarbanes-Oxley Act of 2002 or any rule or regulation promulgated thereunder, or under any similar whistleblower statute, rule or regulation under any other federal or state law.

    Provided further, however, that in the event that an **Insured Person** brings a cross-claim or third-party claim, as described in 9.a. above, against another **Insured Person**, then solely with respect to the **Loss** derived from a cross-claim or third-party claim, the **Insurer** shall be liable solely for **Defense Expenses**;

10. For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization**;

    Pollutant includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, whether live or inanimate, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

11. Alleging, arising out of, based upon or attributable to any initial public offering of securities by the **Insured Organization** or alleging the purchase or sale of such securities subsequent to such offering;

12. With respect to INSURING AGREEMENT C. of this policy, only:

    a.  For actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, secret or any other intellectual property rights;

**b.** For actual or alleged violation of any law, whether statutory, regulatory or common law, with respect to any of the following activities: anti-trust, business competition, unfair trade practices or tortuous interference in another's business or contractual relationships; or

**c.** Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement.

**13.** Alleging, arising out of, based upon or attributable to, in whole or in part, any **Employment Practices Wrongful Act**.

**14.** Alleging, arising out of, based upon or attributable to, in whole or in part, any **Fiduciary Wrongful Act**.

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

## SECTION V. - CONDITIONS

### A. Bankruptcy and Priority of Payments

The bankruptcy or insolvency of the **Insured Organization** or any **Subsidiary** shall not relieve the **Insurer** of any of its obligations hereunder.  The coverage provided by this policy, however, is intended primarily to protect and benefit the **Insured Persons**.

With respect to the payment of the policy proceeds, it is agreed that covered **Loss** due under this policy shall be paid by the **Insurer** in the following order of priority:

**1.** First pay such **Loss** for which coverage is provided under INSURING AGREEMENT A. of this policy;

**2.** With respect to any remaining amount of the Limit of Liability still available after payment of such **Loss**, pay **Loss** for which coverage is provided under INSURING AGREEMENT B. of this policy; and

**3.** With respect to any remaining amount of the Limit of Liability still available after payment of such **Loss**, pay **Loss** for which coverage is provided under INSURING AGREEMENT C. of this policy.

The **Insured Organization** or its representatives and the **Insurer** shall use their best efforts to agree upon the priority of payment of all **Loss** under this policy.  If no agreement is reached regarding the priority of payments, then the **Insurer** and **Insured Organization** will submit the issue of such priority, and only that issue, to binding arbitration.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary                                            President

*This Endorsement Changes The Policy. Please Read It Carefully.*

# ABSOLUTE CONTRACTUAL EXCLUSION

This endorsement modifies insurance provided under the following:

**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A.  Section IV. EXCLUSIONS, 12. of the Directors and Officers Liability Coverage Section is deleted and replaced by the following:

12.  With respect to INSURING AGREEMENT C. of this policy, only:

    a.  For actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, secret or any other intellectual property rights; or

    b.  For actual or alleged violation of any law, whether statutory, regulatory or common law, with respect to any of the following activities: anti-trust, business competition, unfair trade practices or tortuous interference in another's business or contractual relationships.

B.  The following is added to Section IV. EXCLUSIONS of the Directors and Officers Liability Coverage Section:

Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement.

All other terms and conditions of this policy remain unchanged.

**Policy No.:**  NPP687052      **Effective:**  5/16/2020

RSG 244018 0118

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – BROADCASTING, ADVERTISING AND PUBLISHING LIABILITY

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon or attributable to, directly or indirectly or in any way involving:

a.  Publishing or re-publishing;

b.  Advertising;

c.  Broadcasting or re-broadcasting;

d.  Telecasting or re-telecasting;

e.  Any actual or alleged piracy;

f.  Any actual or alleged idea misappropriation under implied contract;

g.  Any actual or alleged libel, slander, or other defamation or invasion of privacy in connection with any advertisement, publicity, article, broadcast or telecast;

h.  Any actual or alleged plagiarism, infringement of patent, copyright, trademark, title or slogan; or

i.  Any actual or alleged false arrest, false imprisonment, wrongful entry or eviction or other wrongful invasion of the right to private occupancy, wrongful detention, malicious prosecution, humiliation, defamation of character or invasion of rights of privacy.

All other terms and conditions of this policy remain unchanged.

**Policy No.:**  NPP687052      **Effective:**  5/16/2020

RSG 206105 0118

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – PROFESSIONAL ERRORS AND OMISSIONS (WITH MANAGEMENT CARVE BACK)

This endorsement modifies insurance provided under the following:

**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION IV. – EXCLUSIONS, 7. of the Directors and Officers Liability Coverage Section is deleted and replaced with the following:

7.  Alleging, arising out of, based upon or attributable to, in whole or in part, the performance or rendering of or failure to perform professional services, where such services are undertaken for others for a fee;

Provided, however, this EXCLUSION shall not be applicable to any derivative or shareholder class action claims against any **Insured**, which allege a failure to supervise those who performed or failed to perform such professional services in question.

All other terms and conditions of this policy remain unchanged.

**Policy No.:**  NPP687052      **Effective:**  5/16/2020

RSG 246013 0118

# EMPLOYMENT PRACTICES LIABILITY
# COVERAGE SECTION (PRIVATE)
# PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning.  Refer to SECTION III. – DEFINITIONS in this Coverage Section or the Common Policy Terms and Conditions.

If purchased, as indicated in Item 3. of the Common Policy Declarations Page, and in consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:

## SECTION I. - INSURING AGREEMENTS

**A. Employment Practices Liability**

The **Insurer** shall pay **Loss** up to the Limit of Liability applicable to this **Coverage Section** on behalf of the **Insured** in connection with any **Employment Practices Claim** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy**.**

**B. Third Party Liability Coverage**

The **Insurer** shall pay for **Loss** up to the Limit of Liability applicable to this **Coverage Section** arising out of or in connection with any **Claim** for **Third Party Discrimination** and/or **Third Party Harassment** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy.

## SECTION II. – COVERAGE EXTENSIONS

**Workplace Violence Expenses Sublimit**

If a sublimit is shown in Item 2.B. of the Employment Practices Liability Declarations Page, the **Insurer** shall provide coverage for **Workplace Violence Expense** the **Insured Organization** incurs resulting directly from any **Workplace Violence**.  This sublimit shall be part of and not in addition to the Limit of Liability set forth in Item 2.A. of the Employment Practices Liability Declarations Page.

No Retention shall apply to the **Workplace Violence Expense** Coverage.

## SECTION III. - DEFINITIONS

**A. Claim**, for purposes of this **Coverage Section** shall be an **Employment Practices Claim**, which means:

A written demand for monetary or non-monetary relief solely where alleging an **Employment Practices Wrongful Act**, including:

1. A civil, criminal, administrative, regulatory or arbitration proceeding or arbitration demand for monetary or non-monetary relief which is commenced by:

   **a.** Receipt or service of a complaint or similar pleading;

   **b.** Return of an indictment or filing of information; or

   **c.** Receipt of a notice of charges;

2. A written request to an **Insured** to toll or waive a statute of limitations regarding a potential **Claim**, commenced by the receipt of such request by the **Insured**;

3. An administrative or regulatory investigation when conducted by the Equal Employment Opportunity Commission ("EEOC") or equivalent state, local or foreign agency, which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the **Insured**.

Provided, such **Employment Practices Claim** shall not include any internal or external labor or grievance proceeding which is pursuant to a collective bargaining agreement.

**B. Employee** means any past, present or future employee of the **Insured Organization**, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any full-time, part-time, seasonal and temporary employee of the **Insured Organization**.  An individual who is leased or

contracted to the **Insured Organization** shall also be an **Employee**, but only if the **Insured Organization** provides indemnification to such leased or contracted individual in the same manner as is provided to the **Insured Organization's** employees.

C. **Employment Practices Claim** means any **Claim** for an **Employment Practices Wrongful Act**.

D. **Employment Practices Wrongful Act** means any actual or alleged:

1. Wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied employment contract;

2. Employment related harassment (including but not limited to sexual harassment);

3. Employment related discrimination (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability);

4. Employment-related retaliation;

5. Employment-related misrepresentation to an **Employee** or applicant for employment with the **Insured Organization**;

6. Employment-related libel, slander, humiliation, defamation and/or invasion of privacy;

7. Wrongful failure to employ or promote;

8. Wrongful deprivation of career opportunity, wrongful demotion or negligent **Employee** evaluation, including the giving of defamatory statements in connection with an **Employee** reference;

9. Employment related wrongful discipline;

10. Failure to grant tenure or practice privileges;

11. Failure to provide or enforce adequate or consistent organization policies or procedures relating to employment performance;

12. Violations of the following federal laws (as amended) including all regulations promulgated thereunder:

    a. Family and Medical Leave Act of 1993;

    b. Americans with Disabilities Act of 1992 (ADA);

    c. Civil Rights Act of 1991;

    d. Age Discrimination in Employment Act of 1967 (ADEA), including the Older Workers Benefit Protection Act of 1990; or

    e. Title VII of the Civil Rights Law of 1964 (as amended) and 42 U.S.C. Section 1983, as well as the Pregnancy Discrimination Act of 1978;

13. Violation of an **Insured Person's** civil rights relating to any of the above; or

14. Negligent hiring, retention, training or supervision, infliction of emotional distress, or violation of an individual's civil rights, when alleged in conjunction with any of the foregoing items 1. through 13.,

whether such **Employment Practices Wrongful Act** as described in 1-14 above is committed directly, indirectly, intentionally or unintentionally, but only if the **Employment Practices Wrongful Act** actually or allegedly pertains to acts committed by an **Insured** and are alleged against an **Insured** by an **Insured Person** or applicant for employment with the **Insured Organization**.

E. **Insured** means any **Insured Organization** and/or any **Insured Person**.

F. **Insured Person** means:

1. Any past, present or future director, officer, or **Employee**, management committee members or members of the Board of Managers of the **Insured Organization**; or

2. In the event the **Insured Organization** or a **Subsidiary** thereof operates outside the United States, then the term **Insured Person** also means those titles, positions or capacities for such foreign **Insured Organization** or **Subsidiary** that are equivalent to the positions of directors or officers in the United States.

**G. Loss** means damages (including back pay and front pay), settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**. **Loss** (other than **Defense Expenses**) shall not include:

**1.** Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

**2.** Amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

**3.** Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

**4.** The cost of creating or reinstating employment;

**5.** Any amounts owed to any **Employee** as wages or compensation previously incurred or vested without regard to any **Claim**;

**6.** Civil or criminal fines or penalties;

**7.** Taxes, whether owed to or by any **Insured**;

**8.** Amounts, including **Defense Expenses**, arising out of, based upon or attributable to actual or alleged liability or costs incurred by any **Insured** to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person, or any actual or alleged liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar relating to an **Employment Practices Claim**;

**9.** Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable. For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

**H. Premises** means the buildings, facilities or properties occupied by the **Insured Organization** in conducting its business.

**I. Third Party** means any person(s) with whom an **Insured** interacts.

**J. Third Party Discrimination** means any discrimination by an **Insured** in his or her capacity as such against a **Third Party** based on such **Third Party's** race, color, creed, religion, age, gender, national origin, sexual orientation or preference, disability, pregnancy or other protected status that is protected pursuant to any applicable federal, state or local statute or ordinance.

**K. Third Party Harassment** means any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment that is by an **Insured** to a **Third Party**.

**L. Workplace Violence** means any intentional and unlawful act:

**1.** of deadly force involving the use of lethal weapon; or

**2.** the threat of deadly force involving the display of a lethal weapon,

which occurs on or in the **Premises** and which did or could result in bodily injury or death to an **Insured Person**.

**M. Workplace Violence Expense** means the reasonable fees and expenses, or cost of:

**1.** an independent security consultant for ninety (90) days following the date **Workplace Violence** occurs;

**2.** an independent public relations consultant for ninety (90) days following the date **Workplace Violence** occurs;

**3.** a counseling seminar for all **Employees** conducted by an independent consultant following **Workplace Violence**;

**4.** independent security guard services for up to fifteen (15) days; and

**5.** an independent forensic analyst.

**SECTION IV. - EXCLUSIONS**

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

1.  Alleging, arising out of, based upon or attributable to, in whole or in part, any litigation involving any **Insured** that was commenced or initiated prior to, or was pending on or before the date referenced in Item 4. of the Employment Practices Liability Declarations Page, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation;

2.  For actual or alleged bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged; provided, this EXCLUSION shall not apply to allegations of mental anguish or emotional distress made solely in connection with an **Employment Practices Claim**;

    The **Insurer** shall not be liable to make any payment, and shall have no duty to defend or pay **Loss** of any sort, in connection with any **Workplace Violence**:

    a.  which occurs at any location other than the **Insured Organization's Premises**;

    b.  arising from declared or undeclared war, civil war, insurrection, riot, civil commotion, rebellion or revolution, military, naval or usurped power, governmental intervention, expropriation or nationalization;

    c.  that reflects legal costs, judgments and settlements incurred as the result of any **Claim**, suit or judicial action brought against an **Insured Organization** in connection with **Workplace Violence**; or

    d.  resulting from the use or threat of force or violence occurring on the **Premises** for the purpose of demanding money, securities or property.

3.  For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization**;

    Pollutant includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, whether live or inanimate, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

4.  For violation of any of the responsibilities, obligations or duties imposed by: The Fair Labor Standards Act (except the Equal Pay Act) or any state or local statutory or common law, regulation or ordinance that governs payment or administration of wages, hours worked, or employee entitlements; the Employee Retirement Income Security Act of 1974; the National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; the Consolidated Omnibus Budget Reconciliation Act; the Occupational Safety and Health Act; any rules or regulations of any of the foregoing promulgated thereunder and amendments thereto; or any similar provisions of any federal, state or local statutory or common law that govern the same subject matter governed by the laws referenced in this section even if particular laws have some additional or different provisions; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

5.  Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement; provided this EXCLUSION shall not apply to **Defense Expenses** in connection with an **Employment Practices Claim**;

6.  Alleging, arising out of, based upon or attributable to any workers' compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

7.  Alleging, arising out of, based upon, directly or indirectly resulting from or in consequence of, or in any way involving any criminal or deliberate fraudulent act; provided this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such Insured committed such criminal or fraudulent act.

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary                                                                 President

# EXHIBIT 2



**Corporate Office**
945 East Paces Ferry Rd.
Atlanta, GA  30326-1160

# PRIVATE COMPANY
# MANAGEMENT LIABILITY POLICY

**NOTICE:**   THIS IS A CLAIMS MADE AND REPORTED POLICY THAT APPLIES ONLY TO THOSE **CLAIMS** FIRST MADE AGAINST THE **INSURED** DURING THE **POLICY PERIOD** THAT ARE REPORTED TO THE **INSURER** DURING THE **POLICY PERIOD**, OR EXTENDED REPORTING PERIOD (IF APPLICABLE) AND REPORTED IN ACCORDANCE WITH THIS POLICY'S REPORTING PROVISIONS.  THE LIMIT OF LIABILITY AVAILABLE TO PAY **LOSS** SHALL BE REDUCED OR TOTALLY EXHAUSTED BY PAYMENT OF **DEFENSE EXPENSES**.

### PLEASE READ YOUR POLICY CAREFULLY

# CLAIM NOTICE

| | |
|---|---|
| **Mail notices to:** | **RSUI Group, Inc.** |
| | **945 East Paces Ferry Rd.** |
| | **Suite 1800** |
| | **Atlanta, GA 30326-1160** |
| **Fax notices to:** | **(404) 231-3755** |
| | **Attn: Claims Department** |
| **E-mail notices to:** | **reportclaims@rsui.com** |
| **RSUI's Panel Counsel Finder:** | **Panel Counsel Link** |

*A member of Alleghany Insurance Holdings LLC*

# PRIVATE COMPANY COMMON POLICY DECLARATIONS

**RSUI**

Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER | RENEWAL OF |
|---|---|---|
| N | PP693379 | NPP687052 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:    RSUI Indemnity Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED ORGANIZATION'S NAME AND MAILING ADDRESS          PRODUCER'S NAME AND ADDRESS

REED HEIN & ASSOCIATES, LLC
220 120TH AVENUE NE
BUILDING D
BELLEVUE, WA 98005

IN CONSIDERATION OF THE PAYMENT OF THE PREMIUM, IN RELIANCE UPON THE STATEMENTS HEREIN OR ATTACHED HERETO, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, THE INSURER AGREES TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**ITEM 2. POLICY PERIOD:**

FROM _____5/16/2021_____  TO  _____5/16/2022_____  12:01 AM Standard Time at the Insured's address as stated herein

**ITEM 3. COVERAGE SECTIONS APPLICABLE TO POLICY:**

|  | **Purchased** | **Shared Limit** | **Separate Limit** |
|---|---|---|---|
| A.  Directors and Officers Liability Insurance | ☒ Yes ☐ No | ☐ | ☒ |
| B.  Employment Practices Liability Insurance | ☒ Yes ☐ No | ☐ | ☒ |
| 1)  Third Party Liability Coverage | ☒ Yes ☐ No | | |
| C.  Fiduciary Liability Insurance | ☐ Yes ☒ No | ☐ | ☐ |

**ITEM 4. LIMIT OF LIABILITY:**

$ ___4,000,000___          Aggregate Limit of Liability for All **Coverage Sections**

**ITEM 5. PREMIUM:**

$ ___49,810.00___          Total Policy Premium for All Coverage Sections

**ITEM 6. POLICY FORM AND ENDORSEMENTS MADE A PART OF THIS POLICY AT THE TIME OF ISSUE:**
SEE SCHEDULE OF ENDORSEMENTS – RSG 240041 0118

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____     _____May 17, 2021_____     _____
                                                                    DATE                        AUTHORIZED REPRESENTATIVE

A member of Alleghany Insurance Holdings LLC

# PRIVATE COMPANY DIRECTORS AND OFFICERS LIABILITY DECLARATIONS

**RSUI**

Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER |
|---|---|
| N | PP693379 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   RSUI Indemnity Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED ORGANIZATION'S NAME

REED HEIN & ASSOCIATES, LLC

## ITEM 2. LIMIT OF LIABILITY:

| | | |
|---|---|---|
| A.  Directors and Officers Limit of Liability | $ | 2,000,000 |
| B.  Additional Side-A Limit of Liability | $ | 500,000 |
| C.  Investigative Costs Sublimit of Liability | $ | 150,000 |

## ITEM 3. RETENTION:

A. Directors and Officers Liability Retentions

| | | |
|---|---|---|
| 1)  Insuring Agreement A | $ | 0 |
| 2)  Insuring Agreement B | $ | 50,000 |
| 3)  Insuring Agreement C | $ | 50,000 |

## ITEM 4. PRIOR AND/OR PENDING LITIGATION DATE:

Directors and Officers Prior and/or Pending Litigation Date:   05/01/2018

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____    _____    _____
                                                                    May 17, 2021                    AUTHORIZED REPRESENTATIVE
                                                                    DATE

# PRIVATE COMPANY EMPLOYMENT PRACTICES LIABILITY DECLARATIONS

**RSUI**

Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER |
|---|---|
| N | PP693379 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   RSUI Indemnity Company (hereinafter referred to as the Insurer)

**ITEM 1.**  INSURED ORGANIZATION'S NAME

REED HEIN & ASSOCIATES, LLC

**ITEM 2. LIMIT OF LIABILITY:**

    A.  Employment Practices Limit of Liability      $ 2,000,000

        (Including Third Party Liability, if purchased)

    B.  Workplace Violence Expenses Sublimit      $ 100,000

**ITEM 3. RETENTION:**

    A.  Employment Practices Liability Retentions

        1)  Employment Practices Liability      $ 100,000

        2)  Third Party Liability Coverage      $ 100,000

**ITEM 4. PRIOR AND/OR PENDING LITIGATION DATE:**

    Employment Practices Prior and/or Pending Litigation Date:      05/01/2018

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____     May 17, 2021    _Kym Hadzek_

                                           DATE            AUTHORIZED REPRESENTATIVE

# PRIVATE COMPANY MANAGEMENT LIABILITY POLICY
# SUPPLEMENTAL DECLARATIONS

*RSUI*

POLICY NUMBER:    NPP693379

## SCHEDULE OF FORMS AND ENDORSEMENTS

| TITLE | FORM NUMBER |
|---|---|
| Washington Changes | RSG 203036 0118 |
| Washington Changes-Subrogation | RSG 202038 0118 |
| Disclosure Pursuant to Terrorism Risk Insurance Act | RSG 204123 0121 |
| Cap on Losses From Certified Acts of Terrorism | RSG 204198 0118 |
| **FORMS APPLICABLE TO MULTIPLE COVERAGE PARTS** | |
| Common Policy Terms and Conditions Coverage Section-Private Company | RSG 241001 0121 |
| Absolute Exclusion-Sexual Abuse with Allocation (EPL Clarification) | RSG 204192 0118 |
| Amended Notice of Claim or Circumstance-Specific Position Trigger | RSG 204151 0118 |
| Bilateral Extended Reporting Period | RSG 204080 0118 |
| Exclusion-Amended Bodily Injury and Property Damage | RSG 206118 0119 |
| Exclusion-Biometric Privacy Claims | RSG 206125 0120 |
| Exclusion-Prior Acts | RSG 206108 0118 |
| Exclusion-Specific Entities and Individuals | RSG 206114 0118 |
| Exclusion-Specific Litigation | RSG 206115 0118 |
| Extradition Coverage | RSG 204174 0118 |
| **FORMS APPLICABLE TO DIRECTORS & OFFICERS LIABILITY** | |
| Directors and Officers Liability Coverage Section-Private Company | RSG 241007 0121 |
| Absolute Contractual Exclusion | RSG 244018 0420 |
| Exclusion-Broadcasting, Advertising and Publishing | RSG 206105 0118 |
| Exclusion-Professional Errors and Omissions with Management Carve Back | RSG 246013 0118 |
| **FORMS APPLICABLE TO EMPLOYMENT PRACTICES LIABILITY** | |
| Employment Practices Liability Coverage Section-Private Company | RSG 241008 0118 |
| Sublimit-Defense Expenses-Wage and Hour Claims | RSG 204153 0118 |

RSG 240041 0118

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# WASHINGTON CHANGES

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A.   SECTION V. – CONDITIONS, F. Cancellation; Renewal Provision of the Common Policy Terms and Conditions Coverage Section is deleted in its entirety and replaced with the following:

**F.   Cancellation; Renewal Provision**

The **Insured Organization** shown in the Declarations may cancel this policy at any time by notifying the **Insurer** or the insurance producer in one of the following ways:

1.   Written notice by mail, fax or e-mail;

2.   Surrender of the policy or binder; or

3.   Verbal notice.

Upon receipt of such notice, the **Insurer** will cancel this policy or any binder issued as evidence of coverage, effective on the later of the following:

1.   The date on which notice is received or the policy or binder is surrendered; or

2.   The date of cancellation requested by the first **Insured Organization**.

This policy may only be cancelled by the **Insurer** in the event the **Insured Organization** fails to pay any premium when due.  In the event of non-payment of premium by the **Insured Organization**, the **Insurer** may cancel this policy upon ten (10) days written notice.  The **Insurer** will mail notice to the **Insured Organization's** address as shown in Item 1. of the Declarations Page and the **Insured Organization's** agent or broker.  The mailing of such notice as aforesaid shall be sufficient proof of notice.

The **Insurer** will give notice of cancellation to any other person shown in the policy to have an interest in any **Loss** which may occur thereunder.

If this policy is cancelled, the **Insurer** will send the **Insured Organization** any premium refund due.  If the **Insurer** cancels, the refund will be pro rata.  If the **Insured Organization** cancels, the refund will be at least 90% of the pro rata refund.  The cancellation will be effective even if the **Insurer** has not made or offered a refund.

The **Insurer** shall not be required to renew this policy upon its expiration.  The offer by the **Insurer** of renewal terms, conditions, Limit of Liability and/or premiums varying from those of the expiring policy shall not constitute a refusal to renew.

**Nonrenewal**

The **Insurer** may elect not to renew this policy by mailing or delivering written notice of nonrenewal, stating the reasons for nonrenewal, to the **Insured Persons** and the **Insured Organization** and the **Insured Organization's** agent or broker, at their last mailing addresses known to the **Insurer**.  The **Insurer** will mail or deliver these notices at least forty-five (45) days before the:

1.   Expiration of this policy; or

2.   Anniversary date of this policy if this policy has been written for a term of more than one year.

Otherwise, the **Insurer** will renew this policy unless:

**Policy No.:**  NPP693379      **Effective:**  5/16/2021

1. The **Insured Organization** fails to pay the renewal premium after the **Insurer** has expressed willingness to renew, including a statement of the renewal premium, to the **Insured Organization** and the **Insured Organization's** insurance agent or broker, at least twenty (20) days before the expiration date; or

2. Other coverage acceptable to the **Insured Organization** has been procured prior to the expiration date of this policy.

**Premiums**

The **Insured Organization** shown in the Declarations Page is responsible for the payment of all premiums; and will be the payee for any return premiums the **Insurer** pays.

B. The following is added to SECTION V. – CONDITIONS, of the Common Policy Terms and Conditions Coverage Section:

**Transfer of The Insured's Rights and Duties Under This Policy**

The **Insured's** rights and duties under this policy may not be transferred without the **Insurer's** written consent except in the case of death of an individual named **Insured**.

If the **Insured** dies, the rights and duties will be transferred to their legal representative but only while acting within the scope of duties as their legal representative. Until the **Insured's** legal representative is appointed, anyone having proper temporary custody of the **Insured's** property will have the **Insured's** rights and duties but only with respect to that property.

C. Section V. – Conditions K. Authorization and Notices of the Common Policy Terms and Conditions Coverage Section is deleted in its entirety.

All other terms and conditions of this policy remain unchanged.

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# WASHINGTON CHANGES - SUBROGATION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – CONDITIONS, J. Subrogation of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

**J.  Subrogation**

With respect to any payments made under this policy on behalf of any **Insured**, the **Insurer** shall be subrogated to the rights of recovery of such **Insured** to the extent of those payments.  The **Insured** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the **Insurer** to bring suit in the name of the **Insureds**. Any recoveries, less the cost of obtaining them, will be distributed as follows:

1.  To the **Insured Persons** and/or the **Insured Organization**, until they are reimbursed for any **Loss** that they sustain that exceeds the sum of the Limit of Liability and the Retention amount, if any;

2.  Then to the **Insurer**, until the **Insurer** is reimbursed for the payment made under this policy; and

3.  Then to the **Insured Persons** and/or the **Insured Organization**, until they are reimbursed for that part of the payment equal to the Retention amount, if any.

All other terms and conditions of this policy remain unchanged.

**Policy No.:**  NPP693379     **Effective:**  5/16/2021

RSG 202038 0118

RSUI INDEMNITY COMPANY

**THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF THIS POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THIS POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

### SCHEDULE*

| |
|---|
| **Terrorism Premium**           **$0** |
| |
| **Additional information, if any, concerning the terrorism premium:** |
| **The portion of your premium for the policy term attributable to coverage for all acts of terrorism covered under this policy including terrorist acts certified under the Act is listed above.** |
| |
| *Information required to complete this Schedule, if not shown above, will be shown in the Declarations Page. |

A.  **Disclosure of Premium**

In accordance with the federal Terrorism Risk Insurance Act, as amended, the **Insurer** is required to provide the **Insured** with a notice disclosing the portion of the **Insured's** premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of the **Insured's** premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations Page.

As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

B.  **Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 80% of that portion of the amount of such insured losses that exceeds the applicable **Insurer** retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

C.  **Cap Insurer Participation in Payment of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met our **Insurer** deductible under the Terrorism Risk Insurance Act, the **Insurer** will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Policy No.:** NPP693379     **Effective:** 5/16/2021

RSG 204123 0121

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RSUI INDEMNITY COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Terms and Conditions Coverage Section:

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met our insurer deductible under the Terrorism Risk Insurance Act, the **Insurer** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act to be an act of terrorism pursuant to such Act.  The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy, such as losses excluded by the Nuclear Exclusion.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP693379      **Effective:** 5/16/2021

RSG 204198 0118



# www.RSUIextra.com

## Online Human Resource Loss Prevention Services for Directors and Officers Liability Policyholders

### Key Features

- Best Practice Help Line for call-in assistance
- Checklist database for lowering risk
- Links to important federal and state government sites
- Online library with up-to-date articles on productivity, leadership and loss prevention
- Sample Human Resource policies and forms
- Online reporting function allows the Site Administrator to monitor usage
- Online training modules designed for managers and supervisors with the ability to adapt programs to meet their own needs.  Best Practice training modules include:
  - Preventing Sexual Harassment
  - Preventing Discrimination
  - Preventing Wrongful Termination
  - Promoting Ethical Behavior

### How to get started

1. Designate a person to serve as the Site Administrator for your organization.
2. Go to *www.RSUIextra.com*.
3. Click the *Register* link on the left-hand side of the home page.
4. Enter your RSUI policy number as the Passcode/Organization Code (i.e. NHP123456).
5. Complete the Registration Information and click *Submit*.
6. You are now registered as the Site Administrator.

### Who is a Site Administrator?

A Site Administrator is often a person who works with personnel or legal matters and is the person who will oversee the use of *www.RSUIextra.com*.  A Site Administrator will have the ability to recruit and add other users as well as make training decisions.

### Questions?

Please call The McCalmon Group at (888) 712-7667 or click *CONTACT US* at *www.RSUIextra.com* on the upper right hand side of the home page.  You will be directed to The McCalmon Group for assistance.

*This site is administered by The McCalmon Group.*

RSG 204154 0716

RSUI INDEMNITY COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# ABSOLUTE EXCLUSION - SEXUAL ABUSE WITH ALLOCATION (EPL CLARIFICATION)

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section and the Employment Practices Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** in connection with that portion of any **Claim** (including but not limited to any derivative or representative class actions) made against any **Insured** alleging, arising out of, based upon or attributable to, or in any way involving, in whole or in part, any forcible physical or sexual assault, battery or molestation, including rape ("Matters Excluded"); provided that, regardless of any other terms or conditions in this Policy, including any endorsements, the covered and uncovered portions of **Loss** arising from any such **Claim** shall be allocated in accordance with this Policy's allocation provision.  It is understood and agreed that **Claims** including both **Employment Practices Wrongful Acts** and Matters Excluded shall be allocated **Claims** (partially covered) and that Matters Excluded go beyond, and are not considered to be **Employment Practices Wrongful Acts** or acts that trigger coverage under the Policy.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP693379    **Effective:** 5/16/2021

RSG 204192 0118

RSUI INDEMNITY COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# AMENDED NOTICE OF CLAIM OR CIRCUMSTANCE – SPECIFIC POSITION TRIGGER

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

**C. Notice of Claim or Circumstance**

1.  If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Claim** is first made, it shall be a condition precedent to the **Insurer's** obligation to pay, that the **Insured** give written notice of such **Claim** to the **Insurer** as soon as practicable after the **Insured's** <u>Chief Executive Officer, Chief Financial Officer, General Counsel, Risk Manager or Human Resources Director</u> first becomes aware of the **Claim**, but in no event shall such notice be given later than <u>sixty (60)</u> days after the expiration or earlier cancellation date of this Policy.

2.  If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Insured** first becomes aware of any facts or circumstances which may reasonably be expected to give rise to a **Claim** against any **Insured** for any **Claim** made against the **Insured** for any **Wrongful Act** occurring prior to the end of the **Policy Period**, and as soon as practicable thereafter, but before the expiration date or any earlier cancellation date of this policy, gives to the **Insurer** written notice, of such facts or circumstances along with the full particulars described below, then any **Claim** subsequently made against any **Insured** arising out of such facts or circumstances will be deemed first made during the **Policy Period**.  The written notice shall include, at a minimum:

    a.  The names or identity of the potential claimants and a detailed description of the specific alleged **Wrongful Act**; and

    b.  The circumstances by which the **Insured** first became aware of the specific alleged **Wrongful Act**.

Further, if any **Claim** first made after the **Policy Period** expires is nonetheless deemed to be made during the **Policy Period** pursuant to Section V.B.4., then it is a condition precedent to coverage for such **Claim** that the **Insured** report it to the **Insurer** as soon as practicable.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP693379    **Effective:** 5/16/2021

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# BILATERAL EXTENDED REPORTING PERIOD

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION II. – COVERAGE EXTENSIONS, B. Extended Reporting Period of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

If the **Insurer** shall refuse to renew this policy or the **Insured Organization** shall cancel or refuse to renew this policy, the **Insured Organization** shall have the right, upon payment of <u>one hundred</u> percent (<u>100</u>%) of the Full Annual Premium, to a period of <u>three hundred and sixty five</u> (<u>365</u>) days following the effective date of such cancellation or non-renewal (herein referred to as the "Extended Reporting Period") in which to give written notice to the **Insurer** of any **Claim** first made against the **Insured** during said <u>365</u> day period for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy.  As used herein, "Full Annual Premium" means the premium stated in Item 5. of the Common Policy Declarations Page and any additional premium(s) charged during the **Policy Period**.  The rights contained in this clause shall terminate unless  written notice of such election together with the additional premium due is received by the **Insurer** at the address shown on the Declarations Page within <u>three hundred and sixty five</u> (<u>365</u>) days of the effective date of cancellation or non-renewal.

The Extended Reporting Period is not cancelable and the additional premium charged shall be fully earned at the inception of the Extended Reporting Period.

The Limit of Liability available under the Extended Reporting Period is part of and not in addition to the Limit of Liability stated in Item 4. of the Declarations Page.

The rights contained in this clause shall not apply in the event of cancellation resulting from non-payment of premium.

All other terms and conditions of this policy remain unchanged.

RSUI INDEMNITY COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – AMENDED BODILY INJURY AND PROPERTY DAMAGE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A.  SECTION IV. – EXCLUSIONS, 6. of the Directors and Officers Liability Coverage Section is deleted and replaced with the following:

6.  Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

B.  The first paragraph of SECTION IV. – EXCLUSIONS, 2. of the Employment Practices Liability Coverage Section is deleted and replaced with the following:

2.  Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly:

a.  Bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; provided, this EXCLUSION 2.a. will not apply to allegations of mental anguish or emotional distress made solely in connection with an **Employment Practices Claim** or a **Claim** for **Third Party Discrimination** and/or **Third Party Harassment**; or

b.  Damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

All other terms and conditions of this policy remain unchanged.

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – BIOMETRIC PRIVACY CLAIMS

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section and Employment Practices Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** under this policy in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, any actual or alleged violation of **Biometric Privacy Information**.

For the purpose of this endorsement, **Biometric Privacy Information** is defined as the Biometric Information Privacy Act ("BIPA"), the California Consumer Privacy Act ("CCPA"), or any federal, state, municipal or local statutory biometric privacy law or any such similar law or statute anywhere in the world that governs or relates to the collection, use, safeguarding, handling, storage, retention or destruction of biometric identifiers, biometric data or biometric information of any kind, including but not limited to retina or iris scans, fingerprints, voiceprints or scans of hand or face geometry.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP693379     **Effective:** 5/16/2021

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – PRIOR ACTS

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Common Policy Terms and Conditions Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** that alleges, arises out of, is based upon or attributable to, directly or indirectly, in whole or in part, any actual or alleged **Wrongful Acts** which first occurred prior to May 1, 2018.

All other terms and conditions of this policy remain unchanged.

**Policy No.:**  NPP693379        **Effective:**  5/16/2021

RSG 206108 0118

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION - SPECIFIC ENTITIES AND INDIVIDUALS

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Common Policy Terms and Conditions Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** which is brought by or on behalf of the following entities or individuals:

Trevor Hein

including, but not limited to any **Claim** brought by any director, officer, heir, trustee or partner of the entity, or by any security holder thereof, whether such **Claim** is brought directly or derivatively.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP693379     **Effective:** 5/16/2021

RSG 206114 0118

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – SPECIFIC LITIGATION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Common Policy Terms and Conditions Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon or attributable to, directly or indirectly, in whole or in part, the following litigation:

Tanya Freeman - Claim #258680

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP693379     **Effective:** 5/16/2021

RSG 206115 0118

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXTRADITION COVERAGE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A.  SECTION III. – DEFINITIONS, of the Common Policy Terms and Conditions Coverage Section is amended to include the following:

**Extradition** means any formal process by which an **Insured Person** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

B.  SECTION III. – DEFINITIONS, **B. Claim**, of the Common Policy Terms and Conditions Coverage Section is amended to include the following:

**Claim** also means any official request for **Extradition** of any **Insured Person**, return of an indictment (in the case of a criminal proceeding), or receipt or filing of a notice of charges.

C.  SECTION III. – DEFINITIONS, **D. Defense Expenses**, of the Common Policy Terms and Conditions Coverage Section is amended to include the following:

**Defense Expenses** also means reasonable and necessary fees, costs and expenses incurred through legal counsel and consented to by the **Insurer** resulting from an **Insured Person** lawfully:

a.  Opposing, challenging, resisting or defending against any request for or any effort to obtain the **Extradition** of that **Insured Person**; or

b.  Appealing any order or other grant of **Extradition** of that **Insured Person**.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP693379    **Effective:** 5/16/2021

RSG 204174 0118

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# ABSOLUTE CONTRACTUAL EXCLUSION

This endorsement modifies insurance provided under the following:

**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A.  Section IV. EXCLUSIONS, 12.c. of the Directors and Officers Liability Coverage Section is deleted in its entirety.

B.  The following is added to Section IV. EXCLUSIONS of the Directors and Officers Liability Coverage Section:

Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement.

All other terms and conditions of this policy remain unchanged.

**Policy No.:**  NPP693379     **Effective:**  5/16/2021

RSG 244018 0420

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – BROADCASTING,
# ADVERTISING AND PUBLISHING LIABILITY

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon or attributable to, directly or indirectly or in any way involving:

a.  Publishing or re-publishing;

b.  Advertising;

c.  Broadcasting or re-broadcasting;

d.  Telecasting or re-telecasting;

e.  Any actual or alleged piracy;

f.  Any actual or alleged idea misappropriation under implied contract;

g.  Any actual or alleged libel, slander, or other defamation or invasion of privacy in connection with any advertisement, publicity, article, broadcast or telecast;

h.  Any actual or alleged plagiarism, infringement of patent, copyright, trademark, title or slogan; or

i.  Any actual or alleged false arrest, false imprisonment, wrongful entry or eviction or other wrongful invasion of the right to private occupancy, wrongful detention, malicious prosecution, humiliation, defamation of character or invasion of rights of privacy.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP693379     **Effective:** 5/16/2021

RSG 206105 0118

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – PROFESSIONAL ERRORS AND OMISSIONS (WITH MANAGEMENT CARVE BACK)

This endorsement modifies insurance provided under the following:

**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION IV. – EXCLUSIONS, 7. of the Directors and Officers Liability Coverage Section is deleted and replaced with the following:

7.  Alleging, arising out of, based upon or attributable to, in whole or in part, the performance or rendering of or failure to perform professional services, where such services are undertaken for others for a fee;

Provided, however, this EXCLUSION shall not be applicable to any derivative or shareholder class action claims against any **Insured**, which allege a failure to supervise those who performed or failed to perform such professional services in question.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP693379    **Effective:** 5/16/2021

RSG 246013 0118

RSUI INDEMNITY COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

## SUBLIMIT-DEFENSE EXPENSES – WAGE AND HOUR CLAIMS

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION II. – COVERAGE EXTENSIONS, of the Employment Practices Liability Coverage Section:

The amount set forth in Item 4. of the Common Policy Declarations Page shall be the maximum aggregate Limit of Liability for all **Loss** under this policy.  Subject to the foregoing, this Policy shall allow up to $50,000 solely for **Defense Expenses** in connection with **Claims** made against any **Insured** for violation of the Fair Labor Standards Act or any similar state or local law or regulation specifically governing the payment of wages or hours worked ("**Wage and Hour Claim**").  This sublimit shall be part of and not in addition to the amount set forth in Item 2.A. of the Employment Practices Liability Declarations Page, and shall not act to create coverage for any form of relief sought or available in any **Wage and Hour Claim**.

A Retention in the amount of $100,000 shall apply to any **Wage and Hour Claim**.  Such Retention shall be borne by the **Insured**, and the **Insurer** shall only be liable for the amount of **Defense Expenses** in excess of the above stated Retention amount.

Notwithstanding anything contained in this endorsement to the contrary, however, solely where coverage for any **Claim** is triggered as "Side A," or non-indemnifiable or non-indemnified **Loss** in keeping with Policy terms and conditions, the Retention normally applicable in such situations shall apply to such **Claim**, and the Retention stated here shall not apply.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP693379      **Effective:** 5/16/2021

RSG 204153 0118

# COMMON POLICY TERMS AND CONDITIONS
## COVERAGE SECTION (PRIVATE)
## PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning.  Refer to SECTION III. - DEFINITIONS.

In consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations hereinafter provided, the **Insurer** agrees:

## SECTION I. – COMMON POLICY TERMS AND CONDITIONS

The Common Policy Terms and Conditions Section of this policy shall apply to all **Coverage Sections**.  Unless stated to the contrary in any **Coverage Section**, the terms and conditions of each **Coverage Section** of this policy shall apply only to that **Coverage Section** and shall not apply to any other **Coverage Section** of this policy.  If any provision in the Common Policy Terms and Conditions sections is inconsistent or in conflict with the terms and conditions in any **Coverage Section**, including any endorsements attached thereto, the terms and conditions of such **Coverage Section** or endorsement, shall supersede for the purposes of that **Coverage Section**.

## SECTION II. - COVERAGE EXTENSIONS

### A.  Marital Estate

This policy shall cover **Loss** arising from any **Claim** made against the lawful spouse or any legally recognized domestic partner of an **Insured Person** for **Claims** arising solely out of his or her status as the spouse or domestic partner of an **Insured Person** (where such status is derived by reason of statutory law or common law) where such **Insured Person** is entitled to coverage under this policy.  Such coverage shall extend to any **Claim** in which a recovery is sought from marital community property, property jointly held by the **Insured Person** and the spouse or domestic partner, or property transferred from the **Insured Person** to the spouse or domestic partner.

Provided, however, that this COVERAGE EXTENSION shall not extend coverage to any **Claim** for, arising from, based upon or attributable to any actual or alleged **Wrongful Act** of the spouse or domestic partner.

### B.  Extended Reporting Period

If the **Insurer** shall refuse to renew this policy or the **Insured Organization** shall cancel or refuse to renew this policy, the **Insured Organization** shall have the right, upon payment of seventy five percent (75%) of the Full Annual Premium, to a period of three hundred and sixty five (365) days following the effective date of such cancellation or nonrenewal (herein referred to as the "Extended Reporting Period") in which to give written notice to the **Insurer** of any **Claim** first made against the **Insured** during said three hundred and sixty five (365) day period for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy.  As used herein, "Full Annual Premium" means the premium stated in Item 5. of the Common Policy Declarations Page and any additional premium(s) charged during the **Policy Period**.  The rights contained in this clause shall terminate unless written notice of such election together with the additional premium due is received by the **Insurer** at its address shown on the Declarations Page within thirty (30) days of the effective date of cancellation or nonrenewal.

The Extended Reporting Period is not cancelable and the additional premium charged shall be fully earned at the inception of the Extended Reporting Period.

The Limit of Liability available under the Extended Reporting Period is part of and not in addition to the Limit of Liability stated in Item 4. of the Declarations Page.

The rights contained in this clause shall not apply in the event of cancellation resulting from non-payment of premium.

### C.  Estates and Legal Representatives

This policy shall cover **Loss** arising from any **Claim** made against the estates, heirs, legal representatives or assigns of an **Insured Person** who is deceased, or against the legal representatives or assigns of an **Insured Person** who is incompetent, insolvent or bankrupt, for the **Wrongful Act** of such **Insured Person**.

**SECTION III. - DEFINITIONS**

**A.    Application** means the application attached to and forming a part of this policy, including any materials submitted or requested in connection with such application within 12 months prior to the inception date of this policy, all of which are deemed a part of this policy.

**B.    Claim** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**C.    Coverage Section** means, individually or collectively, the purchased coverage sections listed in Item 3. of the Declarations, including all endorsements attached thereto.

**D.    Defense Expenses** means reasonable and necessary legal fees and expenses incurred, with the **Insurer's** consent, by any **Insured** in defense of a **Claim**, including any appeal therefrom. **Defense Expenses**, however, shall not include:

   **1.**   Remuneration, overhead or benefit expenses associated with any **Insured Person**; or

   **2.**   Any obligation to apply for or furnish any appellate or similar bond.

**E.    Employment Practices Wrongful Act** shall have the meaning set forth in the Employment Practices Liability Coverage Section, whether or not purchased.

**F.    Fiduciary Wrongful Act** shall have the meaning set forth in the Fiduciary Liability Coverage Section, whether or not purchased.

**G.    Insured** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**H.    Insured Organization** means:

   **1.**   The organization named in Item 1. of the Declarations Page and any **Subsidiary** existing prior to or at the inception date of this policy; or

   **2.**   Subject to SECTION V. - CONDITIONS, G. Merger, Consolidation or Acquisition of this policy, **Insured Organization** shall include any **Subsidiary** created or acquired after the inception date of this policy; or

   **3.**   In the event a bankruptcy proceeding shall be instituted by or against the foregoing entities, the resulting debtor-in-possession (or equivalent status outside the United States), if any.

**I.    Insured Person** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**J.    Insurer** means the Company providing this insurance as shown on the Declarations Page.

**K.    Loss** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**L.    Policy Period** means the period beginning at the inception date and ending at the expiration date stated in Item 2. of the Declarations Page or to any earlier policy cancellation or termination date.

**M.    Subsidiary** means any entity of which the **Insured Organization**, either directly or indirectly, or through one or more of its **Subsidiaries**:

   **1.**   Owns more than fifty percent (50%) of the voting stock and/or outstanding securities; or

   **2.**   Has the right to elect or appoint more than fifty percent (50%) of the voting directors, management committee members or members of the Board of Managers.

   A **Subsidiary** ceases to be a **Subsidiary** when the **Insured Organization** no longer owns more than fifty percent (50%) of the voting stock and/or outstanding securities, or no longer has the right to elect or appoint more than fifty percent (50%) of the voting directors, management committee members or members of the Board of Managers, or the means by which the **Insured Organization** is legally enabled to exercise fifty percent (50%) ownership or control is formally extinguished.

**N.    Third Party Discrimination** shall have the meaning set forth in the Employment Practices Liability Coverage Section, whether or not purchased.

**O.    Third Party Harassment** shall have the meaning set forth in the Employment Practices Liability Coverage Section, whether or not purchased.

**P.  Wrongful Act** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

## SECTION IV. - EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

**1.**  Alleging, arising out of, based upon or attributable to, directly or indirectly, the same or essentially the same facts underlying or alleged in any matter which, prior to the inception date of this policy, has been the subject of notice to any insurer of a **Claim**, or a potential or threatened **Claim**, or an occurrence or circumstance that might give rise to a **Claim** under any policy of which this insurance is a renewal or replacement or which it may succeed in time;

**2.**  Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any nuclear reaction, nuclear radiation, or radioactive contamination, or any related act or incident;

**3.**  Any **Telecommunications Claim**, as defined below.

A **Telecommunications Claim** is any **Claim**:

**a.**  Arising from, based upon, attributable to, or in consequence of any proceeding against any **Insured** brought by the Federal Trade Commission or any other federal, state or local regulatory agency or other administrative body alleging the violation of any federal, state or local laws or regulation pertaining to unsolicited or non-consensual advertising, through faxes, telephone calls, texting or any other medium; and/or

**b.**  Arising from, based upon, attributable to, or in consequence of, any actual or alleged violation of:

**(1)**  The Fair Debt Collection Practices Act or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world;

**(2)**  The CAN-SPAM Act of 2003 or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world;

**(3)**  The Telephone Consumer Protection Act (TCPA) of 1991 or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world; or

**(4)**  Any other law, ordinance, regulation, statute or common law relating to any communication, distribution, publication, sending or transmission via telephone, telephone facsimile machine, computer or other telephonic or electronic devices.

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

## SECTION V. - CONDITIONS

### A.  Duty to Defend

It shall be the right and duty of the **Insurer** to defend any **Claim** against any **Insured** for which coverage applies under this policy, and the **Insurer** shall have the right to appoint counsel of its choosing.  No **Insured** may incur any **Defense Expenses**, admit liability for or settle any **Claim** or negotiate any settlement without the **Insurer's** prior written consent; such consent not to be unreasonably withheld.  Any **Defense Expenses** incurred or settlements made without the prior written consent of the **Insurer** will not be covered under this policy.  The **Insurer** shall have the right to appoint counsel, investigate and conduct negotiations and, with the consent of the **Insured**, to enter into the settlement of any **Claim** that the **Insurer** deems appropriate.  If the **Insured** refuses to consent to a settlement acceptable to the claimant in accordance with the **Insurer's** recommendations, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed:

**1.**  The amount for which the **Insurer** could have settled such **Claim** plus **Defense Expenses** incurred as of the date such settlement was proposed in writing by the **Insurer** ("Settlement Opportunity Amount"); plus

**2.**  Seventy percent (70%) of covered **Loss** in excess of such Settlement Opportunity Amount subject to the policy's Limit of Liability.

In no event shall the **Insurer** be liable under this policy for more than the Limit of Liability shown in Item 4. of the Common Policy Declarations Page.

**B. Limit of Liability; Retention; Payment of Loss**

**1. Aggregate Limit of Liability**

Regardless of **Coverage Sections** purchased, as stated in Item 3. of the Common Policy Declarations Page, the amount shown in Item 4. of the Common Policy Declarations Page is the maximum aggregate limit that the **Insurer** will pay for all **Loss** under all **Coverage Sections** combined, arising out of any and all **Claims** first made against the **Insured** during the **Policy Period** and the Extended Reporting Period (if purchased) and reported in accordance with the terms and conditions of this policy.

The **Insurer** will have no obligation to pay **Loss** or to defend or continue to defend any **Claim** after the aggregate Limit of Liability, stated in Item 4. of the Common Policy Declarations Page, has been exhausted by payment of **Loss**. **Defense Expenses** shall be part of and not in addition to the Limit of Liability and payment of **Defense Expenses** by the **Insurer** will reduce the Limit of Liability.

**2. Separate Limit of Liability**

Regardless of any Separate Limit(s) of Liability purchased, as stated in Item 3. of the Common Policy Declarations, the maximum limit of the **Insurer's** liability for all **Loss** for each applicable **Coverage Section** purchased shall not exceed the Separate Limit of Liability as stated in Item 2. of each applicable Declarations for each applicable **Coverage Section**. Where two or more Separate Limits of Liability are or could be applicable to one **Claim** or series of interrelated **Claims** deemed to be a single **Claim** pursuant to Section V.B.4. below, the larger of the applicable Separate Limits of Liability shall apply, but in no event shall more than one Separate Limit of Liability apply to any **Claim** or series of interrelated **Claims** and in no event shall the Insurer be obligated to pay **Loss** or to defend or continue to defend any **Claim** after the Insurer has paid the applicable Separate Limit of Liability or the Aggregate Limit of Liability per Section V.B.1. of these Common Policy Terms and Conditions.

**3.** As a condition precedent to coverage under this policy, the **Insured** shall pay with respect to each **Claim** the applicable Retention amount, as identified in Item 3. of the Declarations Page for each applicable **Coverage Section** or as otherwise identified. The Retention amount shall be reduced solely by covered **Loss** and shall be applied to all **Loss**, including **Defense Expenses**, and the **Insurer** shall only be liable for the amount of **Loss** that is excess of the stated Retention amount.

**4.** All **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events, or the same or related series of facts, circumstances, situations, transactions or events, shall be deemed to be a single **Claim** for all purposes under this policy, shall be subject to the Retention stated in Item 3. of the Declarations Page for each applicable **Coverage Section**, or other applicable Retention, and shall be deemed first made when the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

**5.** In the event that a **Claim** implicates more than one Retention amount, then the largest of the applicable Retention amounts shall be applied, but in no event shall more than one Retention amount be applied to a **Claim**.

**6.** Any Retention amount applicable to a **Claim** against an **Insured Person** shall apply where indemnification by the **Insured Organization** is permitted or required, regardless of whether the **Insured Organization** has agreed, failed or refused to indemnify such **Insured Person**, provided it shall not apply when indemnification cannot be made by the **Insured Organization** by reason of the **Insured Organization's** financial insolvency.

**7.** The **Insurer's** duty to defend the **Insured** and pay **Defense Expenses** ends upon exhaustion of the Limit of Liability, which includes paying or tendering the Limit of Liability into court.

**8.** Except for payment of **Defense Expenses**, the **Insurer** shall pay for **Loss** only upon final disposition of any **Claim**.

**C. Notice of Claim or Circumstance**

**1.** If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Claim** is first made, it shall be a condition precedent to the **Insurer's** obligation to pay, that the **Insured** give written notice of such **Claim** to the **Insurer** as soon as practicable after such **Claim** is first made, but in no event shall such notice be given later than sixty (60) days after either the **Policy Period** expires or any earlier cancellation date of this policy.

**2.** If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Insured** first becomes aware of any facts or circumstances which may reasonably be expected to give rise to a **Claim** against any **Insured** for any **Claim** made against the **Insured** for any **Wrongful Act** occurring prior to the end of the **Policy Period**, and as soon as practicable thereafter, but before the expiration date or any earlier cancellation date of this policy, gives to the **Insurer** written notice, of such facts or circumstances along with the full particulars described below, then any **Claim** subsequently made against any **Insured** arising out of such facts or circumstances will be deemed first made during the **Policy Period**. The written notice shall include, at a minimum:

    **a.** The names or identity of the potential claimants and a detailed description of the specific alleged **Wrongful Act**; and

    **b.** The circumstances by which the **Insured** first became aware of the specific alleged **Wrongful Act**.

Further, if any **Claim** first made after the **Policy Period** expires is nonetheless deemed to be made during the **Policy Period** pursuant to Section V.B.4., then it is a condition precedent to coverage for such **Claim** that the **Insured** report it to the **Insurer** as soon as practicable.

## D. Cooperation

In the event of a **Claim** or notice of circumstances under SECTION V. - CONDITIONS, C. Notice of Claim or Circumstance of this policy, the **Insured** will provide the **Insurer** with all information, assistance and cooperation that the **Insurer** reasonably requests, and will take no action, without the **Insurer's** prior written consent, that might prejudice the **Insured's** or the **Insurer's** position, potential or actual rights, or defense under this policy.

## E. Allocation

If both **Loss** covered under this policy and loss not covered under this policy are jointly incurred either because a **Claim** includes both covered and non-covered matters or covered and non-covered causes of action or because a **Claim** is made against both an **Insured** and any other parties not insured by this policy, then the **Insured** and the **Insurer** shall use their best efforts to fairly and reasonably allocate payment under this policy between covered **Loss** and non-covered loss based on the relative legal exposures of the parties with respect to covered and non-covered matters or covered and non-covered causes of action.

If the **Insurer** and the **Insured** agree on an allocation of **Defense Expenses**, based on covered and non covered matters or persons, the **Insurer** shall advance **Defense Expenses** allocated to covered **Loss**. If there is no agreement on an allocation of **Defense Expenses**, the **Insurer** shall advance **Defense Expenses** that the **Insurer** believes to be covered under this policy until a different allocation is negotiated, arbitrated, or judicially determined.

Any negotiated, arbitrated or judicially determined allocation of **Defense Expenses** on account of a **Claim** shall be applied retroactively to all **Defense Expenses** on account of such **Claim**, notwithstanding any prior advancement to the contrary. Any advancement or allocation of **Defense Expenses** on account of a **Claim** shall not apply to or create any presumption with respect to the allocation of other loss on account of such **Claim**.

## F. Cancellation; Renewal Provision

The **Insured Organization** may cancel this policy at any time by written notice or by surrender of this policy to the **Insurer** at its address shown on the Declarations Page.

This policy may only be cancelled by or on behalf of the **Insurer** in the event the **Insured Organization** fails to pay any premium when due. In the event of non-payment of premium by the **Insured Organization**, the **Insurer** may cancel this policy upon ten (10) days written notice. The **Insurer** will mail notice to the **Insured Organization's** address as shown in Item 1. of the Declarations Page. The mailing of such notice as aforesaid shall be sufficient proof of notice.

If the **Insured Organization** cancels this policy, the **Insurer** will retain the customary short rate proportion of the premium hereon.

The **Insurer** shall not be required to renew this policy upon its expiration. The offer by the **Insurer** of renewal terms, conditions, Limit of Liability and/or premiums varying from those of the expiring policy shall not constitute a refusal to renew.

If the **Insurer** decides not to renew this policy, the **Insurer** will mail or deliver to the **Insured Organization** written notice of non-renewal, stating the reasons for non-renewal, at least sixty (60) days prior to the expiration date of this policy.

Any notice of non-renewal will be mailed or delivered to the **Insured Organization's** last mailing address known to the **Insurer**. If notice is mailed, proof of mailing will be sufficient proof of notice.

**G.  Merger, Consolidation or Acquisition**

1. If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets do not exceed twenty five percent (25%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place on or after the effective date of such creation or acquisition.

2. If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets exceed twenty five percent (25%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place within the first ninety (90) days after the date of such creation or acquisition. After this ninety (90) day period, the created or acquired **Subsidiary** shall no longer be deemed an **Insured Organization,** unless:

   a. Written notice of the **Subsidiary's** creation or acquisition has been provided to the **Insurer** by the **Insured Organization**, as soon as practicable, and in no event later than ninety (90) days after the date of the creation or acquisition;

   b. The **Insured Organization** has provided the **Insurer** with any additional information the **Insurer** may request;

   c. The **Insured Organization** has agreed to the terms, conditions, exclusions and additional premium charge as may be required by the **Insurer**; and

   d. The **Insurer**, at its sole discretion, has agreed in writing to extend the coverage of this policy to the created or acquired **Subsidiary**.

3. If during the **Policy Period**:

   a. The **Insured Organization** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

   b. Any person or entity or group of persons or entities acting in concert shall acquire an amount of more than fifty percent (50%) of the voting power for the election of directors of the **Insured Organization**;

   (either of the above events in 3. a. or b. are hereunder referred to as the "Transaction"),

   then this policy shall continue in full force and effect for any **Wrongful Act** occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the Transaction. This policy may not be cancelled after the effective time of the Transaction and the premium for this policy shall be deemed fully earned as of such time.

   The **Insured Organization** shall give the **Insurer** written notice of the Transaction as soon as practicable, but not later than thirty (30) days after the effective date of the Transaction.

**H.  Representations**

The **Insured** represents that the information, particulars, documents, representations and statements contained in the **Application** are complete, true and accurate; are deemed incorporated into and constituting part of this policy; are material to the acceptance of the risk assumed by the **Insurer** under this policy. This policy is issued in reliance upon the truth of such representations. No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**. If any of the information, particulars, documents, representations and statements contained in the **Application** are untrue, this policy will be void with respect to any **Insured** who knew of such untruth.

**I.  No Action Against Insurer**

No action may be taken against the **Insurer** unless, as a condition precedent thereto, there has been full compliance with all of the terms and conditions of this policy and until the amount of any **Insured's** obligation to pay **Loss** has been finally determined either by judgment against such **Insured** after adjudicatory proceedings, or by written agreement of the **Insured**, the claimant and the **Insurer**.

No **Insured** has any right under this policy to join the **Insurer** as a party to any **Claim** against an **Insured** to determine the liability of such **Insured**, nor shall the **Insurer** be impleaded by an **Insured** or his, her or its legal representative in any such **Claim**.

**J. Subrogation**

In the event the **Insurer** makes any payment under this Policy, the **Insurer** shall be subrogated to all of the rights of recovery of the **Insured**, who shall execute all papers and take all necessary actions to secure such rights, including the execution of any documents necessary to enable the **Insurer** to effectively bring suit in the name of an **Insured**.

**K. Authorization and Notices**

The **Insured Persons** agree that the **Insured Organization** shown in Item 1. of the Declarations Page acts on their behalf with respect to giving and receiving all notices and return of premium from the **Insurer**.

**L. Changes**

Notice to any agent or knowledge possessed by any agent or representations by persons acting on behalf of the **Insurer** do not effect a waiver or change in any part of this policy or estop the **Insurer** from asserting any right under the terms, conditions and limitations of this policy.  The terms, conditions and limitations of this policy can only be waived or changed by written endorsement.

**M. Assignment**

Assignment of interest under this policy does not bind the **Insurer** without its prior written consent.

**N. Acceptance**

The **Insureds** agree that this policy, including the **Application** and any endorsements, constitutes the entire agreement between them and the **Insurer** relating to this insurance policy.

**O. Headings**

The description in the headings and sub-headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

**P. Governing Law Clause**

This policy shall, to the extent permitted by applicable law, be construed in accordance with the laws of the state or jurisdiction of incorporation or organization of the **Insured Organization** shown in Item 1. of the Declarations Page or, in the case of matters pertaining to a **Subsidiary**, the laws of the state or jurisdiction of incorporation or organization thereof.

**Q. Territory**

This policy shall apply to **Claims** made against any **Insured** anywhere in the world.

**R. Other Insurance**

Unless specifically stated otherwise, the insurance provided under this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written as specific excess insurance over the Aggregate Limit of Liability or Shared Limit of Liability provided by this policy.  Any coverage otherwise available under any **Coverage Section** shall be specifically excess over any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary                                                      President

# DIRECTORS AND OFFICERS LIABILITY
## COVERAGE SECTION (PRIVATE)
## PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning. Refer to SECTION III. – DEFINITIONS in this Coverage Section or the Common Policy Terms and Conditions.

If purchased, as indicated in Item 3. of the Common Policy Declarations Page, and in consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:

## SECTION I. - INSURING AGREEMENTS

### Directors and Officers Liability

**A.** With the **Insured Person**, that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of such **Insured Person** all **Loss** such **Insured Person** is legally obligated to pay, except and to the extent that the **Insured Organization** is required or permitted to indemnify such **Insured Person** for such **Loss.**

**B.** With the **Insured Organization,** that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** for which the **Insured Organization** is required or permitted to indemnify the **Insured Person**.

**C.** With the **Insured Organization,** that if a **Claim** for a **Wrongful Act** is first made against the **Insured Organization** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** the **Insured Organization** is legally obligated to pay.

Notwithstanding anything contained in this policy to the contrary, the coverage provided under SECTION I. INSURING AGREEMENTS A. and B. shall be non-rescindable by the **Insurer**.

## SECTION II. – COVERAGE EXTENSIONS

### A. Outside Board Extension

This policy shall cover **Loss** arising from an **Insured Person** having served, at the direction of and with the consent of the **Insured Organization**, as Director, Officer, or Trustee for any eleemosynary corporation or other not for profit organization where such **Insured Person** is entitled to indemnification by the **Insured Organization**.

This COVERAGE EXTENSION shall be excess of any indemnification and/or insurance that may be permitted or provided by such eleemosynary corporation or organization, regardless of payment made by or on behalf of such eleemosynary corporation or organization, including but not limited to any other Director and Officer Liability Insurance or similar insurance provided for, to, or by any such eleemosynary corporation or organization.

### B. Additional Side-A Limit of Liability

If a limit is shown in Item 2.B of the Directors and Officers Liability Declarations, then there shall be an addition to the maximum aggregate Limit of Liability available under this Directors and Officers Coverage Section. This amount shall be in addition to the Limit of Liability as set forth in Item 2.A. of the Directors and Officers Liability Declarations Page and shall be available solely for **Loss** resulting from a **Claim** against any **Insured Persons** covered under SECTION I. INSURING AGREEMENT A. of this coverage section, and shall be subject to the following additional conditions:

(1) Any **Loss** resulting from a **Claim** against any **Insured Persons** covered under SECTION I. INSURING AGREEMENT A. of this Directors and Officers Coverage Section shall first be paid under the Limit of Liability as set forth in Item 2.A. of the Directors and Officers Liability Declarations Page, and such Limit of Liability must be completely exhausted by payment of **Loss** under SECTION I. INSURING

AGREEMENTS A., B., and/or C. of this Directors and Officers Coverage Section before **Loss** shall be paid under the additional Limit of Liability dedicated for **Insured Persons:** and

(2) The additional Limit of Liability dedicated for **Insured Persons** shall be excess of any insurance available that is specifically excess of this policy and such excess insurance must be completely exhausted by payment of **Loss** thereunder before the **Insurer** shall have any obligation to make any payment on account of the additional Limit of Liability dedicated for **Insured Persons**.

**C. Investigation Costs Sublimit of Liability**

The **Insurer's** maximum aggregate Limit of Liability for all **Loss** under this policy for all **Investigative Costs** shall be the Investigative Costs Sublimit of Liability as indicated in Item 2.C. of the Directors and Officers Liability Declarations Page. This sublimit shall be part of and not in addition to the amount set forth in Item 2.A. of the Directors and Officers Liability Declarations Page.

This policy shall cover **Loss** arising from all **Investigative Costs** which the **Insured Organization** shall become legally obligated to pay as a result of a **Shareholder Derivative Demand** first made during the **Policy Period** or Discovery Period, if applicable, against the **Insured Organization** for a **Wrongful Act** of an **Insured Person**.

## SECTION III. - DEFINITIONS

**A.  Claim**, either in the singular or the plural, means:

   **1.**  A written demand for monetary or non-monetary relief;

   **2.**  A civil, criminal, administrative, regulatory or arbitration proceeding, or arbitration demand for monetary or non-monetary relief which is commenced by:

      **a.**  Receipt or service of a complaint or similar pleading;

      **b.**  Return of an indictment or filing of information; or

      **c.**  Receipt of a notice of charges;

   **3.**  A written request to an **Insured** to toll or waive a statute of limitations regarding a potential **Claim**, commenced by the receipt of such request by the **Insured**;

   **4.**  A civil, criminal, administrative or regulatory investigation of an **Insured Person** by the Securities Exchange Commission ("SEC") or similar state or foreign government authority, after the **Insured Person** is identified in a written "Wells" or other notice from the SEC or a similar state or foreign government authority that describes actual or alleged violations of laws by such **Insured Person**;

**B.  Employee** means any past, present or future employee of the **Insured Organization**, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any full-time, part-time, seasonal and temporary employee of the **Insured Organization**. An individual who is leased or contracted to the **Insured Organization** shall also be an **Employee**, but only if the **Insured Organization** provides indemnification to such leased or contracted individual in the same manner as is provided to the **Insured Organization's** employees.

**C.  Insured** means any **Insured Organization** and/or any **Insured Person**.

**D.  Insured Person** means:

   **1.**  Any past, present or future director, officer, or **Employee**, management committee members or members of the Board of Managers of the **Insured Organization**; or

   **2.**  In the event the **Insured Organization** or a **Subsidiary** thereof operates outside the United States, then the term **Insured Person** also means those titles, positions or capacities for such foreign **Insured Organization** or **Subsidiary** that are equivalent to the positions of directors or officers in the United States.

**E.  Investigative Costs** means reasonable costs, charges, fees (including attorneys' and experts' fees) and expenses incurred by the **Insured Organization**, its board of directors or any committee thereof in connection with the investigation or evaluation of any **Shareholder Derivative Demand**; provided, however, that **Investigative Costs** shall not include salaries, wages, benefits, expenses or fees of any director, officer or **Employee** of the **Insured Organization**.

**F.  Loss** means damages, settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**. **Loss** (other than **Defense Expenses**) shall not include:

1. Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

2. Amounts owed under any contract, partnership, stock or other ownership agreement, or any other type of contract;

3. Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

4. The cost of creating or reinstating employment;

5. Any amounts owed to any **Employee** as wages, compensation, severance or benefits previously incurred or vested without regard to any **Claim**;

6. Civil or criminal fines or penalties;

7. Taxes, whether owed to or by any **Insured**;

8. Amounts, including **Defense Expenses**, arising out of, based upon or attributable to actual or alleged liability or costs incurred by any **Insured** to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person;

9. Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable. For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

G. **Shareholder Derivative Demand** means any written demand by one or more shareholders of the **Insured Organization** made upon the board of directors of the **Insured Organization** to bring a proceeding in a court of law against any **Insured Person** for a **Wrongful Act**.

H. **Wrongful Act** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by:

1. An **Insured Person** acting in his or her capacity as such and on behalf of the **Insured Organization** or any matter claimed against them solely by reason of their status as an **Insured Person**; or

2. The **Insured Organization**.

**SECTION IV. - EXCLUSIONS**

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

1. Based upon, arising out of or attributable to any remuneration received by an **Insured**, or the granting of any remuneration to any **Insured**, without the previous approval of the stockholders or the Board of Directors, which remuneration is found to have been illegal; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** received remuneration to which such **Insured** was not legally entitled;

2. Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any criminal or deliberate fraudulent act; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** committed such criminal or fraudulent act;

3. Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the gaining of any profit or advantage to which an **Insured** was not legally entitled; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** gained profit or advantage to which such **Insured** was not legally entitled;

4. Alleging, arising out of, based upon or attributable to, in whole or part, any litigation involving any **Insured** that was commenced or initiated prior to, or was pending on or before the date referenced in Item 4. of the Directors and Officers Liability Declarations Page, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation;

5. Alleging, arising out of, based upon or attributable to any workers' compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law;

6.  For actual or alleged bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

7.  Alleging, arising out of, based upon or attributable to, in whole or in part, the performance or rendering of or failure to perform professional services, where such services are undertaken for others for a fee;

8.  For violation of any of the responsibilities, obligations or duties imposed by: The Fair Labor Standards Act (except the Equal Pay Act) or any state or local statutory or common law, regulation or ordinance that governs payment or administration of wages, hours worked, or employee entitlements; the Employee Retirement Income Security Act of 1974; the National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; the Consolidated Omnibus Budget Reconciliation Act; the Occupational Safety and Health Act; any rules or regulations of any of the foregoing promulgated thereunder and amendments thereto; or any similar provisions of any federal, state or local statutory or common law that govern the same subject matter governed by the laws referenced in this section even if particular laws have some additional or different provisions; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

9.  Brought by or on behalf of any **Insured**, or which is brought by any security holder of the **Insured Organization**, whether directly or derivatively, unless such **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **Insured**.  Provided, however, this EXCLUSION shall not apply to:

    a.  Any **Claim** brought by an **Insured Person**, where such **Claim** is in the form of a cross-claim or a third-party claim for contribution or indemnity, which is part of and results directly from a **Claim** that is not otherwise excluded by the terms of this policy;

    b.  Any **Claim** brought by the examiner, trustee, receiver, liquidator or rehabilitator (or any assignee thereof) of such **Insured Organization**, in or after any bankruptcy proceeding by or against an **Insured Organization**;

    c.  Any **Claim** brought by any past director, officer, trustee, manager or equivalent executives of the **Insured Organization** who have not served as a director, officer, trustee, manager or equivalent executive for at least three (3) years prior to the date such **Claim** is first made, but only if the **Claim** is brought and maintained totally independent of and without the solicitation, assistance, active participation or intervention of the **Insured Organization** or any **Insured Person** not described in this paragraph 9.c;

    d.  Any **Claim** brought by an **Employee** of the **Insured Organization** who is not or was not a director or officer of the **Insured Organization** and where such **Claim** is brought by such **Employee** only in their capacity as a stockholder and independently of assistance from **Insureds**, except those expressly as noted in section 9.c., above; or

    e.  Any instigation of or involvement in any **Claim**, or solicitation, assistance, active participation or intervention by any **Insured** whistleblower under Section 806 of the Sarbanes-Oxley Act of 2002 or any rule or regulation promulgated thereunder, or under any similar whistleblower statute, rule or regulation under any other federal or state law.

    Provided further, however, that in the event that an **Insured Person** brings a cross-claim or third-party claim, as described in 9.a. above, against another **Insured Person**, then solely with respect to the **Loss** derived from a cross-claim or third-party claim, the **Insurer** shall be liable solely for **Defense Expenses**;

10. For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization**;

    Pollutant includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, whether live or inanimate, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

11. Alleging, arising out of, based upon or attributable to any initial public offering of securities by the **Insured Organization** or alleging the purchase or sale of such securities subsequent to such offering;

12. With respect to INSURING AGREEMENT C. of this policy, only:

    a.  For actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, secret or any other intellectual property rights;

**b.** For actual or alleged violation of any law, whether statutory, regulatory or common law, with respect to any of the following activities: anti-trust, business competition, unfair trade practices or tortuous interference in another's business or contractual relationships; or

**c.** Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement.

**13.** Alleging, arising out of, based upon or attributable to, in whole or in part, any **Employment Practices Wrongful Act**.

**14.** Alleging, arising out of, based upon or attributable to, in whole or in part, any **Third Party Discrimination** and/or **Third Party Harassment**.

**15.** Alleging, arising out of, based upon or attributable to, in whole or in part, any **Fiduciary Wrongful Act**.

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

**SECTION V. - CONDITIONS**

**A. Bankruptcy and Priority of Payments**

The bankruptcy or insolvency of the **Insured Organization** or any **Subsidiary** shall not relieve the **Insurer** of any of its obligations hereunder. The coverage provided by this policy, however, is intended primarily to protect and benefit the **Insured Persons**.

With respect to the payment of the policy proceeds, it is agreed that covered **Loss** due under this policy shall be paid by the **Insurer** in the following order of priority:

**1.** First pay such **Loss** for which coverage is provided under INSURING AGREEMENT A. of this policy;

**2.** With respect to any remaining amount of the Limit of Liability still available after payment of such **Loss**, pay **Loss** for which coverage is provided under INSURING AGREEMENT B. of this policy; and

**3.** With respect to any remaining amount of the Limit of Liability still available after payment of such **Loss**, pay **Loss** for which coverage is provided under INSURING AGREEMENT C. of this policy.

The **Insured Organization** or its representatives and the **Insurer** shall use their best efforts to agree upon the priority of payment of all **Loss** under this policy. If no agreement is reached regarding the priority of payments, then the **Insurer** and **Insured Organization** will submit the issue of such priority, and only that issue, to binding arbitration.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary                                                                 President

# EMPLOYMENT PRACTICES LIABILITY
# COVERAGE SECTION (PRIVATE)
# PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning. Refer to SECTION III. – DEFINITIONS in this Coverage Section or the Common Policy Terms and Conditions.

If purchased, as indicated in Item 3. of the Common Policy Declarations Page, and in consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:

## SECTION I. - INSURING AGREEMENTS

### A.  Employment Practices Liability

The **Insurer** shall pay **Loss** up to the Limit of Liability applicable to this **Coverage Section** on behalf of the **Insured** in connection with any **Employment Practices Claim** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy**.**

### B.  Third Party Liability Coverage

The **Insurer** shall pay for **Loss** up to the Limit of Liability applicable to this **Coverage Section** arising out of or in connection with any **Claim** for **Third Party Discrimination** and/or **Third Party Harassment** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy.

## SECTION II. – COVERAGE EXTENSIONS

### Workplace Violence Expenses Sublimit

If a sublimit is shown in Item 2.B. of the Employment Practices Liability Declarations Page, the **Insurer** shall provide coverage for **Workplace Violence Expense** the **Insured Organization** incurs resulting directly from any **Workplace Violence**. This sublimit shall be part of and not in addition to the Limit of Liability set forth in Item 2.A. of the Employment Practices Liability Declarations Page.

No Retention shall apply to the **Workplace Violence Expense** Coverage.

## SECTION III. - DEFINITIONS

### A.  Claim, for purposes of this Coverage Section shall be an Employment Practices Claim, which means:

A written demand for monetary or non-monetary relief solely where alleging an **Employment Practices Wrongful Act**, including:

1.  A civil, criminal, administrative, regulatory or arbitration proceeding or arbitration demand for monetary or non-monetary relief which is commenced by:

    a.  Receipt or service of a complaint or similar pleading;

    b.  Return of an indictment or filing of information; or

    c.  Receipt of a notice of charges;

2.  A written request to an **Insured** to toll or waive a statute of limitations regarding a potential **Claim**, commenced by the receipt of such request by the **Insured**;

3.  An administrative or regulatory investigation when conducted by the Equal Employment Opportunity Commission ("EEOC") or equivalent state, local or foreign agency, which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the **Insured**.

    Provided, such **Employment Practices Claim** shall not include any internal or external labor or grievance proceeding which is pursuant to a collective bargaining agreement.

### B.  Employee means any past, present or future employee of the Insured Organization, whether such

employee is in a supervisory, co-worker or subordinate position or otherwise, including any full-time, part-time, seasonal and temporary employee of the **Insured Organization**. An individual who is leased or

contracted to the **Insured Organization** shall also be an **Employee**, but only if the **Insured Organization** provides indemnification to such leased or contracted individual in the same manner as is provided to the **Insured Organization's** employees.

**C.**  **Employment Practices Claim** means any **Claim** for an **Employment Practices Wrongful Act**.

**D.**  **Employment Practices Wrongful Act** means any actual or alleged:

**1.**  Wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied employment contract;

**2.**  Employment related harassment (including but not limited to sexual harassment);

**3.**  Employment related discrimination (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability);

**4.**  Employment-related retaliation;

**5.**  Employment-related misrepresentation to an **Employee** or applicant for employment with the **Insured Organization**;

**6.**  Employment-related libel, slander, humiliation, defamation and/or invasion of privacy;

**7.**  Wrongful failure to employ or promote;

**8.**  Wrongful deprivation of career opportunity, wrongful demotion or negligent **Employee** evaluation, including the giving of defamatory statements in connection with an **Employee** reference;

**9.**  Employment related wrongful discipline;

**10.**  Failure to grant tenure or practice privileges;

**11.**  Failure to provide or enforce adequate or consistent organization policies or procedures relating to employment performance;

**12.**  Violations of the following federal laws (as amended) including all regulations promulgated thereunder:

    **a.**  Family and Medical Leave Act of 1993;

    **b.**  Americans with Disabilities Act of 1992 (ADA);

    **c.**  Civil Rights Act of 1991;

    **d.**  Age Discrimination in Employment Act of 1967 (ADEA), including the Older Workers Benefit Protection Act of 1990; or

    **e.**  Title VII of the Civil Rights Law of 1964 (as amended) and 42 U.S.C. Section 1983, as well as the Pregnancy Discrimination Act of 1978;

**13.**  Violation of an **Insured Person's** civil rights relating to any of the above; or

**14.**  Negligent hiring, retention, training or supervision, infliction of emotional distress, or violation of an individual's civil rights, when alleged in conjunction with any of the foregoing items 1. through 13.,

whether such **Employment Practices Wrongful Act** as described in 1-14 above is committed directly, indirectly, intentionally or unintentionally, but only if the **Employment Practices Wrongful Act** actually or allegedly pertains to acts committed by an **Insured** and are alleged against an **Insured** by an **Insured Person** or applicant for employment with the **Insured Organization**.

**E.**  **Insured** means any **Insured Organization** and/or any **Insured Person**.

**F.**  **Insured Person** means:

**1.**  Any past, present or future director, officer, or **Employee**, management committee members or members of the Board of Managers of the **Insured Organization**; or

**2.**  In the event the **Insured Organization** or a **Subsidiary** thereof operates outside the United States, then the term **Insured Person** also means those titles, positions or capacities for such foreign **Insured Organization** or **Subsidiary** that are equivalent to the positions of directors or officers in the United States.

**G.** **Loss** means damages (including back pay and front pay), settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**. **Loss** (other than **Defense Expenses**) shall not include:

1. Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

2. Amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

3. Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

4. The cost of creating or reinstating employment;

5. Any amounts owed to any **Employee** as wages or compensation previously incurred or vested without regard to any **Claim**;

6. Civil or criminal fines or penalties;

7. Taxes, whether owed to or by any **Insured**;

8. Amounts, including **Defense Expenses**, arising out of, based upon or attributable to actual or alleged liability or costs incurred by any **Insured** to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person, or any actual or alleged liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar relating to an **Employment Practices Claim**;

9. Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable. For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

**H.** **Premises** means the buildings, facilities or properties occupied by the **Insured Organization** in conducting its business.

**I.** **Third Party** means any person(s) with whom an **Insured** interacts.

**J.** **Third Party Discrimination** means any discrimination by an **Insured** in his or her capacity as such against a **Third Party** based on such **Third Party's** race, color, creed, religion, age, gender, national origin, sexual orientation or preference, disability, pregnancy or other protected status that is protected pursuant to any applicable federal, state or local statute or ordinance.

**K.** **Third Party Harassment** means any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment that is by an **Insured** to a **Third Party**.

**L.** **Workplace Violence** means any intentional and unlawful act:

1. of deadly force involving the use of lethal weapon; or

2. the threat of deadly force involving the display of a lethal weapon,

which occurs on or in the **Premises** and which did or could result in bodily injury or death to an **Insured Person**.

**M.** **Workplace Violence Expense** means the reasonable fees and expenses, or cost of:

1. an independent security consultant for ninety (90) days following the date **Workplace Violence** occurs;

2. an independent public relations consultant for ninety (90) days following the date **Workplace Violence** occurs;

3. a counseling seminar for all **Employees** conducted by an independent consultant following **Workplace Violence**;

4. independent security guard services for up to fifteen (15) days; and

5. an independent forensic analyst.

**SECTION IV. - EXCLUSIONS**

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

**1.** Alleging, arising out of, based upon or attributable to, in whole or in part, any litigation involving any **Insured** that was commenced or initiated prior to, or was pending on or before the date referenced in Item 4. of the Employment Practices Liability Declarations Page, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation;

**2.** For actual or alleged bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged; provided, this EXCLUSION shall not apply to allegations of mental anguish or emotional distress made solely in connection with an **Employment Practices Claim**;

The **Insurer** shall not be liable to make any payment, and shall have no duty to defend or pay **Loss** of any sort, in connection with any **Workplace Violence**:

    **a.** which occurs at any location other than the **Insured Organization's Premises**;

    **b.** arising from declared or undeclared war, civil war, insurrection, riot, civil commotion, rebellion or revolution, military, naval or usurped power, governmental intervention, expropriation or nationalization;

    **c.** that reflects legal costs, judgments and settlements incurred as the result of any **Claim**, suit or judicial action brought against an **Insured Organization** in connection with **Workplace Violence**; or

    **d.** resulting from the use or threat of force or violence occurring on the **Premises** for the purpose of demanding money, securities or property.

**3.** For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization**;

Pollutant includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, whether live or inanimate, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

**4.** For violation of any of the responsibilities, obligations or duties imposed by: The Fair Labor Standards Act (except the Equal Pay Act) or any state or local statutory or common law, regulation or ordinance that governs payment or administration of wages, hours worked, or employee entitlements; the Employee Retirement Income Security Act of 1974; the National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; the Consolidated Omnibus Budget Reconciliation Act; the Occupational Safety and Health Act; any rules or regulations of any of the foregoing promulgated thereunder and amendments thereto; or any similar provisions of any federal, state or local statutory or common law that govern the same subject matter governed by the laws referenced in this section even if particular laws have some additional or different provisions; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

**5.** Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement; provided this EXCLUSION shall not apply to **Defense Expenses** in connection with an **Employment Practices Claim**;

**6.** Alleging, arising out of, based upon or attributable to any workers' compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

**7.** Alleging, arising out of, based upon, directly or indirectly resulting from or in consequence of, or in any way involving any criminal or deliberate fraudulent act; provided this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such Insured committed such criminal or fraudulent act.

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary                                                              President

# EXHIBIT 3

FILED
2020 FEB 04 03:36 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 20-2-03141-1 SEA

**STATE OF WASHINGTON**
**KING COUNTY SUPERIOR COURT**

STATE OF WASHINGTON,

        Plaintiff,

    v.

REED HEIN & ASSOCIATES, LLC, d/b/a TIMESHARE EXIT TEAM; BRANDON REED; TREVOR HEIN; MAKAYMAX, INC.; and HEIN & SONS INDUSTRIES, INC.,

        Defendants.

NO.

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF UNDER THE CONSUMER PROTECTION ACT, RCW 19.86, THE DEBT ADJUSTING ACT, RCW 18.28, AND THE CREDIT SERVICES ORGANIZATION ACT, RCW 19.134

COMES NOW PLAINTIFF, State of Washington, by and through its attorneys Robert W. Ferguson, Attorney General, and M. Elizabeth Howe, Aaron J. Fickes, and Lynda Atkins, Assistant Attorneys General, and brings this action against the above-captioned defendants (Defendants) for violations of the Consumer Protection Act, RCW 19.86, the Debt Adjusting Act, RCW 18.28, and the Credit Services Organization Act, RCW 19.134, associated with unfair and deceptive conduct in the marketing and sale of timeshare "exit" services offered to consumers across the United States and Canada. The State alleges the following on information and belief:

**INTRODUCTION**

1.1    In 2012, defendants Brandon Reed and Trevor Hein—at the time employed selling rain gutter systems—formed Reed Hein and Associates, LLC (Reed Hein) and

COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF - 1

1    immediately began selling "expert" services to release consumers from their timeshare contracts.

2    Contrary to their marketing claims, Reed Hein had no expertise in releasing consumers from

3    timeshare contracts (a service dubbed "exiting" timeshares). Since 2012 Defendants have

4    unfairly and deceptively contracted with more than 32,000 consumers looking to be rid of their

5    unwanted timeshares and have collected millions of dollars in upfront fees from consumers in

6    the process.

7         1.2    From Reed Hein's Bellevue, Washington headquarters, Defendants (consisting

8    of Reed Hein, its founders, and their two holding companies) target customers across North

9    America to sell their illusory services. Defendants mislead consumers at every step of the

10   process. Defendants' deceptive advertising has at times portrayed Reed Hein as performing

11   speedy, "risk-free" exit services with a 100% success rate. In reality, customers can wait months

12   or years for an exit that may never come, all while continuing to owe money for their timeshare.

13   The majority of Defendants' customers: (i) do not receive the promised exit, even after years of

14   Reed Hein's claimed work toward it; (ii) receive an exit that causes the customer unanticipated

15   negative financial or other consequences; or (iii) receive an exit the customer could have

16   obtained for themselves, without paying thousands of dollars to Defendants. Of the "exits" Reed

17   Hein has delivered, many do not conform to Reed Hein's marketing claims. For example, Reed

18   Hein has manipulated customers into failing to make payments to the timeshare developer or

19   resort (Resort), which then <u>forecloses</u> on the customer—Defendants do not warn that this is

20   considered an "exit" and thus voids Defendants' supposed "100% money-back guarantee."

21   Among other problems, Reed Hein customers have suffered credit damage and have been subject

22   to debt collection as a result of exits procured by Defendants. Defendants have also congratulated

23   many customers on "successful" exits, only for the customer to find out months or years later

24   that they still own their timeshares and are now behind on their payments. These negative

25   outcomes are for those exits Defendants have actually delivered: according to Defendants' own

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 2

1    records,[1] of the more than 38,000 exits Reed Hein has been hired to perform since 2012, Reed

2    Hein has delivered only <u>approximately half</u>. More than 4,600 of these exits have been

3    <u>outstanding for three years or more.</u>

4         1.3     Defendants spend more than $1 million per month advertising for new customers,

5    despite having yet to deliver services for nearly 15,000 pending customers. From advertising to

6    services rendered, Defendants present a false front: Undisclosed to its customers and except in

7    rare circumstances, Reed Hein does not negotiate directly with Resorts as it claims. Reed Hein

8    is essentially a referral service for third-party vendors (Vendors): Reed Hein collects a huge fee

9    from its customers—<u>up to $8,795 or more for each timeshare to be exited, usually paid upfront</u>—

10   only to outsource 95% or more of its customers' files to Vendors for a significantly discounted

11   rate, <u>often as low as $500 per file</u>. The Vendors are left to accomplish the timeshare exits

12   however the Vendors see fit, without Defendants' supervision or input, and often without a

13   contract to govern the Vendors' work. Defendants lack the expertise to assess the legitimacy of

14   an exit, and must rely on the Vendor that the exit is complete and/or valid. What few exits Reed

15   Hein accomplishes internally are generally through "surrender" programs offered by the Resorts,

16   which timeshare owners could utilize directly.

17        1.4     The Washington Attorney General has received more than 90 consumer

18   complaints from Defendants' customers regarding their unfair and deceptive business practices.

19   On November 28, 2018, the Better Business Bureau issued an alert regarding a "pattern of

20   complaints" observed in the more than 300 complaints it has received against Reed Hein, which

21   currently holds a "C-" rating with the organization. Moreover, because Defendants misrepresent

22   all aspects of their business, many "satisfied" customers may not realize that they have been

23   deceived as to the work done, that they may have suffered lasting financial damage, and/or that

24   they may even still legally own their timeshares. Numerous Resorts have also filed lawsuits

25        [1] The State's allegations herein are based on exit status information disclosed by Defendants on December
26   17 and 19, 2019, as current through those dates.

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 3

1    against Defendants related to Reed Hein's practices. *See, e.g., Diamond Resorts International,*

2    *Inc., et al. v. Reed Hein & Associates, LLC, et al.,* No. 2:17-cv-03007 (D. Nev. 2017).

3         1.5    Virtually every aspect of Defendants' operation is deceptive and/or unfair in

4    violation of the Consumer Protection Act (CPA), and thousands of people across the country and

5    in Canada—including over 2,500 consumers in Washington—have fallen victim to Defendants'

6    practices. Moreover, attendant to their "exit" services, Defendants offer debt adjusting services

7    and credit repair services without complying with the provisions of the Debt Adjusting Act,

8    RCW 18.28, or the Credit Services Organization Act, RCW 19.134. As such, many of Reed

9    Hein's customer contracts are void, and Defendants have committed thousands of *per se*

10   violations of the CPA.

11                              **JURISDICTION AND VENUE**

12        2.1    The Attorney General is authorized to bring this action under the Consumer

13   Protection Act, RCW 19.86.080, the Debt Adjusting Act, RCW 18.28.185, and the Credit

14   Services Organization Act, RCW 19.134.070.

15        2.2    This Court has personal jurisdiction over Defendants pursuant to RCW 4.28.180,

16   RCW 4.28.185, and RCW 19.86.160 because the acts alleged have been committed in this State

17   and Defendant Reed Hein's principal place of business is located in Bellevue, Washington.

18        2.3    Venue is proper in King County pursuant to RCW 4.12.020 and 4.12.025, and

19   Superior Court Civil Rule 82 because Reed Hein is headquartered in King County, transacts

20   business in King County, and provides consumers with a contact address in King County.

21                                      **PARTIES**

22        3.1    The Plaintiff is the State of Washington.

23        3.2    Defendant **Reed Hein** is a limited liability company registered with the

24   Washington Secretary of State. Brandon Reed and Trevor Hein are the registered governing

25   persons of Reed Hein. Reed Hein's corporate office is located at 220 120th Ave NE, Bellevue,

26   WA 98005. Upon information and belief, Reed Hein's principal place of business is located at

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 4

220 120th Ave NE, Bellevue, WA 98005, and the company's former principal place of business was at 3400 188th St. SW #300, Lynnwood, WA 98037. Upon information and belief, Reed Hein operates under the trade names "Reed Hein," "Timeshare Exit Team," "TET," "TSET," and "RHA," and formerly operated under the names "Reed Hein Travel" and "World Travel Seattle." Reed Hein's primary website is timeshareexiteam.com, but Reed Hein formerly maintained a separate reedhein.com website and maintains dozens of other web domains to redirect to timeshareexitteam.com. On information and belief, Reed Hein began operation in 2012.

3.3     Defendant **Brandon Reed** was, at all times material to this lawsuit, the co-founder, governor, operator or manager of Reed Hein. Brandon Reed is also a 60% owner of Reed Hein through a wholly-owned Washington corporation, Makaymax, Inc. In these roles, Brandon Reed directs, controls, participates in, and knowingly approves of the policies, activities, and practices alleged in the Complaint herein. Upon information and belief, Brandon Reed resides in Kirkland, Washington.

3.4     Defendant **Trevor Hein** was, from Reed Hein's creation through at least approximately July 2016, the co-founder, governor, operator or manager of Reed Hein. In these roles, Trevor Hein directed, controlled, participated in, and knowingly approved of the policies, activities, and practices alleged in the Complaint herein. Trevor Hein is also a 40% owner of Reed Hein through a wholly-owned Delaware corporation, Hein & Sons Industries, Inc. Upon information and belief, Trevor Hein resides in British Columbia, Canada.

3.5     On information and belief, Defendant **Makaymax, Inc.,** is a Washington corporation incorporated on June 2, 2015. Makaymax, Inc., is wholly-owned by Brandon Reed and has been operated by Brandon Reed since its formation as a holding company.

3.6     On information and belief, Defendant **Hein & Sons Industries, Inc.,** is a Delaware corporation incorporated on March 20, 2012. Hein & Sons Industries, Inc., is wholly-

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 5

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1 owned by Trevor Hein and has been operated by Trevor Hein since its formation as a holding

2 company.

3 **NATURE OF TRADE OR COMMERCE**

4       4.1     Defendants, at all times relevant to this action, have been engaged in trade or

5 commerce within the meaning of RCW 19.86.010(2).

6 **FACTS**

7 **A.     Defendants Profess to Provide Timeshare "Exit" Services**

8       5.1     Reed Hein's customers are owners of various types of timeshare interests, *i.e.*,

9 people entitled by contract to the use of a particular Resort's property for a specific interval of

10 time, or entitled to a certain number of "points" that can be exchanged for use of particular Resort

11 properties. Timeshare ownership takes many different legal forms, and can require the timeshare

12 owner to make a variety of different payments, including Resort membership fees and

13 maintenance fees. Many of Reed Hein's customers own timeshare interests that are mortgaged,

14 subject to promissory notes, or otherwise encumbered.

15       5.2     For a variety of reasons, a significant number of timeshare owners are interested

16 in terminating their timeshare interests. Some of these owners are elderly or have had a change

17 in medical or financial circumstances, and no longer want the timeshare obligations. Others

18 regret entering the timeshare contracts at all, some due to claimed unfairness or misfeasance by

19 the Resorts. Regardless of the timeshare owner's motivation, terminating a timeshare interest is

20 not always easily done, and as a result a cottage industry of "exit companies" like Reed Hein has

21 arisen claiming to assist in terminating these interests.

22       5.3     Defendants advertise that Reed Hein can terminate owners' timeshare interests

23 by forcing Resorts to take back their timeshares. Defendants advertise that Reed Hein can

24 perform exits regardless of the circumstances of how the timeshare agreement was reached, the

25 particulars of the contract, and whether the timeshare has a mortgage balance. To attract new

26 customers, Defendants advertise extensively through radio, television, emails, direct mailings,

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 6

1    websites, trade show appearances, and paid endorsements. **Attachment A** to this Complaint

2    includes samples of Reed Hein's online and print advertisements; **Attachment B** to this

3    Complaint includes image captures of timeshareexitteam.com and reedhein.com.

4         5.4      Consumers interested in Reed Hein's services meet with a representative

5    (sometimes called a "Client Advisor") at one of many "local" offices Defendants have set up in

6    metropolitan areas across the country or by webinar. During sales presentations, Client Advisors

7    reiterate that Reed Hein can legally, safely, and permanently get owners out of their timeshare

8    contracts through Reed Hein's "secret," "unique," and "proprietary" process. Unbeknownst to

9    prospective customers, these Client Advisors are commissioned salespeople whom Reed Hein

10   does not require to have expertise in the timeshare industry or in terminating timeshare interests.

11        5.5      For the services Defendants claim to offer, Reed Hein charges a significant fee of

12   between $2,897 to $8,795 or more for the first timeshare exit (some customers have more than

13   one contract to exit). Defendants incentivize upfront payments by offering small discounts, but

14   will also accept payment installments. Reed Hein's contracts from 2019-forward provide that

15   Reed Hein has no obligation to provide services until paid in full.

16        5.6      Defendants consider any fees received as earned upon receipt, despite not having

17   done any assessment to determine whether an exit is possible. Defendants have contracted to

18   receive fees for approximately 38,000 customer "exits" since 2012, collecting millions in upfront

19   fees. Defendants also advertise a "100% money-back guarantee" (Money-Back Guarantee) that

20   Reed Hein will refund its fee if it cannot accomplish an exit. This Guarantee features prominently

21   in Reed Hein's marketing materials, including on its website and advertisements featuring its

22   paid celebrity endorsers.

23        5.7      Defendants tell incoming customers that an exit can take a significant amount of

24   time, currently 18 months or longer. The process is opaque to the customer: Customers receive

25   infrequent updates from Reed Hein "Account Coordinators" (administrative employees who do

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 7

1    not perform substantive work toward exits) informing them that progress is being made toward

2    an exit.

3          5.8      Eventually, if the process ends, Defendants send customers an "exit letter" on

4    Reed Hein's letterhead congratulating them on being exited from their timeshare contract.

5    Defendants do not always provide any proof of an exit beyond the exit letter. Most customers

6    are left with the impression that Reed Hein has exited them and they face no potential future

7    liability on their timeshare contract.

8          5.9      Virtually every step of this process—from advertising to the exit letter—is unfair,

9    deceptive, and/or outright false:

10                  a.      The "exits" Defendants claim to accomplish are often legally invalid,

11   damaging, and/or not as-advertised to customers—or are never delivered at all;

12                  b.      Defendants have no proprietary process or internal expertise in the

13   termination of timeshare contracts, and instead covertly outsource 95% or more of their

14   customers to third-party Vendors;

15                  c.      Defendants' much-touted Money-Back Guarantee is illusory and seldom

16   honored; and

17                  d.      Defendants make unfair or misleading representations to consumers at all

18   stages of their relationship.

19         5.10     Worse still, Reed Hein's signups far outpace its supposed exits. According to

20   their own data as of December 2019, Defendants have nearly 15,000 customers in limbo awaiting

21   an exit, while Defendants continue to take on hundreds more new customers each month.

22   Defendants have delivered only approximately <u>half</u> of the exits for which they have been hired,

23   and many of those exits may be disputed by the Resorts.

24         5.11     In their efforts to bring in revenue by adding new customers, Defendants spend

25   approximately $1 million a month in advertising ($10-12 million per year). With 17,000 exits

26   outstanding (for nearly 15,000 customers), Reed Hein is spending approximately 25% of its

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 8

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

annual revenue to attract more customers rather than servicing its existing backlog. Additionally, on information and belief, Defendants no longer follow their own internal "Do Not Take" List (*i.e.*, Defendants' list of Resorts they cannot exit), meaning that Defendants are knowingly advertising to, and collecting money from, customers whom they cannot service.

5.12    Un-exited customers may have no recourse with Reed Hein, despite Defendants' advertised Money-Back Guarantee. Defendants' business practices leave the company far short of the assets needed to honor the Guarantee made to customers whose exits are outstanding. On information and belief, Defendants keep only a minimal operational reserve, such that funds paid by incoming customers must be spent to continue servicing Reed Hein's backlog of un-exited customers.

**B.    Reed Hein's Exits Are Invalid or Not What Was Advertised to Consumers**

5.13    Reed Hein specifically markets that their "exits" involve getting the Resort to "take back" the timeshare or "cancelling" or "annulling" the timeshare contract. For a time, Defendants' advertisements specifically claimed that Reed Hein's process "forced" Resorts to take the timeshare back, but Reed Hein's corporate representative has conceded in deposition testimony that Reed Hein and its Vendors' methods—short of a lawsuit—cannot <u>force</u> the Resorts to do anything, and are successful in returning the timeshare to the Resort only with the Resort's <u>consent</u>.

5.14    Instead, Defendants use exit methods of varying legitimacy, and rarely in the form advertised. Brandon Reed has conceded in sworn deposition testimony that several of these methods were "not what [he] told [his] customers," who were told "something completely different."

**1.    Invalid or Unsafe Exits**

**a.    Foreclosure and Notice of Termination Exits**

5.15    Defendants consider foreclosure by the Resort to be an exit in satisfaction of Reed Hein's contract, because the customer technically no longer owns the timeshare. Likewise,

1   Defendants consider customers successfully exited when a Resort issues a Notice of Termination

2   of the timeshare contract for nonpayment. Under this strategy, all Reed Hein needs to do to earn

3   its upfront fee is instruct its customer to stop making payments on the timeshare—or impede

4   them from doing so—and wait for the Resort to foreclose or issue a Notice of Termination. Both

5   outcomes can harm a customer's credit rating and create other negative financial consequences.

6   While Defendants have recently begun warning customers of the risk of foreclosure or

7   termination, Defendants do not disclose to customers that Reed Hein or its Vendors are seeking

8   these outcomes, even though more than 1 in 10 of Reed Hein's purportedly successful exits took

9   these forms.

10       5.16    Defendants affirmatively instructed many customers to stop making any

11  payments to their Resort, including mortgage payments. Even after Defendants claim they

12  stopped instructing customers not to pay, Defendants implied that if customers stopped making

13  payments, it could speed up the exit process or even prompt the Resort to "cancel" their

14  timeshare. In addition, Defendants' attorney Vendors would send representation letters to the

15  Resorts that barred the Resorts from communicating directly with the consumers, preventing

16  some consumers from realizing the Resort was demanding payment or threatening foreclosure.

17       5.17    Defendants take credit for such foreclosures even when they know the foreclosure

18  did not result from Reed Hein's supposed work or when Reed Hein was unaware of the

19  foreclosure until informed by the customer. Reed Hein's internal policy manual has a section

20  titled, "I Could Have Just Done This on My Own, I want My Money Back," which instructs

21  employees to refuse refunds based on foreclosures. Employees are further instructed to tell

22  customers: "they did NOT do it on their own. They signed a contract with us and we achieved

23  an exit." Framing foreclosures and Notices of Terminations as successful exits allows

24  Defendants to refuse to provide refunds.

25

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 10

### b. "Notices of Resignation" Exits

5.18 Defendants' claimed "successful" exits include exits by means of "notice of resignation." This involves a Vendor sending a letter to the Resort unilaterally resigning the timeshare ownership, making a statement such as "the particular owner no longer wishes to be a member of the club." On information and belief, these form notices of resignation are rejected by Resorts and have no legal effect unless the Resort consents.

### c. "Deed Back to Resort" Exits

5.19 Defendants' claimed successful exits include exits by means of a "deed back to the resort." For this method, the Vendor attorney arranges for a quitclaim deed conveying the customer's timeshare interest back to the Resort. The customer signs the deed, and the Vendor arranges for it to be recorded, without obtaining consent from the Resort. Absent the Resort's consent, these "deed backs" are legally invalid and the customer remains liable under the original timeshare contract.

### d. Invalid (or Potentially Invalid) Exits by Transfers to Third Parties

5.20 Defendants' Vendors also practice a variety of exit methods involving invalid or potentially invalid transfers to third parties. For example, one Vendor regularly "exited" via a method called "deed back to associate." For that method, the Vendor prepares and records a deed purporting to convey the customer's timeshare interest to an "associate" who is paid $100 per deed. The Vendor does not inquire into, or even consider, the associate's ability or intention to pay the fees that come with the timeshare ownership. These "deed to associate" transfers occur without the consent of the Resort and are legally invalid, meaning that the Resort may still pursue payment from Reed Hein's customer.

5.21 Other Vendors used by Defendants purport to locate third-party transferees who are willing to take on the customer's timeshare. While these transfers may be performed with the consent of the Resorts, Reed Hein's customers risk liability if the transfer is later unwound due to an illegitimate transferee. In practice, Reed Hein customers are made to sign and notarize

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 11

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1    transfer paperwork which includes blank spaces for Vendors to insert an unspecified transferee

2    at a later date; the customer may never even learn the transferee's identity and has no means to

3    know their legitimacy. If the customer refuses to execute the blank paperwork, Defendants take

4    the position that the customer has rejected a Reed Hein-procured exit opportunity and voided the

5    Money-Back Guarantee.

6              e.      **"Verbal Confirmation from Resort" Exits**

7    5.22    Defendants and certain of their Vendors also accept "verbal confirmation" from

8    the Resort that the Resort will not enforce the timeshare debt, with no further action. These

9    "verbal confirmation" exits, by nature, do not come with proof that the Reed Hein customer has

10   been released from their obligations under the timeshare contact or mortgage, and are

11   unenforceable. Defendants accept that such "Verbal Confirmation from Resort" is effective, and

12   communicate to the customer that the customer no longer owns the timeshare.

13   5.23    These "verbal confirmation" exits have proved worthless to various Reed Hein

14   customers who, months or years after Reed Hein informed them of the successful exit, received

15   payment demands from their Resorts for the timeshares they still legally own.

16             f.      **Unrecognized and Later-Rejected Exits**

17   5.24    Defendants claim to have obtained various forms of exits that they know, or

18   should know, are not recognized by Resorts and the Resorts still consider Reed Hein's customers

19   to be the legal owner of the timeshares. Defendants do not pursue a legal or any other type of

20   proceeding to determine whether Reed Hein or the Resort is correct, and instead report to

21   customers that they are exited from the timeshare. Reed Hein's exit letter contains the caveat

22   that if the Resort continues to contact the customer, the customer is to contact Reed Hein and

23   not engage with the Resort. Reed Hein provides multiple misleading explanations as to why a

24   customer would still be receiving timeshare invoices after an exit, including that the Resort is

25   trying to trick them into reactivating the timeshare contract.

26

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1    5.25    Additionally, according to the sworn testimony of Reed Hein's corporate

2    representative, Defendants rejected the "notice of resignation," "deed back to resort," and "deed

3    to associate" exit methods as not "safe" in 2016. Despite this, in their advertised count of 19,000

4    "successful" exits, Defendants include more than 2,600 exits by these methods, meaning that

5    more than 1 out of every 10 exits Reed Hein touts in its marketing are by means Defendants

6    claim they have since rejected.

7        **2.    Deceptive Exits That Are Not What Was Advertised**

8            **a.    Exits by Sale or Transfer to Third Parties**

9    5.26    Over time, Defendants' marketing has stated that Reed Hein is not a transfer or

10   listing company, and does not sell or transfer timeshares to third parties. Multiple versions of

11   Reed Hein's contracts have also specified: "This is not a listing agreement." Despite this repeated

12   representation, since Reed Hein's inception, Defendants' non-attorney Vendors have primarily

13   exited Reed Hein's customers by transferring or selling their timeshares to third parties.

14   5.27    Reed Hein's sales scripts even criticize the idea of a customer attempting to resell

15   their timeshare or hiring another company to do so. These scripts argue that the timeshare has

16   no resale value, will not sell, and/or that the customer will be scammed by listing companies

17   during the resell attempt, and that the customer instead should hire Reed Hein. While Reed

18   Hein's marketing specifically warned consumers against paying upfront fees to hire someone to

19   sell their timeshare, Defendants collected significant upfront fees from customers to do just that.

20   5.28    Defendants even profited from these resales: at least one Vendor pays Reed Hein

21   for timeshare "inventory" to resell, with Reed Hein receiving a percentage of the proceeds. These

22   payments are neither disclosed to the customer nor credited toward their Reed Hein fees. Reed

23   Hein's customer contracts were silent on this subject until 2019, when Defendants added a

24   provision that the customer "waives any right to any compensation that could result from an Exit

25   achieved through the Services."

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 13

5.29     Reed Hein's sales scripts also criticize transfers to third parties as an exit method, referencing incidents where timeshare owners were held accountable when the person to whom they transferred the timeshare did not make required payments to the Resort. Yet thousands of Reed Hein customers' "exits" were by transfer to third parties whom neither Reed Hein nor the customer selected. Where "transfers" are referenced at all in Reed Hein's marketing, Defendants create the deceptive net impression that the "transfer" will be back to the Resort rather than to a third party without the Resort's involvement.

5.30     Reed Hein's contracts did not begin to define "exit" as including the possibility of sale or transfer to a third party until 2019, after Defendants became aware of the State's investigation.

### b.     Transfer Vendors and Defendants' Exploitative Re-negotiation of Customers' Exit Agreements

5.31     In approximately 2017, Defendants began outsourcing thousands of their backlogged customer files to transfer company Vendors. Some Vendors required Reed Hein's customers to be current on all their maintenance fees and other payments to their Resorts to perform a transfer. Defendants thus informed hundreds or thousands of their customers who were behind on these payments—the majority of whom were directed by Defendants to stop making payments—that Reed Hein had a guaranteed "exit" for them within 180 days, but the customer needed to make any overdue payments to take advantage of the new "partnership." If customers balked, Defendants informed them that the transfer opportunity was an exit in satisfaction of Reed Hein's contract, and refusal to participate would void Reed Hein's advertised 100% Money-Back Guarantee. Facing the loss of their money, many customers complied.

5.32     Customers who moved forward with transfer Vendors after this point were often asked to execute an "Exit Agreement Addendum" modifying their prior contracts with Reed Hein. The Addendum's contents varied slightly over time, but required the customer to become (and stay) current on all Resort payments for a specified amount of time, after which time Reed Hein would take over financial responsibility for all Resort payments. However, in exchange for

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1  Reed Hein taking over payment responsibility, the Addendum required that the customer allow

2  Reed Hein and the transfer Vendor <u>unlimited time</u> to complete the exit. Reed Hein thus takes

3  over the payments, but is free to leave the timeshare legally in the customer's name for as long

4  as Defendants desire. This way, Defendants not only escape any time estimates provided to

5  existing customers, but make it so that Reed Hein never has to deliver its promised services so

6  long as Reed Hein can continue to make payments to the Resorts using revenue obtained from

7  other incoming customers.

8           **c.    Customers Are Made to Negotiate Their Own Exits**

9           5.33    In recent months, Defendants have implemented a new "exit process." Reed Hein

10  directs customers to file complaints with the Better Business Bureau and state Attorneys General

11  to prompt Resorts to contact the customer, at which point Reed Hein directs the <u>customer</u> to

12  negotiate an exit using talking points provided by Reed Hein. Reed Hein specifically directs

13  these customers not to inform the Resort of Reed Hein's involvement. As with Defendants' other

14  methods, this is not what Defendants advertised to their customers: Customers who hired Reed

15  Hein to "work directly" with Resorts have effectively paid thousands of dollars to Defendants

16  for the privilege of negotiating their own exits.

17  **C.    Defendants Do Not Possess the Expertise and Internal Capabilities They Advertise
       and Outsource 95% or More Exits to Vendors**

18

19           5.34    As early as December 2013, Defendants advertised that "[w]e are industry experts

20  in relieving people of their timeshare commitments." Only a year before, Brandon Reed and

21  Trevor Hein were employed selling rain gutter systems; neither had any experience or training

22  in performing timeshare exits, and they did not hire internal personnel who did. Brandon Reed

23  has testified under oath in other litigation that Reed Hein's business model from inception was

24  to <u>outsource all exit work</u> to third-party Vendors.

25           5.35    Defendants only began attempting "internal" (*i.e.*, non-Vendor) exits in

26  approximately 2015, and even this was limited to contacting Resorts about voluntary surrender

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 15

1    programs for unwanted timeshares—which the customer could have done for free. The

2    employees making these contacts, including Reed Hein's former office manager, had no

3    specialized training or experience. Only in 2016 did Defendants hire contractors or employees

4    with backgrounds in the timeshare industry to attempt to negotiate exits with Resorts, and only

5    then as a "secondary" measure as Defendants continued to outsource first to Vendors.

6        **1.    Defendants Fail to Disclose or Actively Conceal the Extent that Reed**
7               **Hein's Services Will Be Outsourced**

8        5.36    In most cases, Defendants immediately determine that the customer's exit will be

9    outsourced, but Defendants will often conceal or fail to disclose the Vendor's involvement unless

10   or until the Vendor's exit process necessitates disclosure, such as if the Vendor wants legal

11   documents executed.

12       5.37    In assigning a Vendor, Defendants do not do the case-by-case analysis of the

13   customer's timeshare that is promised in their advertising. Instead, 95% of the time, Defendants

14   decide whether the file should go to an attorney Vendor or non-attorney Vendor based solely on

15   whether the timeshare is encumbered.

16       5.38    Reed Hein has also broken ties with several of its Vendors, which often leaves

17   Defendants without a mechanism to affect the desired exit. During such periods, Defendants

18   continue to sign up customers for services but do not inform the customers that no work will be

19   done toward their timeshare exit until Reed Hein can locate a new Vendor. For example, for

20   several months in late 2018, Defendants did not have an attorney Vendor to whom they could

21   send incoming Reed Hein customers, after cutting off new assignments to all their existing

22   attorney Vendors. Reed Hein nevertheless continued to take on customers with encumbered

23   timeshares, without informing them that that no action would be taken on their exits until Reed

24   Hein located a new Vendor. Reed Hein ultimately had to restore its relationship with a prior

25   Vendor—who had previously sued Reed Hein for breach of contract for failing to send enough

26   customer files—to start work on these exits.

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1     5.39     Reed Hein would not necessarily tell their customers that work by an attorney (let

2     alone a third party) was contemplated for their exit, and salespersons were trained to convey

3     Reed Hein's hope that no attorney would be necessary. In many instances, Reed Hein neglected

4     to obtain a power of attorney before hiring a Vendor attorney on the customer's behalf, or

5     allowed a power of attorney to lapse before hiring one. Customers have complained to Reed

6     Hein, demanding a refund, on the basis that they did not realize Reed Hein would be hiring an

7     unknown third party.

8     5.40     In many cases, Defendants directed and trained their employees not to reveal the

9     identity of Defendants' Vendors, even in circumstances where they were permitted to indicate a

10    Vendor was being used. Employees also referred to Vendors in communications with customers

11    as though the Vendors were in-house personnel.

12    5.41     Where there was a Vendor contract, Defendants sometimes built in a provision

13    barring the Vendor from speaking to Reed Hein's customers. When one of Reed Hein's Vendor

14    attorneys began interacting with customers and sending them direct communications, including

15    an outline of Reed Hein's fee arrangement with the attorney, Defendants advised those

16    customers that the communications were "a formality" or should be ignored.

17    5.42     Attorney Vendors send representation letters to Resorts indicating the customer

18    (not Reed Hein) has retained the attorney to seek an exit of the timeshare. Attorneys send these

19    letters even when the customer does not know the attorney's identity or even that the attorney

20    has been retained. This is despite the fact that some of Reed Hein's attorney Vendor contracts

21    explicitly provided that Reed Hein customers would not have an attorney-client relationship with

22    the attorney and barred Reed Hein from implying that the attorney Vendor represented the

23    customer.

24    5.43     Defendants internally recognized that Reed Hein's contracts with customers did

25    not provide for Reed Hein to outsource exit services to a third-party Vendor. Reed Hein

26    employees were instructed in approximately April 2018 that they could direct customers to an

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 17

assignment provision in the contract as a basis for authority to outsource the exits, and "reset customer expectations" about third-party Vendors accordingly. Defendants only revised their contract to permit outsourcing of exit services in 2019, after commencement of the State's pre-litigation investigation.

**2.    Defendants Exercise Little to No Supervision Over Their Vendors**

5.44    On information and belief, Defendants maintain so little oversight of their Vendors that Defendants were unable to provide a complete Vendor list, contact information for all Vendors, or even the last names of their primary contacts at several of their Vendors, in the course of the State's investigation. In fact, Defendants' lack of supervision and oversight is to such degree that Reed Hein was once surprised to find itself accused of misappropriating a customer's timeshare "points," when these points were actually taken by a Vendor to whom Reed Hein had given the customer's Resort logon credentials.

5.45    Because many of these Vendor relationships are not governed by a written contract, Defendants have little to no control over what the Vendor does, or recourse if the Vendor does not perform. What few contracts Defendants do enter into with Vendors often provide the Vendors with broad discretion to act without consulting Reed Hein. Because of this, several of Defendants' Vendors have further subcontracted out the consumer's file, with or without Defendants' knowledge, without Defendants' oversight, and without a contract between Defendants and the subcontractor.

**3.    Defendants Rely on the Vendors' Assessment that An Exit is Complete or Valid and Do Not Perform Due Diligence**

5.46    Because Defendants do not possess expertise in timeshare law, Defendants must rely entirely on the assessment of their Vendors as to whether a purported exit is complete or legally valid.

5.47    Until at least approximately 2016, Defendants did not perform any work to validate an exit by one of their Vendors, and would send "exit letters" to customers based on as

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 18

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1    little as a verbal representation by the Vendor that an exit was complete. Defendants would not

2    further verify or require documentation from the Vendor.

3          5.48    Defendants also did not understand or supervise their Vendors' methods.

4    Brandon Reed testified in a recent deposition that, when retaining an attorney Vendor who

5    would ultimately be responsible for more than 6,000 purported exits, Reed "assumed he did

6    lawyer work. He did attorney work, whatever that is."

7          5.49    For years, and with Defendants' knowledge, that same attorney Vendor sent

8    hundreds of boilerplate letters to Resorts on behalf of Reed Hein customers alleging that the

9    customers wanted to exit their timeshares on the basis of fraud and/or misrepresentation. The

10    Vendor made no effort to determine whether there was a basis for such allegations. Defendants

11    accepted the attorney's letters accusing Resorts of fraud as a viable strategy to compel Resorts

12    to allow cancellation of timeshare contracts.

13          5.50    On multiple occasions, Defendants falsely communicated to customers that they

14    had been exited from their timeshares in reliance on information or legal assessments from Reed

15    Hein's Vendors. Many of these customers stopped making payments to Resorts on the basis of

16    Defendants' false assertion that they were exited, and became delinquent in their payments.

17    **D.**      **Defendants' Advertised Money-Back Guarantee Is Deceptive and Illusory**

18          5.51    Defendants feature a "100%" Money-Back Guarantee prominently in Reed

19    Hein's marketing materials and sales presentations, creating the deceptive net impression that

20

21

22

23

24

25

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 19

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

Reed Hein's services are risk-free because the customer can always get their money back. Reed Hein's Money-Back Guarantee, however, is illusory.



**Fig. 1. Timeshareexitteam.com as of December 4, 2019.**

5.52    The fine print of the Money-Back Guarantee has varied over time, but in every version Reed Hein attaches numerous caveats and qualifications that allow the company to avoid paying a refund at its discretion, which Reed Hein exercises in almost any circumstance to deny payment. Defendants' contractual small print does not correct the deceptive net impression created by its website and marketing materials.

5.53    Defendants have consistently interpreted the Money-Back Guarantee so that Reed Hein does not have to perform any deliverables in any specific span of time. Reed Hein will then use that as a ground to deny customers a refund and claim that Reed Hein is still working on a customer's file or that an exit may be forthcoming. Even now, the current fine print of the Guarantee only renders a customer "eligible" for a refund if three years have passed.

5.54    Defendants also build in a variety of pitfalls designed to void the Money-Back Guarantee:

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

a.  Reed Hein voids the Guarantee if it has any exit offer, regardless of cost or form. Defendants interpret this to include if a customer rejects one of its Vendors, even if the Resort has never been contacted.

b.  Reed Hein also voids its Money-Back Guarantee if the customer fails in its "duties," such as continuing to pay Resort fees, even if Reed Hein advised the customer not to pay.

c.  The most recent version of the Money-Back Guarantee declares the Guarantee void if the customer achieves their own exit: meaning that Defendants are entitled to keep the customer's funds even if they never did any work.

d.  A Reed Hein internal policy manual states that, "we do not offer refunds for . . . cancellations" of its customer contracts entered between approximately 2016 and early 2019, which include the Money-Back Guarantee.

5.55    In practice, Defendants' refund policy is that customers are not entitled to their full money back unless and until Reed Hein (in its discretion) determines that it is unable to obtain an exit. Defendants regularly deny requests for full refunds on the basis that Reed Hein has already begun work, and do not proactively refund money even if the exit has gone undelivered for years. Reed Hein typically does not honor its 100% Money-Back Guarantee unless the customer threatens to complain to a third party, such as the news media or the Washington State Attorney General's Office. Reed Hein has even conditioned refunds on customers taking down negative reviews or complaints online.

**E.      Defendants Make Misrepresentations and/or Create Deceptive Net Impressions at Every Stage of their Relationship with Consumers**

**1.      Misrepresentations Regarding the Safety and Efficacy of Exits**

5.56     Defendants advertise that the timeshare "exits" they will obtain on behalf of customers will be permanent and legal, and that the customer will not be harmed by the exit process. In particular, Defendants advertised that Reed Hein could get customers out of their timeshare "safely, legitimately, forever" or "safely, legally, forever." As discussed further above, the "exits" obtained by Defendants often do not meet these criteria.

5.57     "Safely" or "Securely": Defendants' marketing and sales presentations convey to potential customers that Reed Hein's services are safe, and even "100% risk free." In truth, many of Reed Hein's exit methods expose customers to debt collection actions, foreclosure, lawsuits, credit damage, unanticipated tax liability, and other consequences that Defendants did not include in their marketing. Defendants failed to disclose these risks to many customers, or told them there was no risk of these consequences.

5.58     Defendants claim they discontinued marketing that Reed Hein's exits were "safe" in late 2017, because they did not see any advertising benefit to the term. However, "safely, legally, and forever" still appears on Defendants' website.

5.59     "Legitimately" or "legally": Defendants' marketing and advertising conveys that the exits sold are valid and in accordance with applicable law. However, as discussed in section B, many of the exits ultimately obtained are legally questionable or wholly invalid.

5.60     Despite this, Defendants market their services to any timeshare owner, regardless of circumstances or the implicated Resort. In doing so, Defendants create the deceptive net impression that any timeshare contract can be legitimately exited using their services, even if there is no legal basis to break the timeshare contract. Some Resorts will not work with exit companies in any circumstance.

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 22

5.61    For those customers who are not legally exited, timeshare fees under their contract, including late fees, continue to accrue. Some customers only learn this when contacted by collections agencies or when the Resort forecloses on the customer's timeshare.

5.62    For many of Defendants' invalid exits, Resorts continue to send invoices and payment demands to the Reed Hein customer. Defendants inform their customers that it is "normal" for the Resort to continue to send payment demands, either because the Resort is attempting to trick the customer into somehow reactivating the exited timeshare contract or because the Resort's billing department has not gotten word of the exit. On information and belief, Defendants make these representations to consumers to prevent them from realizing that the exit is invalid or that the customer still is financially obligated to the Resort.

5.63    "Forever": Defendants' marketing and advertising conveys that the exits it obtains are permanent. In practice, Defendants will declare that a customer is exited for the purposes of satisfying Reed Hein's contractual obligations even though the exit is such that the Resort may still attempt to enforce the contract.

## 2.    Misrepresentations and Deceptive Net Impression Regarding Defendants' Expertise and Capabilities

5.64    From Reed Hein's inception, Defendants have advertised that they had unique, secret, or proprietary methods to affect timeshare exits. Defendants tell consumers who attend sales presentations that Reed Hein has special methods their competitors do not. All of Defendants' exit methods, (i.e., hiring a third-party Vendor to perform the exit or calling Resorts to ask if they have surrender programs), are available to the public.

5.65    Defendants' marketing to consumers also fosters the impression that Reed Hein itself is performing work internally to exit consumers from timeshares. At various times, Defendants have advertised that they have a "skilled in-house team" to handle exits, which Defendants interpret as applying to the customer service team interacting with Reed Hein's customers, who are neither skilled nor trained in timeshare exits.

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 23

1    5.66    Defendants' misrepresentations also extend to the size and local reach of the Reed

2   Hein organization. Over time, Defendants have advertised that Reed Hein has more than 30

3   satellite offices in local markets. Defendants' marketing stresses that Reed Hein has "real,"

4   "physical" offices for its customers across the U.S. and Canada, staffed by employees with

5   "local" experience. In reality, only Reed Hein's Canadian and U.S. headquarters were staffed

6   full time. Reed Hein's many other "offices" are virtual offices: rental office space used by one

7   or two regional salespeople for appointment-only sales meetings.

8    5.67    Defendants' marketing also falsely touts "local" expertise and connections to

9   handle timeshare issues particular to a Resort or region. In reality, Defendants will outsource

10   customer files to Reed Hein's current preferred Vendor regardless of where the customer's

11   timeshare is located. For example, of the approximately 38,000 timeshares Defendants were

12   hired to exit, Defendants outsourced more than 6,000 customers' files to a single-attorney law

13   office in Palm Springs, California; more than 6,000 to a single-attorney law office in Pawnee,

14   Oklahoma; more than 2,000 to a Seattle, Washington law firm; and more than 5,000 to a transfer

15   company based in Ozark, Missouri.

16    **3.    Misrepresentations Regarding Working "Directly" with Resorts**

17    5.68    Defendants mislead consumers that their "exits" are the result of "work[ing]

18   directly with resorts" and getting Resorts to "take[] the property back." Defendants misrepresent

19   that they have developed relationships with timeshares that facilitate negotiation of an exit.

20    5.69    Reed Hein does not have the relationships with Resorts that it claims, and many

21   Resorts affirmatively refuse to deal with timeshare exit companies, Reed Hein in particular.

22   Contrary to their marketing, Defendants take affirmative steps not to interact directly with

23   Resorts, and many times have actively concealed Reed Hein's involvement in a customer's

24   request for an exit. Reed Hein employees have specifically directed customers not to mention

25   that they have hired Reed Hein.

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 24

1  5.70 For Vendor exits, only the Vendor interacts with the Resort, and the Vendor

2 identifies itself as working on behalf of the customer rather than Reed Hein. Reed Hein's

3 marketing efforts have only recently begun referring to "partners" in the exit process; prior to

4 2017 Reed Hein's marketing indicated that Reed Hein itself would accomplish the exit on behalf

5 of the customer, and hire a third party "if needed" after Reed Hein's own efforts failed.

6  5.71 Even Reed Hein's internal team conceals its role in negotiations. Employees act

7 under a power of attorney granted by the consumer to the individual employee rather than Reed

8 Hein. The employee does not identify him or herself to the Resort as acting on behalf of Reed

9 Hein, forgoes company letterhead, and communicates from sources (e.g. private email addresses,

10 post office boxes, and cellular telephones) that are not associated with Reed Hein.

11  **4. Misrepresentations Regarding the Speed of Exit Services.**

12  5.72 To attract consumers, Defendants have advertised that they can accomplish their

13 exit services quickly and immediately free consumers from payment obligations to their

14 timeshares. Among other representations, Defendants state "Never pay another maintenance fee"

15 and "Why wait . . . we can get you out now." In some cases, Reed Hein employees explicitly

16 told customers their exit could be accomplished before the next year's maintenance fees were

17 due to be paid.

18  5.73 In reality, Defendants' supposed exits take months or years to accomplish, even

19 according to their own disclaimers and estimates. Over time, Defendants' estimate of the

20 timetable for a timeshare exit has stretched from as little as 30 days to (currently) 18 months or

21 more, during which time the customer is still legally obligated to pay any fees and costs

22 associated with their timeshare. In fact, more than 4,600 of Reed Hein's outstanding exits as of

23 December 2019 had been <u>pending for three years or more</u>.

24  **5. Misrepresentations regarding Reed Hein's Success Rate**

25  5.74 Through at least March 2015, Defendants advertised that Reed Hein had a 100%

26 success rate in exiting consumers from their timeshares. Reed Hein contracts during this period

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 25

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

even described the company's services as a "100% certain solution." Documents provided to customers at the time of signing up for Reed Hein's services informed them "Please do not despair, we will get you out. It's not a question of IF, only a question of WHEN." On information and belief, Defendants' claimed 100% success rate was untrue when made, and Defendants ultimately ceased to make this representation in recognition that they could not substantiate it.

5.75    On information and belief, Defendants have advertised that Reed Hein accomplishes more than a thousand "exits" per month. Reed Hein's corporate representative has since conceded in sworn testimony that the "thousand" referred to in these advertisements was the number of customers who signed up for Reed Hein's services per month, who had yet to be exited at all.

5.76    Defendants now claim to have performed <u>only approximately half</u> of the more than 38,000 exits Reed Hein has been paid to accomplish since the company began operation.

**6.    Defendants Create the Deceptive Net Impression that Reed Hein is a Law Firm and Misrepresent that Reed Hein Performs "Consumer Protection"**

5.77    Defendants' marketing and branding create a deceptive net impression that Reed Hein is a law firm and/or that Reed Hein employs in-house attorneys with timeshare expertise. Reed Hein has no actual attorney "associates" and the only attorneys on Reed Hein's payroll serve as corporate counsel. On information and belief, representatives of Reed Hein have also directly made misrepresentations to this effect.

5.78    Defendants' sales scripts and presentations also reinforced this impression. Scripts referred to "Our Attorneys – They are consumer advocate attorneys," and did not specify that any attorneys used are Vendors.

5.79    Representations    made    by    Defendants    on    reedhein.com    and timeshareexitteam.com bolster the misimpression that Reed Hein is a law firm or has in-house timeshare attorneys. Timeshareexitteam.com routinely referred to Reed Hein as a "firm" employing "consumer advocates" for the benefit of "clients." Through at least September 2014,

COMPLAINT FOR INJUNCTION AND OTHER
RELIEF - 26

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1  reedhein.com specifically advertised "expertise" in, among other things, the legal fields of

2  "Mortgage Mediation" and "Automotive Contracts." Through at least May of 2015,

3  Reedhein.com also stated that Defendants protect[ed] consumers "when they are misled by false

4  advertising, deceptive sales practices, defective products, and various other unfair trade

5  practices."

6  **Fig. 2. Reed Hein.com webpage as of Sept 2, 2014 (retrieved from archive.org).**



16    5.80    Reedhein.com also stated that Defendants "represent consumers," who are

17  referred to as "our firm's clients," and claimed that Defendants' services included "preparing the

18  strongest case for you."

19    5.81    Defendants did not add language to their website disclaiming that Reed Hein was

20  a law firm until sometime after September 2015 (in small print), and did not add a similar

21  disclaimer to their contracts until February, 2016 or later.

22    5.82    Defendants further create the impression that they are lawyers after they are hired;

23  Reed Hein employees were trained not to disclose the names of attorneys or that these attorneys

24  were third-party Vendors. In customer communications, employees routinely referred to Vendor

25  attorneys as "the attorney," "our attorney," or "your attorney." Defendants also insert Reed Hein

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 27

1  personnel between the customer and any attorney, telling the customer that they must liaise with

2  the attorney through their Reed Hein representatives.

3      5.83    At least some of Defendants' customers understood Reed Hein to be a law firm

4  or to have lawyers on staff when they retained Defendants' services.

5      5.84    Also central to Defendants' marketing is the representation that Reed Hein is a

6  "Consumer Protection Firm" or "Consumer Protection Group" employing a team of "consumer

7  advocates" to look out for consumer interests.



**Fig. 3. Timeshareexitteam.com as of Sept. 5, 2015 (retrieved from archive.org).**

12      5.85    In using these terms, Defendants create the impression that Reed Hein is

13  performing work to protect consumers or redress consumer harm. Reed Hein further bolsters this

14  impression by trading on public perception of the timeshare industry and stating that Resorts are

15  victimizing consumers.

16      5.86    Contrary to these repeated representations, Reed Hein's sole work consists of

17  selling timeshare exit services for profit. The employees who sign up Reed Hein's customers are

18  commissioned salespeople whose compensation was (through January 2018) based <u>solely</u> on the

19  sales they closed. As Reed Hein's corporate representative conceded in a recent deposition, Reed

20  Hein's "goal . . . is to sell as many exits as possible and generate as much revenue and income

21  as possible."

22      **7.    Defendants Deceptively Manipulate Online Reviews to Create Positive**
23      **Perception of Reed Hein's Abilities and Services**

24      5.87    Defendants also manipulate online reviews of Reed Hein's services in order to

25  attract and maintain customers, and discredit negative commentary by unhappy customers. This

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 28

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1  includes having employees pose as satisfied customers online and leave fabricated reviews

2  describing positive experiences with Reed Hein.

3      5.88    Defendants further manipulate online reviews by hosting a false and deceptive

4  online review aggregator on the timeshareexitteam.com website. Defendants' "Timeshare Exit

5  Team review summary" purports to aggregate 1-star (Bad) through 5-star (Excellent) reviews

6  from Google.com, Trustpilot.com, and Birdeye.com but <u>omits more than two hundred negative</u>

7  <u>(*i.e.*, 1- and 2-star) reviews</u> posted to those review websites. Through this deceptive "review

8  summary," Defendants falsely represent and/or create the impression that no negative reviews

9  of the company exist, when in fact hundreds of such reviews have been posted online including

10  approximately one hundred 1- and 2-star reviews on the Better Business Bureau's website.

11      5.89    Reed Hein also specifically misrepresented for several years that they had no

12  complaints with the Better Business Bureau or the Washington State Attorney General's Office,

13  or any other form of "action" from a U.S. or Canadian government agency. This

14  misrepresentation, which was included in contracts signed by Reed Hein customers through at

15  least May 2016, was untrue by as early as 2014.

16  **8.    Defendants Make Specific Misrepresentations to Consumers During Sales**

17  **Presentations**

18      5.90    Defendants present their salespeople as having expertise in the timeshare industry

19  and Reed Hein's "proprietary" exit process. In fact, the salespeople are not required to have any

20  timeshare-related experience and are not even told how Reed Hein obtains the exits.

21      5.91    Defendants advertise that their significant fee is a onetime cost (except for a

22  potential Resort-required settlement fee), compared to perpetual Resort fees. However, Reed

23  Hein does not disclose that it may later ask for more money if the exit opportunity it obtains

24  requires additional payments to a third-party Vendor, claiming this is allowed under their

25  contracts because the money is not going to Reed Hein. Furthermore, Reed Hein now requires

26  that customers keep paying for—but not use—the timeshare; customers thus have to pay Reed

1    Hein's fee <u>and</u> the Resort fees for the duration of the exit process, without the enjoyment of their

2    timeshare.

3        5.92    Reed Hein's fee calculation itself is deceptive: Customers are falsely told the fee

4    is calculated based on the work necessary to obtain an exit. Instead, Reed Hein's fee is based on

5    a formula designed to appear palatable to the potential customer when compared to the amount

6    of the customers' annual timeshare and maintenance fees, and the remaining amount of any

7    mortgage or other encumbrance.

8        **9.    Defendants Continue to Make Misrepresentations After Customers Hire
             the Company and Through the "Exit" Itself**

9

10           **a.    Defendants Withhold Information or Provide False Information to
                  Their Customers**

11       5.93    Defendants regularly misrepresent to the customer the status of their exit and any

12    work that has been done. This includes making representations that Reed Hein has made

13    immediate contact with Resorts and is engaged in negotiation, when Defendants have made no

14    contact with the Resort or have made only informational inquiries. This also includes describing

15    that an exit is underway or being finalized, when no work has been done or when the Vendor

16    has not communicated any status information to Defendants. Defendants often have so little

17    knowledge of their own customers' status that the <u>customers</u> must inform Reed Hein that they

18    are in foreclosure or have obtained their own exits.

19       5.94    Defendants direct their employees to respond to customer inquiries with generic,

20    pre-approved language representing that work is ongoing on their exit. This includes stock

21    phrases such as "we are continuing to negotiate" and blaming any delays in the exit process on

22    being "at the mercy of" the Resorts. These stock phrases are sent even if the customer's file has

23    not yet been referred to a Vendor, or if the Resort has not yet been contacted.

24       5.95    Defendants also routinely refuse to provide proof of work to customers, claiming

25    that it is "proprietary." Defendants refuse to provide such documentation in part because any

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 30

1  such work would be in the possession of Vendors, not Reed Hein, and in part because providing

2  proof of work would expose Defendants' many misrepresentations.

3       5.96   Defendants further structure customer service at Reed Hein to obscure

4  information from their customers. Customers complain that their inquiries are ignored or that

5  Reed Hein employees stall in responding, that they are made to re-submit or re-execute

6  documents that they have already provided, and that their files are frequently reassigned so that

7  they have no steady point of contact.

8       5.97   Defendants even had a specific written policy to diffuse customer complaints and

9  inquiries without escalating the call to a supervisor. Employees were instructed to tell the

10  customer they were being transferred to the "next level of support," but to actually transfer them

11  to another employee at the same level with no additional information. As the policy noted, "[i]n

12  most cases, speaking to any other member of the team is enough."

13       5.98   On the other hand, Defendants prioritize "Alpha" level complaints and refund

14  requests where the customer threatens to contact the Better Business Bureau, State Attorneys

15  General, private attorneys, or The Dave Ramsey Show (Reed Hein's most profitable

16  endorsement).

17           **b.**     **Defendants Manipulate Customers to Cut Off Their Access to the**

18                    **Resort to Conceal Defendants' True Business Model**

19       5.99   Customers who hire Reed Hein are told to cease all communication with Resorts

20  because communicating with the Resort might derail efforts to exit the timeshare. Customers are

21  explicitly instructed to hang up the phone if the Resort calls them, and to forward any Resort

22  correspondence to Reed Hein without responding. In addition to this, customers surrender their

23  logon credentials for the Resort to Reed Hein, allowing Reed Hein to change the contact

24  information for the account and prevent the Resort from reaching the customer. Where a Vendor

25  attorney has sent a representation letter on behalf of a Reed Hein customer, the Resort is also

26  bound to only communicate with the attorney.

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 31

1    5.100    These actions cut off the customers' only other source of information regarding

2    their timeshare, and prevent the customer from assessing the true scope of Defendants' work.

3    This can lead to direct harm: For example, for years an attorney Vendor discarded all billing

4    statements he received for Reed Hein customers, deeming them "trash," resulting in hundreds of

5    Reed Hein customers not knowing that their Resorts were still demanding payment.

6    5.101    Reed Hein cuts off contact between the customer and the Resort in part to prevent

7    the Resort from expressing to the customer that Reed Hein is misleading the customer. Reed

8    Hein's corporate representative has also admitted that Reed Hein is concerned that if the

9    customer is in contact with the Resort, the Resort may offer an exit directly to the customer and

10    undercut Reed Hein's business.

11    **F.    Defendants Further Manipulate Customers Through Deceptive Offers of Credit**
12    **Repair Services**

13    5.102    On information and belief, Defendants represent to consumers that Defendants

14    will preserve the consumer's credit record, history, or rating, or assist in repairing the consumer's

15    credit if it should be negatively impacted by Reed Hein's exit process.

16    5.103    Beginning as early as September 2014, Defendants represented directly via

17    reedhein.com that Reed Hein had expertise in credit repair services. This representation was

18    made continually through at least May 2015.



**Fig. 4. reedhein.com webpage as of May 3, 2015 (retrieved from archive.org).**

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 32

1    5.104   Beginning as early as 2016, Defendants began representing directly to customers

2    that Reed Hein would provide credit repair services where necessary as part of the exit services

3    customer's paid Reed Hein to perform, or negotiate directly with Resorts to have the Resorts

4    withdraw any negative credit reporting. On information and belief, Defendants continued to

5    claim that Reed Hein would provide assistance or help with credit repair as part of Reed Hein's

6    services through at least December 2018.

7    5.105   On information and belief, despite promising credit repair to incoming customers

8    as part of Reed Hein's services, Defendants began refusing to provide such services in

9    approximately March of 2018. Defendants acknowledged to customers that these services were

10   promised, but informed them that Reed Hein did not offer credit repair "anymore."

11   **1.    Defendants Never Provided the Advertised Credit Repair and Instead**
        **Hired Vendors**
12

13   5.106   Although Defendants created the impression that Reed Hein itself would provide

14   credit repair services, these services were provided by third party Vendors, if at all. On occasions

15   where Defendants actually disclosed that a third party Vendor would be involved, usually after

16   a customer hired Reed Hein, Defendants reserved sole discretion to select the Vendor.

17   5.107   On information and belief, as with their exit Vendors, no written contracts

18   governed Reed Hein's relationship with the credit repair companies. Additionally, on

19   information and belief, no contracts were entered between the customer and the credit repair

20   companies. The entire arrangement was governed by verbal agreements between Defendants and

21   their Vendors, undisclosed to Reed Hein's customers.

22   **2.    Defendants Do Not Comply With Statutory Requirements for Credit**
        **Service Organizations**
23

24   5.108   In association with their advertised services, including credit repair, Defendants

25   offer a three-day cancellation policy in exchange for a full refund. Defendants' contracts do not

26   include any statement, conspicuous or otherwise, regarding a customer's right to cancel the

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 33

1  contract at any time prior to midnight of the <u>fifth day</u> after the date of the transaction, or any

2  reference to an attached notice of cancellation form to be completed in such event. No such

3  attached cancellation form is provided.

4          5.109   In association with their advertised services, including credit repair, Defendants'

5  contracts do not specify the total of all payments to be made by the customer. Instead, the

6  contracts specify Defendants' initial fees, and provide the customer may be required to pay

7  unspecified transfer or settlement fees in the future.

8          5.110   In association with their advertised services, including credit repair, Defendants

9  charge customers prior to full and complete performance of the services Reed Hein has agreed

10  to provide. On information and belief, Defendants have not obtained a surety bond in any

11  amount from a surety company admitted to do business in Washington with respect to credit

12  repair services. On information and belief, nor have Defendants established a trust account at a

13  federally-insured bank with respect to their advertised credit repair services.

14         5.111   In association with their advertised services, including credit repair, Defendants

15  do not provide customers with any written statements reflecting the information set forth in RCW

16  19.134.050 and, as such, Defendants do not keep any signed acknowledgments of the customer's

17  receipt of these written statements on file.

18  **G.      Defendants Mislead Consumers in Performance of Debt Adjustment Services**

19         5.112   Defendants explicitly adjust consumer debt in the context of selling services to

20  release consumers from mortgaged or otherwise encumbered timeshare interests. Defendants'

21  marketing recognizes that Defendants' services represent the adjustment of consumer debt,

22  characterizing timeshare ownership as "debt" and "perpetual liability." Despite this recognition,

23  Defendants routinely engage in acts prohibited for debt adjusters:

24         5.113   Defendants' fees, which they attempt to collect upfront, are in the range of

25  thousands of dollars, far in excess of the twenty-five dollar initial fee permissible to debt

26  adjusters. Defendants also regularly charge more than fifteen percent of the total debt owed to

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 34

1  the mortgagor, including charging a "base price calculated at 30% of [the] mortgage amount" to

2  resolve "[a]ny mortgage over $30,001."

3      5.114  Because Defendants actively conceal from Resorts that customers have hired

4  Reed Hein, Reed Hein routinely fails to notify its customers' creditors (the Resorts) of the

5  retention of its services. Reed Hein also fails to provide a monthly accounting to its customers

6  of any kind.

7      5.115  Defendants improperly fail to include in their contracts the provisions mandated

8  by RCW 18.28.100(7), and fail to hold payments received from customers in a separate trust

9  account or make payments on behalf of customers from that account.

10      5.116  Defendants also improperly pay a $150 referral fee to customers to refer other

11  prospective customers to Reed Hein for services which include debt adjustment services.

12      5.117  Lastly, Defendants' Powers of Attorney, which specifically allow Reed Hein or

13  its employees to negotiate "Timeshare Interest/ Debt" and settle with customers' secured

14  creditors, improperly authorize Defendants to employ or terminate the services of attorneys or

15  arrange the terms of or compensate for the services of attorneys on behalf of Reed Hein's

16  customers.

**FIRST CAUSE OF ACTION**
**(VIOLATIONS OF THE CONSUMER PROTECTION ACT, RCW 19.86.020)**

19      6.1     Plaintiff re-alleges Paragraphs 1.1 through 5.117 and incorporates them as if set

20  fully herein.

21      6.2     Defendants engaged in the following acts or practices constituting unfair or

22  deceptive acts in trade or commerce:

23          a.      Misrepresenting, directly or indirectly, that Reed Hein terminates

24  consumers' obligations with respect to their timeshares by forcing Resorts to cancel or annul

25  timeshare contracts or take back the timeshare;

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 35

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1          b.      Misrepresenting, directly or indirectly, that Reed Hein negotiates directly

2 with Resorts to terminate consumers' obligations with respect to their timeshares;

3          c.      Misrepresenting, directly or indirectly, that Reed Hein itself will perform

4 services toward terminating consumers' obligations with respect to their timeshares, rather than

5 through the use of third-party Vendors;

6          d.      Outsourcing services performed for Reed Hein customers to third-party

7 Vendors where the customer's contract with Reed Hein did not provide for Reed Hein to hire a third

8 party or assign responsibility for performance of the services in the contract;

9          e.      Outsourcing services performed for Reed Hein customers to third-party

10 Vendors with whom Reed Hein and/or the customer does not have a contract;

11          f.      Misrepresenting, directly or indirectly, that Reed Hein personnel have

12 performed services toward terminating consumers' obligations with respect to their timeshares

13 when any services have in fact been performed by a Vendor;

14          g.      Failing to supervise and maintain oversight over services performed by

15 Vendors where the customer contracted with Reed Hein to receive such services;

16          h.      Delivering services to customers that are legally ineffective at terminating

17 the customers' obligations with respect to their timeshare;

18          i.      Delivering services to customers that create the risk of legal action against

19 customers for invalid transfers of their timeshare;

20          j.      Interpreting foreclosure and/or Notice of Termination for nonpayment as a

21 successful termination of customers' obligations with respect to their timeshare without disclosing

22 this interpretation to customers at the point of sale;

23          k.      Misrepresenting, directly or indirectly, that customers' obligations with

24 respect to their timeshare have been terminated when they have not been;

25

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 36

l.       Misrepresenting, directly or indirectly, that customers' obligations with respect to their timeshare have been terminated when Defendants know or should know the Resort does not recognize the termination;

m.      Misrepresenting, directly or indirectly, that Reed Hein has made progress toward and/or performed services toward terminating a customer's obligations with respect to their timeshare when no such services have been performed;

n.      Misrepresenting, directly or indirectly, that Reed Hein does not obtain proceeds from the sale of a customer's timeshare to a third party;

o.      Misrepresenting, directly or indirectly, that Reed Hein would perform services toward terminating customers' obligations with respect to encumbered timeshares during periods when Reed Hein was not providing services or outsourcing services on encumbered timeshares to Vendors;

p.      Misrepresenting, directly or indirectly, that Reed Hein has developed relationships with Resorts that facilitate termination of customers' obligations with respect to timeshares;

q.      Misrepresenting, directly or indirectly, that consumers will not face negative consequences if they cease making payments to Resorts with respect to their timeshares;

r.      Impeding customers' communications with Resorts with respect to the customers' obligations regarding their timeshares, including payment obligations;

s.      Misrepresenting, directly or indirectly, that Reed Hein's services do not present any risk to customers, including but not limited to risk of foreclosure by Resorts with respect to customers' timeshares;

t.      Misrepresenting, directly or indirectly, that Defendants have expertise, trade secrets, or unique or proprietary strategies and methods that Reed Hein will employ toward terminating consumers' obligations with respect to their timeshares;

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 37

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1    u.    Misrepresenting, directly or indirectly, that Reed Hein will terminate

2    consumers' obligations with respect to their timeshare safely, legitimately, legally, permanently, or

3    forever;

4    v.    Giving customers the deceptive net impression that Reed Hein has local

5    and/or region-specific expertise;

6    w.    Misrepresenting, directly or indirectly, that Reed Hein's fees are calculated

7    based on the services required to terminate a customers' obligations with respect to their timeshare;

8    x.    Misrepresenting, directly or indirectly, that Reed Hein has a 100% success

9    rate and/or the highest success rate in the industry;

10    y.    Creating the deceptive net impression that Reed Hein can terminate any

11    customer's obligations with respect to their timeshare, regardless of circumstances;

12    z.    Misrepresenting, directly or indirectly, that consumers who hire Reed Hein

13    will not have to make further payments to Resorts with respect to their timeshares;

14    aa.    Misrepresenting, directly or indirectly, the amount of time that it will take

15    for Reed Hein to terminate customers' obligations with respect to their timeshare;

16    bb.    Misrepresenting, directly or indirectly, or creating the deceptive net

17    impression that Reed Hein is a law firm and/or Reed Hein performs "consumer protection" services;

18    cc.    Misrepresenting, directly or indirectly, or creating the deceptive net

19    impression that Reed Hein employs in-house attorneys who perform services to terminate

20    consumers' obligations with respect to their timeshares;

21    dd.    Misrepresenting, directly or indirectly, that no complaints about Reed Hein

22    had been filed with the Better Business Bureau or the Washington State Attorney General's Office,

23    or that Reed Hein had not been the subject of any other form of "action" from a U.S. or Canadian

24    government agency;

25    ee.    Manipulating online reviews of Reed Hein by having Reed Hein

26    representatives pose as satisfied customers and leave fabricated reviews;

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 38

1       ff.    Displaying an online review summary on timeshareexitteam.com which

2 omits 1- and 2- star reviews from the summarized review sources;

3       gg.    Misrepresenting, directly or indirectly, that terminations of a customers'

4 obligations with respect to their timeshares were the result of services provided by Reed Hein when

5 Defendants know that Reed Hein had not provided services resulting in the termination;

6       hh.    Forming contracts with customers who own timeshares with Resorts on

7 Reed Hein's internal "Do Not Take" list;

8       ii.    Requiring customers to sign "Exit Agreement Addendums," which

9 substantially change the terms of the customers' contract with Reed Hein, under threat of voiding

10 Defendants' Money-Back Guarantee;

11       jj.    Creating the deceptive net impression that Defendants' Money-Back

12 Guarantee entitles customers to a full refund of fees paid to Reed Hein if dissatisfied with Reed

13 Hein's services;

14       kk.    Offering a Money-Back Guarantee that may be voided if Reed Hein offers

15 to terminate a customer's timeshare interest through a method rejected by the customer because the

16 method does not correspond the methods described in Reed Hein's marketing or representations at

17 sales presentations;

18       ll.    Offering a Money-Back Guarantee that permits Reed Hein to refuse to

19 refund customers' payments if Reed Hein expresses an intent to continue to attempt performance

20 under the contract where the Money-Back Guarantee does not require Reed Hein to perform within

21 a specified amount of time;

22       mm.    Refusing to honor the Money-Back Guarantee in circumstances where the

23 basis to void the Guarantee was the customer's failure to pay the Resort at Defendants' direction;

24       nn.    Conditioning honoring the Money-Back Guarantee on a customer's

25 withdrawal of public negative reviews or complaints to third parties;

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 39

oo.     Misrepresenting, directly or indirectly, that consumers face no risk of credit damage from Reed Hein's services; and

pp.     Misrepresenting, directly or indirectly, that Reed Hein provides credit repair services when Reed Hein later refuses to provide such services.

6.3     Defendants' practices outlined above affect the public interest and have the capacity to deceive a substantial number of consumers and are unfair or deceptive acts or practices in trade or commerce in violation of RCW 19.86.020.

**SECOND CAUSE OF ACTION**
**(VIOLATIONS OF THE DEBT ADJUSTING ACT, RCW 18.28.080, 18.28.110,**
**18.28.120, 18.28.130, and 18.28.150)**

7.1     Plaintiff re-alleges Paragraphs 1.1 through 6.3 and incorporates them as if set fully herein.

7.2     Defendants act as debt adjusters, as defined by RCW 18.28.010, by engaging in or holding themselves out as engaging in the business of debt adjusting for compensation. Defendants engage in or hold themselves out as engaging in the business of debt adjusting, as defined by RCW 18.28.010, by managing, counseling, settling, adjusting, prorating, or liquidating the indebtedness of a debtor, or receiving funds for the purpose of distributing said funds among creditors in payment or partial payment of obligations of a debtor.

7.3     Defendants violated, and continue to violate, RCW 18.28.080(1), by charging an initial amount of more than twenty-five dollars for debt adjusting services as part of Defendants' total fee.

7.4     Defendants violated, and continue to violate, RCW 18.28.080(1), by charging a total fee for Defendants' debt adjusting services of more than fifteen percent of the total debt listed by the debtor on the contract.

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 40

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

7.5    Defendants violated, and continue to violate, RCW 18.28.080(2), by retaining fees charged to consumers without notifying creditors that the consumer has engaged Reed Hein in a program of debt adjusting.

7.6    Defendants violated, and continue to violate, RCW 18.28.100, by failing to include in every contract between Defendants and a debtor the information, terms, and notices set forth in that statute, including the required "NOTICE TO DEBTOR" in ten point boldface type or larger directly above the space reserved in the contract for the debtor's signature. RCW 18.28.100(7).

7.7    Defendants violated, and continue to violate, RCW 18.28.110(5), by failing to render an accounting to each debtor with whom they have contracted for debt adjustment services at least once a month, indicating the total amount received from or on behalf of the debtor, the total amount paid to each creditor, the total amount which any creditor has agreed to accept as payment in full on any debt owed the creditor by the debtor, the amount of charges deducted, and any amount held in trust.

7.8    Defendants violated, and continue to violate, RCW 18.28.120(6), by advertising, displaying, distributing, broadcasting or televising their services in a manner wherein false, misleading or deceptive statements or representations are made with regard to Defendants' debt adjustment services and/or the charges to be made for Defendants' debt adjustment services, including the false, misleading or deceptive statements and misrepresentations alleged in paragraphs 6.2.a. through 6.2.pp.

7.9    Defendants violated, and continue to violate, RCW 18.28.120(7), by offering, paying, or giving cash or other compensation to customers for referring prospective customers to Reed Hein.

7.10    Defendants violated, and continue to violate, RCW 18.28.130(3), by accepting Powers of Attorney authorizing Defendants to employ or terminate the services of attorneys or arrange the terms of or compensate for the services of attorneys on behalf of debtors.

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 41

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1    7.11    Defendants violated, and continue to violate, RCW 18.28.150(1), by failing to hold

2  payments received from debtors in trust in a separate trust account and by failing to make payments

3  on behalf of debtors from such an account.

4    7.12    Pursuant to RCW 18.28.185, a violation of the Debt Adjustment Act is an unfair act

5  or practice in trade or commerce and a *per se* violation of the Consumer Protection Act, RCW

6  19.86.

7    7.13    Pursuant to RCW 18.28.090, Defendants' contracts with all debtors to whom

8  Defendants collected fees in excess of those permitted by RCW 18.28.080 are void and all funds

9  received by Defendants which have not been paid on the debtors' behalf to their creditors must be

10  returned to the debtors.

11

## THIRD CAUSE OF ACTION
12
### (VIOLATIONS OF THE CREDIT SERVICES ORGANIZATION ACT, RCW
### 19.134.020, 19.134.040, and 19.134.060)
13

14    8.1    Plaintiff re-alleges Paragraphs 1.1 through 7.13 and incorporates them as if set fully

15  herein.

16    8.2    Defendants act as a credit services organization in Washington, as defined by RCW

17  19.134.010, by representing to Reed Hein customers who are "buyers," as defined in the same

18  statute, that with respect to the extension of credit by others Defendants can or will, in exchange for

19  the payment of money or other valuable consideration, sell, provide, or perform the following (the

20  "Credit Services"):

21    a.    Improving, saving, or preserving a buyer's credit record, history, or rating;

22  or

23    b.    Providing advice or assistance to a buyer with regard to improving, saving,

24  or preserving a buyer's credit record, history, or rating.

25    8.3    Defendants violated, and continue to violate, RCW 19.134.020(1), by charging

26  and/or receiving money or other valuable consideration prior to full and complete performance of

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 42

1 the Credit Services that Defendants have agreed to perform for buyers without obtaining a surety

2 bond of $10,000 issued by a surety company admitted to do business in Washington and

3 establishing a trust account at a federally-insured bank or savings and loan association located in

4 Washington.

5     8.4     Defendants violated, and continue to violate, RCW 19.134.020(4), by making or

6 using untrue or misleading representations in the offer or sale of the Credit Services and engaging,

7 directly or indirectly, in acts, practices, and courses of business that operate or would operate as

8 fraud or deception to persons in connection with the offer or sale of the Credit Services, including

9 using the untrue or misleading representations alleged in paragraphs 6.2.a. through 6.2.pp.

10    8.5     Defendants violated, and continue to violate, RCW 19.134.040, by failing to provide

11 buyers of the Credit Services, before execution of a contract or agreement between buyers and

12 Defendants and/or before the receipt by Defendants of money or other valuable consideration from

13 buyers, whichever occurs first, with a statement in writing containing all of the information set forth

14 in RCW 19.134.050.

15    8.6     Defendants violated, and continue to violate, RCW 19.134.040, by failing to

16 maintain on file, for a period of two years, exact copies of statements personally signed by buyers

17 acknowledging receipt of written statements containing all of the information required by RCW

18 19.134.050.

19    8.7     Defendants violated, and continue to violate, RCW 19.134.060, by failing to include

20 all of the following in contracts which include purchase of the Credit Services:

21         a.     A conspicuous statement in bold face type, in immediate proximity to the

22 space reserved for the signature of the buyer, as follows: "You, the buyer, may cancel this contract

23 at any time prior to midnight on the fifth day after the date of the transaction. See attached notice of

24 cancellation form for an explanation of this right," as set forth in RCW 19.134.060(1)(a);

25

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 43

1          b.      The terms and conditions of payment, including the total of all payments to

2 be made by the buyer, whether to Defendants or to some other person, as set forth in RCW

3 19.134.060(1)(b); and/or,

4          c.      An accompanying form, completed in duplicate and easily detachable,

5 captioned "Notice of Cancellation" and containing in bold face type the cancellation language set

6 forth in RCW 19.134.060(2).

7      8.8      Pursuant to RCW 19.134.070(5), a violation of the Credit Services Organization Act

8 is an unfair act or practice in trade or commerce and a *per se* violation of the Consumer Protection

9 Act, RCW 19.86.

10                               **PRAYER FOR RELIEF**

11      WHEREFORE, the STATE OF WASHINGTON prays that this Court grant the

12 following relief:

13      9.1      That the Court issue a preliminary injunction enjoining and restraining Defendants

14 and their representatives, officers, agents, servants, employees, and all other persons acting or

15 claiming to act for, on behalf of, or in active concert or participation with Defendants offering or

16 selling the Timeshare Exit Services, Debt Adjustment Services, and/or Credit Services described

17 herein until such further order of the Court. RCW 7.40.040.

18      9.2      That the Court adjudge and decree that Defendants have engaged in the conduct

19 complained of herein.

20      9.3      That the Court adjudge and decree that the conduct complained of herein in

21 Paragraphs 6.1 through 6.3 constitutes unfair or deceptive acts or practices in violation of the

22 Consumer Protection Act, Chapter 19.86 RCW.

23      9.4      That the Court assess civil penalties pursuant to RCW 19.86.140 of up to $2,000 per

24 violation for each and every violation of RCW 19.86.020 committed by Defendants.

25      9.5      That the Court adjudge and decree that the conduct complained of in Paragraphs 7.1

26 through 7.13 constitutes violations of the Debt Adjusting Act, Chapter 18.28 RCW.

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 44

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1    9.6    That the Court assess civil penalties pursuant to RCW 19.86.140 of up to $2,000 per

2    violation for each and every violation of RCW 18.28 committed by Defendants.

3    9.7    That the Court adjudge and decree that the conduct complained of in Paragraphs 8.1

4    through 8.8 constitutes violations of the Credit Services Organization Act, Chapter 19.134 RCW.

5    9.8    That the Court assess civil penalties pursuant to RCW 19.86.140 of up to $2,000 per

6    violation for each and every violation of RCW 19.134 committed by Defendants.

7    9.9    That the Court issue a permanent injunction enjoining and restraining Defendants

8    and their representatives, successors, assignees, officers, agents, servants, employees, and all other

9    persons acting or claiming to act for, on behalf of, or in active concert or participation with

10   Defendants from continuing or engaging in the unlawful conduct complained of herein.

11   9.10    That the Court make such orders pursuant to RCW 19.86.080 as it deems

12   appropriate to provide for restitution to consumers of money or property that may have been

13   acquired by Defendants by means of the unlawful conduct complained of herein, regardless of the

14   geographical location of the consumers' residences.

15   9.11    That the Court make such orders pursuant to RCW 19.86.080 as it deems

16   appropriate to provide that Plaintiff, State of Washington, have and recover from Defendants the

17   costs of this action, including reasonable attorneys' fees.

18

19   / / /

20

21   / / /

22

23   / / /

24

25   / / /

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 45

1    9.12    That the Court order such other relief as it may deem just and proper to fully and

2  effectively dissipate the effects of the conduct complained of herein, or which may otherwise seem

3  proper to the Court.

4        DATED this 4th day of February, 2020.

5

6                    ROBERT W. FERGUSON
                     Attorney General

7

8

9                    M. ELIZABETH HOWE, WSBA# 53140
                     AARON J. FICKES, WSBA# 51584

10                   LYNDA ATKINS, WSBA# 52396
                     Assistant Attorneys General

11                   Attorneys for Plaintiff State of Washington
                     800 Fifth Avenue, Suite 2000

12                   Seattle, WA 98104
                     (206) 464-7745

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 46

# EXHIBIT 4

ELECTRONICALLY FILED
4/15/2021 3:28 PM
Heidi Percy
County Clerk
Snohomish County, WASH
Case Number: 21-2-01761-31

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR SNOHOMISH COUNTY

PHILLIP ISAACS, individually and on behalf of all others similarly situated; REBECCAH ISAACS, individually and on behalf of others similarly situated;

     Plaintiffs,

v.

REEDHEIN & ASSOCIATES d/b/a TIMESHARE EXIT TEAM; MAKAYMAX INC.; HEIN & SONS INDUSTRIES, INC.; BRANDON REED, individually; and TREVOR HEIN, individually,

     Defendants.

Case No.   21-2-01761-31

SUMMONS

TO:    REEDHEIN & ASSOCIATES d/b/a TIMESHARE EXIT TEAM;

MAKAYMAX INC.; HEIN & SONS INDUSTRIES, INC.; BRANDON REED, individually;

and TREVOR HEIN, individually.

A lawsuit has been started against you in the above-titled Court by

SUMMONS - 1

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

Plaintiffs PHILLIP ISAACS, individually and on behalf of all others similarly situated; REBECCAH ISAACS, individually and on behalf of others similarly situated.

Plaintiffs' claim is stated in the written Complaint, a copy of which is served upon you with this Summons.

In order to defend against this lawsuit, you must respond to the Complaint by stating your defense in writing, and by serving a copy upon the person signing this Summons within twenty (20) days after the service of this Summons, excluding the day of service or a default judgment may be entered against you without notice. If you are served with this summons outside the State of Washington, in order to defend against this lawsuit, you must respond to the Complaint by stating your defense in writing and serving a copy on the undersigned person within sixty days (60) after service. A default judgment is one in which Plaintiff is entitled to what he asks for because you have not responded. If you serve a Notice of Appearance on the undersigned person, you are entitled to notice before a default judgment may be entered.

You may demand that Plaintiffs file this lawsuit with the Court. If you do so, the demand must be in writing and must be served upon the person signing this Summons. Within fourteen (14) days after you serve the demand, Plaintiffs must file this lawsuit with the court, or the service on you of this Summons and Complaint will be void.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

This Summons is pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

SUMMONS - 2

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

1

DATED this 15th day of April, 2021.

2

ALBERT LAW PLLC

3

4

By: _____

5

Gregory Albert, WSBA#: 42673
3131 Western Ave., Suite 410

6

Seattle, WA 98121
Telephone: (206)-576-8044

7

Email: greg@albertlawpllc.com
*Attorney for Plaintiffs*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**SUMMONS - 3**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

THE HON. MARSHA J. PECHMAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| GERALD SIEGRIST and PATRICIA SIEGRIST,<br><br>     Plaintiffs,<br><br>v.<br><br>REEDHEIN & ASSOCIATES d/b/a TIMESHARE EXIT TEAM; MAKAYMAX INC.; HEIN & SONS INDUSTRIES, INC.; BRANDON REED, individually; and TREVOR HEIN, individually,<br><br>     Defendants. | Case No. 2:21-cv-00588-MJP<br><br>FIRST AMENDED COMPLAINT FOR DAMAGES<br><br><br>JURY OF TWELVE REQUESTED |

COMES NOW PLAINTIFFS Gerald and Patricia Siegrist, by and through their attorney Gregory Albert of Albert Law PLLC, and brings this action against the above captioned Defendants for common law fraud, breach of contract, breach of fiduciary duty, unjust enrichment, and numerous violations of the Consumer Protection Act, RCW 19.86 *et seq.*, associated with unfair and deceptive conduct in the marketing and sale of timeshare "exit"

**FIRST AMENDED COMPLAINT FOR DAMAGES - 1**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

services offered to consumers across the United States and Canada. Plaintiffs allege the following on information and belief:

## I.    INTRODUCTION

1.      Reed Hein and Associates, doing business as "Timeshare Exit Team," is a company that had defrauded tens of thousands of customers out of tens of millions of dollars. It falsely advertises it has "specialized knowledge" and a "proprietary process" that allows it to "force" developers and vacation resorts to release customers from unwanted timeshare obligations. Using deceptive statements and false advertisements, it solicits potential customers into meetings with "client advisors," who uniformly advise clients to spend tens thousands of dollars for services Reed Hein does not know how to provide. Reed Hein induces customers into an explicit fiduciary relationship, but rather than put its clients' money in trust or escrow, Reed Hein immediately treats the money as earned revenue and spends it or disburses it as profit to the owners. Reed Hein then "processes" its customers' claims through a variety of convoluted schemes designed to look like they have legal significance they do not have. At the end of the process, Reed Hein tells customers to stop paying their bills and sends customers a letter stating it "exited" them from their timeshare obligations. For the last 7 years, Reed Hein has relied upon the fact that vacation resorts and developers are reluctant to pursue its customers in court because of bad publicity. However, vacation resorts and developers have now begun interfering with Reed Hein's model, creating a backlog of tens of thousands of customers Reed Hein cannot even pretend to service. Vacation resorts and developers have begun targeting Reed Hein customers with lawsuits, which Reed Hein does not disclose to prospective customers. The only legally valid 'exits' Reed Hein customers ever achieve are exits they could, and often do, achieve on their own. Gerald and Patricia Siegrist spent $4,383 on Reid Hein's illusory services without receiving any results.

**FIRST AMENDED COMPLAINT FOR DAMAGES - 2**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

## II.      PARTIES

**a. Plaintiffs**

2.       Plaintiffs Gerald and Patricia Siegrist are married. They are residents of Washington State.

**b. Defendants**

3.       Defendant **Brandon Reed** was, at all times material to this lawsuit, the co-founder, governor, operator or manager of Reed Hein & Associates. Brandon Reed is also a 60% owner of Reed Hein through a wholly-owned Washington corporation, Makaymax, Inc. In these roles, Brandon Reed directs, controls, participates in, and knowingly approves of the policies, activities, and practices alleged in the Complaint herein. Upon information and belief, Brandon Reed resides in Kirkland, Washington.

4.       Defendant **Trevor Hein** was, from Reed Rein's creation through at least approximately July 2016, the co-founder, governor, operator or manager of Reed Hein. In these roles, Trevor Hein directed, controlled, participated in, and knowingly approved of the policies, activities, and practices alleged in the Complaint herein. Trevor Hein is also is or was a 40% owner of Reed Hein through a wholly-owned Delaware corporation, Hein & Sons Industries, Inc. Upon information and belief, Trevor Hein resides in British Columbia, Canada.

5.       On information and belief, Defendant **Hein & Sons Industries, Inc.,** is a Delaware corporation incorporated on March 20, 2012. Hein & Sons Industries, Inc., is wholly-owned by Trevor Hein and has been operated by Trevor Hein since its formation as a holding company.

6.       Defendant **Reed Hein** is a limited liability company registered with the Washington Secretary of State. Brandon Reed and Trevor Hein are the registered governing persons of Reed Hein.

**FIRST AMENDED COMPLAINT FOR DAMAGES - 3**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

Reed Hein's corporate office is located at 220 120th Ave NE, Bellevue, WA 98005. Upon information and belief, Reed Hein's principal place of business is located at 220 120th Ave NE, Bellevue, WA 98005, and the company's former principal place of business was at 3400 188th St. SW #300, Lynnwood, WA 98037. Upon information and belief, Reed Hein & Associates operates under the trade names "Reed Hein," "Timeshare Exit Team," "TET," "TSET," and "RHA," and formerly operated under the names "Reed Hein Travel," and "World Travel Seattle." Reed Hein's primary website is timeshareexitteam.com, but Reed Hein formerly maintained a separate reedhein.com website and maintains dozens of other web domains to redirect to timeshareexitteam.com. On information and belief, Reed Hein began operation in 2012.

### III.    JURISDICTION AND VENUE

7.    This Court has personal jurisdiction over Defendants pursuant to RCW 4.28.180, RCW 4.28.185, and RCW 19.86.160 because the acts alleged have been committed in this State and Defendant Reed Hein's principal place of business is located in Bellevue, Washington.

8.    Venue is proper in Snohomish County pursuant to the "Timeshare Owner Exit Agreement" signed by the Plaintiff and Reed Hein & Associates, establishing the venue as the Snohomish County Superior Court.

### IV.    FACTUAL ALLEGATIONS

9.    The following allegations are made based on evidence, the parties' own sworn testimony, information, and belief.

10.    Unless indicated otherwise, the following allegations have been ongoing at all times relevant hereto.

11.    Reed Hein & Associates doing business as Timeshare Exit Team describes itself as a company that can "force" timeshare companies (resorts, timeshare brokers, etc.) to forego consumer's timeshare obligation ("timeshare exits"). The company claims to have helped tens of thousands of customers exit their timeshare contracts. In 2018, it claimed a revenue of $38

**FIRST AMENDED COMPLAINT FOR DAMAGES - 4**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

million and spent approximately $9 million in advertising.

12.     Gerald and Patricia Siegrist pay approximately $795.45 per month toward a timeshare obligation with "Wapato Point" Timeshare Company. Mr. and Mrs. Siegrist sought to terminate or significantly reduce this obligation after hearing about Rein Hein's services through its extensive marketing campaign. Mr. and Mrs. Siegrist were deceived by Reid Hein's false advertising and unfair business practices described herein. In January 2016, Mr. and Mrs. Siegrist paid $4,383 to Reed Hein in exchange for the company's services.

13.     According to the power-of-attorney form Reed Hein asked the Siegrists to sign, Reed Hein had "the legal duty to act solely in the interests of [Mr. and Mrs. Siegrist] and to avoid conflicts of interest," which includes keeping Mr. and Mrs. Siegrist's property separate and distinct from any other property owned or controlled by Reed Hein.

14.     According to the power-of-attorney form Reed Hein asked the Siegrists to sign, Reed Hein assumed the role of the Siegrists' fiduciary and all fiduciary duties recognized under Washington State law.

15.     Reed Hein induced the Siegrists into a commercial relationship using materially false statements and omissions of material information.

16.     Reed Hein performed little or no work on Mr. and Mrs. Siegrist's matter.

17.     Reed Hein ignored Mr. and Mrs. Siegrist's reasonable requests for periodic updates.

18.     Reed Hein comingled Mr. and Mrs. Siegrist's property with its own property.

19.     Reed Hein knowingly engaged in conflicts of Mr. and Mrs. Siegrist's interests.

20.     Reed Hein immediately converted Mr. and Mrs. Siegrist's funds into earned revenue before performing work.

21.     Reed Hein failed to notify Mr. and Mrs. Siegrist that it would be unable to process their file for several years.

22.     Reed Hein never "exited" Mr. and Mrs. Siegrist from their timeshare agreement.

**FIRST AMENDED COMPLAINT FOR DAMAGES - 5**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

23. Reed Hein did not honor its money-back guarantee.

**a. Brandon Reed's Testimony Shows he and Trevor Hein Began Soliciting Customers in 2012 without Any Plan to Provide Services**

24. On August 21, 2011, Brandon Reed and Trevor Hein started Reed Hein & Company on for the purpose of selling rain gutter protection systems.

25. In November 2011, Brandon Reed was operating a rain gutter protection booth in British Columbia, Canada, when he observed a busy booth offering to help timeshare owners exit out of their agreements with developers, resorts, and other companies brokering timeshares ("timeshare companies"). Mr. Reed observed they had a "big sign" and "people were lining up." Mr. Reed observed the company running the booth charged an upfront fee without providing an immediate service, which he believed was not honest.

26. Mr. Reed nevertheless started a business that charged customers an upfront fee to provide timeshare exit services. Mr. Reed acknowledges he "knew nothing about timeshares" at the time. Asked why he began charging upfront fees for services he did not know how to provide, Brandon Reed had the following dialogue under oath:

> Q· Why would you collect a fee before you've done anything for the consumer?
> A· Yeah. One, that's how we did it in the beginning. I mean, that's how we -- You know, I've been asked that before, like why do we -- When I've been interviewed before in the past, we've, "Why do you charge an upfront fee?" Well, we just -- That's how we did it in the beginning. I don't even remember why we started – we started charging upfront fees, but we did.

27. On December 31, 2012, "[w]ithin one month" of observing the busy booth, Mr. Reed and Mr. Hein started a company called "ReedHein Travel" in Bellevue, WA with the express purpose of selling timeshare exit services while simultaneously selling timeshares. From August through September 2012, Mr. Reid and Mr. Hein opened a Puyallup Fair booth where they discovered the prospect of their services were popular.

**b. Beginning in 2013 Defendant Reed Hein & Associates Unfairly and With the Intent**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

**to Mislead, Promised Services It Did Not Provide or Know How to Provide**

28.     In 2013, ReedHein Travel changed its name to Reed Hein & Associates doing business as Timeshare Exit Team ("TET"). After the experience at the Puyallup Fair Booth, Defendant TET created a website on which they falsely and misleadingly claimed customers could legally "ditch" their timeshares "forever."



Ditch Your Timeshare. Legally. Forever.

29.     Also, the website falsely and misleadingly claimed that Timeshare Exit Team works with timeshare companies and developers to "dissolve" its customers' contracts.



We help timeshare owners get rid of their timeshares. We are NOT a resale or donation company. We work with timeshare companies to dissolve your contract.

Done. Over with. Forever.

30.     None of that is true. From 2013-2015, TET provided no service at all. It did not negotiate with timeshare companies. It did not force timeshare companies to forego contracts. TET's initial strategy was to simply tell customers to stop paying their timeshares, which would induce the timeshare companies and developers to foreclose on the customer's product. At that point, Reed Hein would claim it "exited" the customers from their contract. When customers inevitably complained that they could have induced the foreclosures without TET's assistance,

**FIRST AMENDED COMPLAINT FOR DAMAGES - 7**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

TET's customer service representatives were instructed to tell them "they signed a contract with us and we achieved an exit." Customers complaining that TET offered no services became such a pervasive problem that TET adopted a chapter in its operations manual called: "I Could Have Just Done This on My Own, I want My Money Back."

31.     In addition to the foregoing false claims, TET began soliciting business with variations of the phrase "Safe, Legal, and Guaranteed" or "Safe. Legitimate. Guaranteed."

Ad · www.timeshareexitteam.com/ ▾   **(877) 714-2857**

**Timeshare Exit Team™ | Safe. Legitimate. Guaranteed.**

Give Us a Call Now To Schedule Your Free Consultation! 100% Money Back Guarantee. The most trusted **Timeshare Exit** Company in the industry–Endorsed by Dave Ramsey. Nationally Endorsed. Services: **Exit** Preparation, **Exit** Strategy, **Exit** Management, **Exit** Completion.

32.     Asked under oath how the timeshare exit services were safe and legal as advertised, Brandon Reed was unable to explain:

> Q  Those are your advertising terms, aren't they?
>
> A  I believe so, yes.
>
> Q· Okay.· Well, given that these are the advertising terms that Timeshare Exit Team uses, I would expect that Timeshare Exit Team would know what the legal and safe and permanent ways of getting somebody out of their timeshare is. So please tell me what they are.
>
> A: I'm -- I'm not a lawyer, so our partners –
>
> Q.  We understand you're not a lawyer. You do not have to keep saying that…But you're running a business that is making these advertising claims. I want to hear from you, who is the president and owner of the business --
>
> A  Yes.
>
> Q  -- how it is you can make these claims. What is the basis for these claims?
>
> A  Yeah. I'm going to just -- I can't -- Again, I don't know how else to say it. I'm not -- I'm not an attorney.

**FIRST AMENDED COMPLAINT FOR DAMAGES - 8**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

33.     Reed Hein instructs customers like the Siegrists not to communicate with developers at all, falsely telling them that doing will extend the time required to dissolve their contracts. In reality, Reed Hein gives those instructions because communicating directly with the timeshare company might induce the timeshare company to allow the customer out of the contract for free, obviating the need for Reed Hein's fake services. Under oath, Reed Hein officers have given two reasons for that policy, both of which are unfair and deceptive, and neither of which is ever disclosed to the customer. In his deposition, Brandon Reed testified that Reed discourage customers from speaking to timeshare companies or developers because the timeshare companies might share a negative perspective about TET:

> Q. In the third paragraph, the one that starts, "If the timeshare contacts you for any reason"
>
> A. Uhm-hm.
>
> Q. -- "we suggest that you disregard those calls for now, as we do not want you to contact or converse with the timeshare for any reason, as it can undo and/or lengthen the exit process, unless otherwise told to do so."… How -- How or why would the timeshare developer talking to its own customer exit them -- prolong the exit process?
>
> A. Because the timeshare companies, the developers would -- again, hating what it is that we do, they – They would just -- They would actually say -- And we know this just because the customers have called on occasion or they've taken a call and are talking about -- You know, talking about us. "Oh, hey, we're working with, you know, Timeshare Exit Team."
>       And it's like all of a sudden, you know, the customer is calling us and saying, "Oh, my gosh. I hear that you're a scam and blah, blah, blah."
>
> Q. Okay. So the reason is that because if they talk to the timeshare developer, the timeshare developer is going to say bad things about you?
>
> A. They do, yes. It was because it was creating a customer service - It was creating problems in customer service. And when your

**FIRST AMENDED COMPLAINT FOR DAMAGES - 9**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

customers are calling you and saying, "Hey, my timeshare just said
this about you guys," it's just - Imagine having -- I mean, that's…

34.      Alternatively, former TET Chief Operating officer Thomas Parenteau testified the
instructions were designed to prevent customers from obtaining an exit without TET, which he
acknowledged to be a "good thing" for the customer:

> A.  For a couple of different reasons. We have had experiences
> where the customer ends up with more than what they own,
> number one. And, number two, we have had also what I would call
> consumer confusion where the customer will call the developer
> and -- after they have retained – you know, they have hired us and
> all of a sudden, the developer will give them an exit to undermine
> our services. So that's happened as well.
>
> Q.  Then the second scenario you described, the resort or the
> developer is offering the customer a way out of the timeshare;
> right?
>
> A. Correct. Once they hear our name.
>
> Q. What is so bad about that? Isn't that what you want?
>
> A. Actually, yes, it is.
>
> Q. All right. So why would you want to foreclose that possibility?
>
> A. I think we just want to put it on paper that: Listen, if you call
> the developer, you're going to get confused because they're either
> going to upgrade you or they're going to let you out.
>
> Q.  Okay.
>    And nowhere in your advertisements or in the materials you give
> to your customers does it say "Don't call the timeshare resort or
> developer because they might offer you an exit"?
>
> A.  No.
> Q.  Which you agree would be a good thing?
> A.  Mm-hm.
> Q.  Is that a "yes"?
> A.  Yes.

**FIRST AMENDED COMPLAINT FOR DAMAGES
- 10**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

Q.  So why would that be a justification for telling the customers
not to call the timeshare resort or developer?

A.  Because it creates customer confusion…Like I said, when they
call the developer and as soon as the word "Timeshare Exit Team"
is mentioned, the developer offers an exit.

### c.  Reed Hein and TET's Ongoing Deceptive Acts and Practices

35.    **Misleading Inducement**: In addition to its false advertising and false claims that
it can "force" timeshare companies to exit their contracts with timeshare owners, TET induces
consumers into a relationship by misleadingly offering to let them meet with a "Client Advisor"
about their claims. Client Advisors are salespeople trained in sales techniques and TET does not
require them to know anything about the timeshare industry. They do not reject customers based
on the customers' actual ability to exit timeshares. Client Advisors do not advise customers to do
anything other than hire TET. They reiterate the false claim that TET can legally, safely, and
permanently get owners out of their timeshare contracts through TET's proprietary system
regardless of the customer's circumstance.

36.    **Payments**: In 2013, TET charged between $1,000-$9,000 in fees upfront,
depending on the forecasted cost of the timeshare plan the customer sought to exit. Upon
information and belief, those fees can exceed $40,000 for some new customers in 2019. The
Siegrists have paid TET $4,383. TET accepts money from all customers, regardless of their
circumstances or their legal right to exit their timeshare contracts. TET allows customers to pay
in installments, but the contract it offers clients does not obligate it to provide any services until
the installments are complete.

37.    **Unenforceable Contract:** After inducing a relationship under false auspices,
TET asks clients to sign a master services agreement defining a variety of client's obligations
while leaving its own obligations too vague to be enforced. According to Reed Hein, the customer
is not entitled to a refund unless the customer fulfills its obligations under the contract, including

**FIRST AMENDED COMPLAINT FOR DAMAGES
- 11**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

an obligation to pay the timeshare company an indeterminate amount to be released from the contract and the duty to execute a new contract with a third-party law firm, the terms of which are nowhere defined under the Reed Hein contract. The agreement has changed over time, but TET's obligations under Mr. and Mrs. Siegrist's $4,383 agreement contained only one illusory obligation for TET: "Reed Hein shall work to secure a release from the OWNER's Timeshare."

38.     **Misappropriation of funds**: After receiving money from clients, TET immediately treats it as earned revenue without regard to services rendered or the possibility that TET can even provide the services. Although TET claims to be an agent of the customers, it does not put their money into a trust or escrow account and immediately appropriates the money to itself. In 2019 TET took in approximately $35 million in customer fees, all of which it immediately treated as earned revenue.

39.     **Deceptive and Materially Misleading Processes**: After accepting money, TET sends customers' claims through a byzantine process designed to deceive customers into thinking TET is earning its money and achieving results. The processes have taken a variety of forms since 2013. Initially, TET did not directly handle its customers claims, either telling customers to default or sending them to a third-party ("Vendors") for more processing. If the customer defaulted, the timeshare companies would often foreclose on their timeshare ownerships, which TET considered to be an "exit." The Vendors would achieve equally dubious exits in a variety of ways described below. Beginning in 2015, TET attempted to communicate directly with timeshare companies and developers with mixed results. Although TET claims it can "force" the timeshare companies to let customers exit timeshare contracts, TET's communications consist entirely of asking the timeshare companies to voluntarily release customers.

40.     **Lack of Results**: TET continues to advertise its ability to produce results, even though the purported exits are becoming more difficult and often impossible to obtain. Initially, timeshare companies were willing to entertain TET's customers' requests for exits. After discovering TET's business model, timeshare companies have stopped negotiating with any TET

**FIRST AMENDED COMPLAINT FOR DAMAGES - 12**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

customers and have begun suing TET customers for damages – a material fact that TET does not disclose to new customers. In 2019, TET hired a law firm created for the sole purpose of processing TET's claims. Out of 1,200 customer TET sent to the firm in 2019, it was able to exit fewer than 10 timeshare holders.

41.     **False Money-Back Guarantee:** Although TET ostensibly offers a money-back guarantee, the guarantee is illusory and almost never honored. Customers are only entitled to money back if TET is unable to obtain an exit, but whether TET is unable to obtain an exit is unilaterally determined by TET without any clear criteria to guide that determination. After years of processing, TET simply tells customers who demand their money back that more processing is necessary to achieve their exit. Consequently, TET has a backlog of <u>thousands</u> of pre-paid customers that it has never helped and never reimbursed.

42.     **Pyramid Scheme**: TET takes in more customers than it exits, leading to a severe backlog of thousands of un-exited customers. Treating all payments as income-instantly-earned, TET does not maintain their money in trust or escrow. Instead, it disburses it toward operating costs or profit for Brandon Reed, Trevor Hein, and others. TET maintains an inadequate reserve and it would become instantly insolvent if its backlog of un-exited customers demanded its money back. Instead, TET relies entirely on an influx of new customers to fund its operations and the money-back guarantees.

43.     **False Exits**: When and if the processing ends, TET sends customers a letter claiming the customers "exited" their timeshare agreements. TET's exits often do not constitute a legally cognizable rescission of the timeshare contracts. Instead, TET has historically relied on timeshare company's reluctance to sue timeshare holders because of the negative press, although that has now changed. With the exception of exits voluntarily granted by timeshare companies, often after the customers are left to negotiate for themselves, TET's exits are not legally cognizable. They range from convoluted quitclaim deed schemes to plain falsehoods about whether the client exited their contract.

**FIRST AMENDED COMPLAINT FOR DAMAGES - 13**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

## 1. Legally Invalid Exits

44.   Reed Hein initially claimed to customers it was able to "force" developers and timeshare companies to take back timeshares, but that is false. In his deposition, Parenteau was directly asked how he "forced" timeshare companies to "take back" timeshare agreements and gave a nonsensical answer:

> Q. So back to my question: In what ways has Reed Hein forced any resort to take any timeshare back?
>
> A. By the methods that we are moving inventory back and out of the customer's name.

Parenteau eventually acknowledged that the methods do not force the timeshare companies to do anything. The only successful exits occur with the consent of the resorts.

## A. Foreclosure or Termination

45.     TET's first strategy was to induce foreclosures or terminations. Despite stating that it can force timeshare companies to "take back" agreements, Reed Hein originally encouraged customers to default on their dues and maintenance fees in order to induce a foreclosure. Depending on the asset, the timeshare company either takes possession of the client's interest in the asset or notifies the customer that the timeshare company is terminating the contract. Then TET considers the foreclosure or notice to be an exit in satisfaction of its contract with the customer. Both outcomes can harm a customer's credit rating and create other negative financial consequences, but Reed Hein has traditionally relied on timeshare companies' unwillingness to suffer adversarial proceedings in court, where their high-pressure sales pitches might be scrutinized by a judge. At some point, TET realized it was exposing itself to claims of tortious interference with a business contract and began advising clients to continue paying their timeshare fees for Reed Hein's own benefit. In 2017, timeshare companies began suing TET for tortious interference and its customers for nonpayment. TET does not notify customers that they consider an adversarial foreclosure to be an "exit," nor do they notify customer that they might

**FIRST AMENDED COMPLAINT FOR DAMAGES - 14**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

be sued, both of which are material information.

### B. Notices of Resignation

46. TET falsely claims that it can force timeshare companies to rescind the agreement with "notices of resignation." That is false because 1) the timeshare company's decision to accept the notice is entirely voluntary and 2) timeshare companies no longer accept notices of resignation from TET's customers. A notice of resignation is something any customer can do. It is simply a letter sent to the timeshare company stating that the customer no longer wishes to participate in the program. The timeshare company has the option whether to rescind the agreement. While TET has had some minor success with that approach in the past, timeshare companies no longer agree to rescind contracts with TET customers.

### C. Unenforceable Quitclaim Deeds

47. TET falsely tells customers it can exit them from their timeshares by executing and recording a quitclaim deed conveying the customer's timeshare interest back to the timeshare company. TET does that without the consent of the timeshare company and it has no legal enforceability. Again, TET simply relies on the timeshare company's reluctance to sue customers.

### D. Quitclaim Deed/Foreclosure Hybrid

48. TET falsely tells customers it can exit them from timeshares by a combined quitclaim-foreclosure/notice of termination approach. TET pays a vendor to execute a quitclaim deed giving the customer's interest in the timeshare to a third party who then refuses to pay. Like the quitclaim deeds to the timeshare company, the quitclaim deeds to the third party are legally unenforceable. TET simply relies on the timeshare company's reluctance to take customers to court.

### E. Extortion of Customers

49. Since nonconsensual quitclaim deeds are unenforceable and timeshare companies are becoming increasingly difficult, TET strong-arms its clients into signing illusory quitclaims

**FIRST AMENDED COMPLAINT FOR DAMAGES - 15**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

under the threat they will lose their money-back guarantee if they do not. TET purports to locate third-parties who are willing to take the customer's interest in the timeshare. TET then has the customer execute and notarize transfer paperwork containing blank spaces for the transferees. If the customer refuses to sign the legally incognizable document, TET claims that its duty to exit the customer is discharged and the customer has waved his or her money back guarantee.

### F. False Claims of Exits

50.     Facing an enormous backlog of un-exited customers, TET resorts to telling customers outright lies. TET sends customers letters notifying them that TET received a confirmation from the timeshare company that it has agreed to exit their contract. TET then sends letters stating they have been "exited" under the terms of its service agreement. And takes no further action. Timeshare companies frequently continue to demand payments and have begun suing TET customers who believed based on information from TET that their timeshare obligations were rescinded. When the customer complains to TET, it claims that it received a "verbal confirmation" from the timeshare company.

### 2. Deceptive Claims Designed to Induce Reliance

#### A. TET Makes False Claims that Timeshare Obligations Can Be Passed to Children

51.     In Gretchen Morgensen's January 22, 2016 New York Times article *The Timeshare Hardsell Comes Roaring Back*, Morgensen explained that the timeshare industry purposefully perpetuates the false claim that timeshare obligations and benefits can be passed down to buyers' children. Timeshare Exit Team intentionally contributes to that misunderstanding. As of the date of filing, the company's website includes the following false "answer" to the "frequently asked question" of whether an owner's heir will inherit his or her timeshare interest:

> 74% of timeshares have consumers in lifetime contracts, many of
> which have perpetuity commitments. While the issue of inheritance
> is a legal one for which you should seek legal counsel, Timeshare

Exit Team understands that some timeshare interests might continue
to burden an owner's heirs or estate after the owner's passing

In October 2014, the company used even less careful language following language:

yes, your kids can inherit your timeshare when you pass away based
on tenancy, whether they want it or not.

## B. TET Acts as a Listing Company While Discouraging Clients from Using Listing Companies

52.    TET profited from the resale of customer's timeshares after discouraging customers to resell their so themselves, which they could have done without the additional expense of a TET agreement. TET stated in its marketing materials and its contracts that it is not a transfer or listing company. TET trained its employees to warn customers about the dangers of listing companies. It warned customers that their assets had no listing value, that listing companies would try to scam them, would collect high upfront fees, and that there was little chance of the timeshare reselling on the market. TET's sales scripts also criticize transfers to a third party as an exit method. However, the primary way in which TET customers exited their contracts was through the transferring or selling of their timeshares to third parties. TET engages in the same practices it discouraged, except that it collects fees upfront to do it.

## C. TET Creates a Hobson's Choice for Consumers So They Cannot Exit and Cannot Obtain a Refund

53.    TET tells its customers that they did not need to pay maintenance fees and other payments to their timeshare companies. However, transfer companies require TET's customers to be current on payments in order to make a transfer. If TET chooses to use a transfer company, it informs customers that they have 180 days to make their payments for a guaranteed exit. If they do not pay, they forfeit the money-back guarantee that TET advertised. However, customers opting for that method are required to sign a legally invalid "Exit Agreement Addendum." Under the addendum, TET and the transfer company have an unlimited amount of time to complete the exit while the timeshare obligations remain in the

**FIRST AMENDED COMPLAINT FOR DAMAGES - 17**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

customer's name. That way, TET can force the property owners to maintain their property in perpetuity without ever receiving their money-back guarantee.

### D. After Promising to Negotiate Directly with Timeshare Companies, TET Made Customers Negotiate Directly with the Timeshare Companies

54.     Facing an enormous backlog with no coherent plan to discharge its duties, TET directs its customers to file complaints with the Better Business Bureau and state Attorneys General to prompt the timeshare companies to contact the customers. TET directs the customer to negotiate for their own exit using TET's talking points. TET directs them not to inform the timeshare company of its involvement. That method is contrary to TET's claims that it would "work directly" with resorts. In essence, customers pay thousands of dollars to Defendants to negotiate their own exits.

### E. TET Employees Do Not Possess the Expertise It Advertises

55.     Brandon Reed testified that he knew "nothing" about timeshares when he started TET. As early as December 2013, Defendants advertised that "[w]e are industry experts in relieving people of their timeshare commitments." Neither had any experience or training in performing timeshare exits, and they did not hire internal personnel who did. Brandon Reed has testified under oath in other litigation that Reed Hein' s business model from inception was to outsource all exit work to third-party Vendors.

56.     Defendants only began attempting "internal" (i.e., non-Vendor) exits in approximately 2015, and even this was limited to contacting Resorts about voluntary surrender programs for unwanted timeshares-which the customer could have done for free. The employees making these contacts, including Reed Rein's former office manager, had no specialized training or experience. Only in 2016 did Defendants hire contractors or employees with backgrounds in the timeshare industry to attempt to negotiate exits with Resorts, and only then as a "secondary" measure as Defendants continued to outsource first to Vendors.

**FIRST AMENDED COMPLAINT FOR DAMAGES - 18**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

**F. Defendants' Advertised Money-Back Guarantee Is Deceptive and Illusory**

57.     The fine print of the Money-Back Guarantee has varied over time, but in every version Reed Hein attaches numerous caveats and qualifications that allow the company to avoid paying a refund at its discretion, which Reed Hein exercises in almost any circumstance to deny payment. Defendants' contractual small print does not correct the deceptive net impression created by its website and marketing materials.

58.     Defendants have consistently interpreted the Money-Back Guarantee so that Reed Hein does not have to perform any deliverables in any specific span of time. Reed Hein will then use that as a basis to deny customers a refund and claim that Reed Hein is still working on a customer's file or that an exit may be forthcoming. Even now, the current fine print of the Guarantee only renders a customer "eligible" for a refund if three years have passed.

59.     Defendants also build in a variety of devices designed to void the Money-Back Guarantee:

      b.   Reed Hein voids the Guarantee if it has any exit offer, regardless of cost or form. Defendants interpret this to include if a customer rejects one of its Vendors, even if the timeshare company has never been contacted.

      c.   Reed Hein also voids its Money-Back Guarantee if the customer fails in its "duties," such as continuing to pay timeshare fees, even if Reed Hein advised the customer not to pay.

      d.   The most recent version of the Money-Back Guarantee declares the Guarantee void if the customer achieves their own exit: meaning that Defendants are entitled to keep the customer's funds even if they never did any work.

      e.   A Reed Hein internal policy manual states that, "we do not offer refunds for . . . cancellations" of its customer contracts entered between approximately 2016 and early 2019, which include the Money-Back Guarantee.

**FIRST AMENDED COMPLAINT FOR DAMAGES - 19**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

60.     In practice, Defendants' refund policy is that customers are not entitled to their full money back unless and until Reed Hein (in its sole discretion) determines that it is unable to obtain an exit. Defendants regularly deny requests for full refunds on the basis that Reed Hein has already begun work, and do not proactively refund money even if the exit has gone undelivered for years. Reed Hein typically does not honor its 100% Money-Back Guarantee unless the customer threatens to complain to a third party, such as the news media or the Washington State Attorney General's Office. Reed Hein has even conditioned refunds on customers taking down negative reviews or complaints online.

### G.   TET Creates the Deceptive Impression that Reed Hein is a Law Firm and Misrepresents that Reed Hein Performs "Consumer Protection"

61.     Defendants' marketing and branding create a deceptive net impression that Reed Hein is a law firm and/or that Reed Hein employs in-house attorneys with timeshare expertise. Reed Hein has no actual attorney "associates" and the only attorneys on Reed Hein's payroll serve as corporate counsel. A Reed Hein sales agents told Gerald and Patricia Siegrist that Brandon Reed and Trevor Hein are licensed attorneys.

62.     Defendants' sales scripts and presentations also reinforced this impression. Scripts referred to "Our Attorneys - They are consumer advocate attorneys," and did not specify that any attorneys used are Vendors.

63.     Representations made by Defendants on reedhein.com and timeshareexitteam.com bolster the misimpression that Reed Hein is a law firm or has in-house timeshare attorneys. Timeshareexitteam.com routinely referred to Reed Hein as a "firm" employing "consumer advocates" for the benefit of "clients." Through at least September 2014, reedhein.com specifically advertised "expertise" in, among other things, the legal fields of "Mortgage Mediation" and "Automotive Contracts." Through at least May of 2015, reedhein.com also stated that Defendants protected consumers "when they are misled by false advertising, deceptive sales practices, defective products, and various other unfair trade

practices."

64.     Reedhein.com also stated that Defendants "represent consumers," who are referred to as "our firm's clients," and claimed that Defendants' services included "preparing the strongest case for you."

65.     Defendants did not add language to their website disclaiming that Reed Hein was a law firm until sometime after September 2015 (in small print), and did not add a similar disclaimer to their contracts until February 2016 or later.

66.     Defendants further create the impression that they are lawyers after they are hired; Reed Hein employees were trained not to disclose the names of attorneys or that these attorneys were third-party Vendors. In customer communications, employees routinely referred to Vendor attorneys as "the attorney," "our attorney," or "your attorney." Defendants also insert Reed Hein personnel between the customer and any attorney, telling the customer that they must liaise with the attorney through their Reed Hein representatives.

61.     At least some of Defendants' customers understood Reed Hein to be a law firm or to have lawyers on staff when they retained Defendants' services.

62.     Also central to Defendants' marketing is the representation that Reed Hein is a "Consumer Protection Firm" or "Consumer Protection Group" employing a team of "consumer advocates" to look out for consumer interests.

63.     In using these terms, Defendants create the impression that Reed Hein is performing work to protect consumers or redress consumer harm. Reed Hein further bolsters this impression by trading on public perception of the timeshare industry and stating that Resorts are victimizing consumers.

64.     Contrary to these repeated representations, Reed Rein's sole work consists of selling timeshare exit services for profit. The "Client Advisors" who sign up Reed Hein's customers are commissioned salespeople whose compensation was (through January 2018) based solely on the sales they closed. As Reed Hein' s corporate representative conceded in a recent

**FIRST AMENDED COMPLAINT FOR DAMAGES - 21**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

deposition, Reed Hein's "goal … is to sell as many exits as possible and generate as much revenue and income as possible."

### H. Defendants Manipulate Online Reviews to Create Positive Perception of Reed Hein's Abilities and Services

67.     Defendants also manipulate online reviews of Reed Hein's services in order to attract and maintain customers and discredit negative commentary by unhappy customers. This includes having employees pose as satisfied customers online and leave fabricated reviews describing positive experiences with Reed Hein.

68.     Defendants further manipulate online reviews by hosting a false and deceptive online review aggregator on the timeshareexitteam.com website. Defendants' "Timeshare Exit Team review summary" purports to aggregate 1-star (Bad) through 5-star (Excellent) reviews from Google.com, Trustpilot.com, and Birdeye.com but omits more than two hundred negative (*i.e.,* 1- and 2-star) reviews posted to those review websites. Through this deceptive "review summary," Defendants falsely represent and/or create the impression that no negative reviews of the company exist, when in fact hundreds of such reviews have been posted online including approximately one hundred 1- and 2-star reviews on the Better Business Bureau's website.

69.     Reed Hein also specifically misrepresented for several years that it had no complaints with the Better Business Bureau or the Washington State Attorney General's Office, or any other form of "action" from a U.S. or Canadian government agency. This misrepresentation, which was included in contracts signed by Reed Hein customers through at least May 2016, was untrue by as early as 2014.

### I. Defendants Make Specific Misrepresentations to Consumers During Sales Presentations

70.     Defendants present their salespeople as having expertise in the timeshare industry and Reed Hein's "proprietary" exit process. In fact, the salespeople are not required to have any timeshare-related experience and are not even told how Reed Hein obtains the exits.

**FIRST AMENDED COMPLAINT FOR DAMAGES - 22**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

71.     Defendants advertise that their significant fee is a onetime cost (except for a potential resort-required settlement fee), compared to perpetual Resort fees. However, Reed Hein does not disclose that it may later ask for more money if the exit opportunity it obtains requires additional payments to a third-party Vendor, claiming this is allowed under their contracts because the money is not going to Reed Hein. Furthermore, Reed Hein now requires that customers keep paying for — but not use — the timeshare; customers must pay Reed Hein's fee and the Resort fees for the duration of the exit process, without the enjoyment of their timeshare.

72.     Reed Hein's fee calculation itself is deceptive: Customers are falsely told the fee is calculated based on the work necessary to obtain an exit. Instead, Reed Hein's fee is based on a formula designed to appear palatable to the potential customer when compared to the amount of the customer's annual timeshare and maintenance fees, and the remaining amount of any mortgage or other encumbrance.

### 3.   Material Omissions and Active Concealment of Material Facts

#### A.   TET Declines to Notify Customers that Timeshare Companies Have Begun Suing Its Customers

73.     Timeshare companies have been unwilling to sue timeshare holders who default because it would expose their sales and negotiation tactics. Since 2013, TET's alleged "exits" merely consisted of legally invalid quitclaim deeds and other form of nonpayment, relying on the timeshare companies' unwillingness to file suit. As late as 2018, timeshare companies began filing suit against TET customers. TET does not disclose to future customers the possibility that they might be sued or the reality that its current customers are being sued.

#### B.   TET Fails to Disclose and Actively Conceals the Extent that Its Services Will Be Outsourced

74.     In most cases Defendants immediately determine that the customer's exit will be outsourced, but Defendants will often conceal or fail to disclose the Vendor's involvement unless or until the Vendor's exit process necessitates disclosure, such as if the Vendor wants legal

**FIRST AMENDED COMPLAINT FOR DAMAGES - 23**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

documents executed.

75.     In assigning a Vendor, Defendants do not discriminate based on the qualities or merits of the case. Instead, 95% of the time, Defendants decide whether the file should go to an attorney Vendor or non-attorney Vendor based solely on whether the timeshare is encumbered.

76.     Reed Hein has also broken ties with several of its Vendors, which often leaves Defendants without a mechanism to effect the desired exit. During such periods, Defendants continue to sign up customers for services but do not inform the customers that no work will be done toward their timeshare exit until Reed Hein can locate a new Vendor. For example, for several months in late 2018, Defendants did not have an attorney Vendor to whom they could send incoming Reed Hein customers, after cutting off new assignments to all their existing attorney Vendors. Reed Hein nevertheless continued to take on customers with encumbered timeshares, without informing them that that no action would be taken on their exits until Reed Hein located a new Vendor. Reed Hein ultimately had to restore its relationship with a prior Vendor who had previously sued Reed Hein for breach of contract for failing to send enough customer files to start work on exits.

77.     Reed Hein would not necessarily tell their customers that work by an attorney (let alone a third party) was contemplated for their exit, and salespersons were trained to convey Reed Hein's hope that an attorney would be unnecessary. In many instances, Reed Hein neglected to obtain a power of attorney before hiring a Vendor attorney on the customer's behalf, or allowed a power of attorney to lapse before hiring one. Customers have complained to Reed Hein, demanding a refund, on the basis that they did not realize Reed Hein would be hiring an unknown third party.

78.     In many cases, TET directed and trained its employees not to reveal the identity of its Vendors to customers, even in circumstances where they were permitted to indicate a Vendor was being used. Employees also referred to Vendors in communications with customers as though the Vendors were in-house personnel.

**FIRST AMENDED COMPLAINT FOR DAMAGES - 24**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

79.     Where there is a Vendor contract, Defendants sometimes build in a provision barring the Vendor from speaking to Reed Hein's customers. When one of Reed Hein's Vendor attorneys began interacting with customers and sending them direct communications, including an outline of Reed Rein's fee arrangement with the attorney, Defendants advised those customers that the communications were "a formality" or should be ignored.

80.     Attorney Vendors send representation letters to Resorts indicating the customer (not Reed Hein) has retained the attorney to seek an exit of the timeshare. Attorneys send these letters even when the customer does not know the attorney's identity or even that the attorney has been retained. This is despite the fact that some of Reed Hein's attorney Vendor contracts explicitly provided that Reed Hein customers would not have an attorney-client relationship with the attorney and barred Reed Hein from implying that the attorney Vendor represented the customer.

81.     Defendants internally recognized that Reed Hein's contracts with customers did not provide for Reed Hein to outsource exit services to a third-party Vendor. Reed Hein employees were instructed in approximately April 2018 that they could direct customers to an assignment provision in the contract as a basis for authority to outsource the exits, and "reset customer expectations" about third-party Vendors accordingly. Defendants only revised their contract to permit outsourcing of exit services in 2019, after commencement of the State's pre-litigation investigation.

### 4.     Additional Unfair Acts and Practices

#### A.     Defendants Further Manipulate Customers Through Deceptive Offers of Credit Repair Services

82.     On information and belief, Defendants represent to consumers that Defendants will preserve the consumer's credit record, history, or rating, or assist in repairing the consumer's credit if it should be negatively impacted by Reed Hein's exit process.

83.     Beginning as early as September 2014, Defendants represented directly via

**FIRST AMENDED COMPLAINT FOR DAMAGES - 25**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

reedhein.com that Reed Hein had expertise in credit repair services. This representation was made continually through at least May 2015.

84.     Beginning as early as 2016, Defendants began representing directly to customers that Reed Hein would provide credit repair services where necessary as part of the exit services customers paid Reed Hein to perform, or negotiate directly with Resorts to have the Resorts withdraw any negative credit reporting. On information and belief, Defendants continued to claim that Reed Hein would provide assistance or help with credit repair as part of Reed Rein's services through at least December 2018.

85.     On information and belief, despite promising credit repair to incoming customers as part of Reed Hein's services, Defendants began refusing to provide such services in approximately March of 2018. Defendants acknowledged to customers that these services were promised but informed them that Reed Hein did not offer credit repair "anymore."

### 1. Defendants Never Provided the Advertised Credit Repair and Instead Hired Vendors

86.     Although Defendants created the impression that Reed Hein itself would provide credit repair services, these services were provided by third party Vendors, if at all. On occasions where Defendants actually disclosed that a third-party Vendor would be involved, usually after a customer hired Reed Hein, Defendants reserved sole discretion to select the Vendor.

87.     On information and belief, as with their exit Vendors, no written contracts governed Reed Hein's relationship with the credit repair companies. Additionally, on information and belief, no contracts were entered between the customer and the credit repair companies. The entire arrangement was governed by verbal agreements between Defendants and their Vendors, undisclosed to Reed Hein's customers.

### 2. Defendants Do Not Comply with Statutory Requirements for Credit Services Organizations

88.     In association with their advertised services, including credit repair, Defendants

**FIRST AMENDED COMPLAINT FOR DAMAGES - 26**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

offer a three-day cancellation policy in exchange for a full refund. Defendants' contracts do not include any statement, conspicuous or otherwise, regarding a customer's right to cancel the contract at any time prior to midnight of the fifth day after the date of the transaction, or any reference to an attached notice of cancellation form to be completed in such event. No such attached cancellation form is provided.

89.    In association with their advertised services, including credit repair, Defendants' contracts do not specify the total of all payments to be made by the customer. Instead, the contracts specify Defendants' initial fees, and provide the customer may be required to pay unspecified transfer or settlement fees in the future.

90.    In association with their advertised services, including credit repair, Defendants charge customers prior to full and complete performance of the services Reed Hein has agreed to provide. On information and belief, Defendants have not obtained a surety bond in any amount from a surety company admitted to do business in Washington with respect to credit repair services. On information and belief, nor have Defendants established a trust account at a federally insured bank with respect to their advertised credit repair services.

91.    In association with their advertised services, including credit repair, Defendants do not provide customers with any written statements reflecting the information set forth in RCW 19.134.050 and, as such, Defendants do not keep any signed acknowledgments of the customer's receipt of these written statements on file.

### 3.    Defendants Mislead Consumers in Performance of Debt Adjustment Services

92.    Defendants explicitly adjust consumer debt in the context of selling services to release consumers from mortgaged or otherwise encumbered timeshare interests. Defendants' marketing recognizes that Defendants' services represent the adjustment of consumer debt, characterizing timeshare ownership as "debt" and "perpetual liability." Despite this recognition, Defendants routinely engage in acts prohibited for debt adjusters:

**FIRST AMENDED COMPLAINT FOR DAMAGES - 27**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

93.    Defendants' fees, which they attempt to collect upfront, are in the range of thousands of dollars, far in excess of the twenty-five-dollar initial fee permissible to debt adjusters. Defendants also regularly charge more than fifteen percent of the total debt owed to the mortgagor, including charging a "base price calculated at 30% of [the] mortgage amount" to resolve "[a]ny mortgage over $30,001."

94.    Because Defendants actively conceal from Resorts that customers have hired Reed Hein, Reed Hein routinely fails to notify its customers' creditors (the Resorts) of the retention of its services. Reed Hein also fails to provide a monthly accounting to its customers of any kind.

95.    Defendants improperly fail to include in their contracts the provisions mandated by RCW 18.28.100(7), and fail to hold payments received from customers in a separate trust account or make payments on behalf of customers from that account.

96.    Defendants also improperly pay a $150 referral fee to customers to refer other prospective customers to Reed Hein for services which include debt adjustment services.

97.    Lastly, Defendants' Powers of Attorney, which specifically allow Reed Hein or its employees to negotiate "Timeshare Interest/ Debt" and settle with customers' secured creditors, improperly authorize Defendants to employ or terminate the services of attorneys or arrange the terms of or compensate for the services of attorneys on behalf of Reed Hein's customers.

### B. TET Falsely Asserts That Communications Between TET and its Customers Are Protected by Attorney-Client Privilege

98.    Reed Hein executes Power-of-Attorney agreements with their customers. Under those agreements, Reed Hein asserted that it "acts as an agent pursuant to the POA agreements when it hires law firms or transfers companies . . . and when it communicates and interacts with the law firms on behalf of the Reed Hein customers." Reed Hein further asserted that "If Reed Hein decides to hire a law firm for a customer, Reed Hein and the law firms specifically intend

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

to create a relationship under privileged material is freely exchanged. As such, the law firms, customers, and Reed Hein all intend that the attorney-client and work product privileges and protections apply to all three parties in this agency relationship – the law firms, the customers/clients, and Reed Hein."

99.     However, Reed Hein knows a federal court in 2018 held that the communications and work product between those entities were not subject to attorney-client privilege or the work product doctrine. After that ruling, Reed Hein continued to assert that those communications and work product were subject to attorney-client privilege and work product privileges.

## V.     CLAIMS FOR RELIEF

### COUNT ONE
### BREACH OF CONTRACT INCLUDING BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

100.    Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

101.    Every contract contains an implied covenant of good faith and fair dealing.

102.    Defendants induced customers into contracts unfairly and in bad faith by using false claims and promises.

103.    Defendants breached the terms of the spirit of its contracts with customers.

104.    As a direct, proximate, and legal result of the breaches, Plaintiffs have suffered damages in an amount to be proven at trial.

### COUNT TWO
### COMMON LAW FRAUD

105.    Defendants induced customers to spend money on its services by making materially false representations and omitting material facts with the intent that the false statements and omitted facts be acted upon.

106.    Plaintiffs were ignorant of or would not be expected to know the truth of the

**FIRST AMENDED COMPLAINT FOR DAMAGES - 29**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

material misrepresentations and material omissions.

107.    Plaintiffs relied on the truth of Defendants' misrepresentations and trusted that there were no material omissions.

108.    Plaintiffs suffered damages as a result of their reliance.

## COUNT THREE
## UNJUST ENRICHMENT/DISGORGEMENT

109.    Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

110.    Plaintiffs have conferred a substantial benefit upon Defendants derived from the fees paid by Plaintiffs.

111.    Those payments were accepted and retained by Defendants under circumstances such that it would be inequitable for Defendants to retain the benefit without payment to Plaintiffs.

112.    As a result of Defendants' unjust enrichment, Plaintiffs have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

113.    Plaintiffs also seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful, and/or deceptive practices.

## COUNT FOUR
## VIOLATION OF CONSUMER PROTECTION ACT, RCW 19.86 *et. seq.*

114.    Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

115.    Plaintiffs can prevail on a claim for damages under the State Consumer Protection Act by establishing (1) an unfair or deceptive act or practice, (2) that occurred in the conduct of trade or commerce, (3) that has an impact on the public interest, (4) that results in injury to the plaintiffs in their business or property, and (5) causation. *Klem v. Washington Mut. Bank*, 176 Wash.2d 451 (1992).

**FIRST AMENDED COMPLAINT FOR DAMAGES - 30**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

116.    Defendants commit an unfair or deceptive act or practice by promising to hold a customer's funds separate and apart from company's funds, when the company in fact converted Plaintiffs' funds into its own funds.

117.    Because Defendants committed the unfair or deceptive acts or practices as part of a transaction, the acts or practice occurred in the conduct of trade or commerce.

118.    Because Defendants has presented the same power-of-attorney form to tens of thousands of customers, and because the company has in fact converted the funds of all those customers into its own funds, the company's unfair or deceptive act or practice as an impact on the public interest.

119.    Defendants engaged in the following acts or practices constituting unfair or deceptive acts in trade or commerce:

    a.   Misrepresenting, directly or indirectly, that Reed Hein terminates consumers' obligations with respect to their timeshares by forcing Resorts to cancel or annul timeshare contracts or take back the timeshare;

    b.   Misrepresenting, directly or indirectly, that Reed Hein negotiates directly with Resorts to terminate consumers' obligations with respect to their timeshares;

    c.   Misrepresenting, directly or indirectly, that Reed Hein itself will perform services toward terminating consumers' obligations with respect to their timeshares, rather than through the use of third-party Vendors;

    d.   Outsourcing services performed for Reed Hein customers to third-party Vendors where the customer's contract with Reed Hein did not provide for Reed Hein to hire a third party or assign responsibility for performance of the services in the contract;

    e.   Outsourcing services performed for Reed Hein customers to third-party Vendors with whom Reed Hein and/or the customer does not have a contract;

    f.   Misrepresenting, directly or indirectly, that Reed Hein personnel have performed

**FIRST AMENDED COMPLAINT FOR DAMAGES - 31**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

services toward terminating consumers' obligations with respect to their timeshares when any services have in fact been performed by a Vendor;

g. Failing to supervise and maintain oversight over services performed by Vendors where the customer contracted with Reed Hein to receive such services;

h. Delivering services to customers that are legally ineffective at terminating the customers' obligations with respect to their timeshare;

i. Delivering services to customers that create the risk of legal action against customers for invalid transfers of their timeshare;

j. Interpreting foreclosure and/or Notice of Termination for nonpayment as a successful termination of customers' obligations with respect to their timeshare without disclosing this interpretation to customers at the point of sale;

k. Misrepresenting, directly or indirectly, that customers' obligations with respect to their timeshare have been terminated when they have not been;

l. Misrepresenting, directly or indirectly, that customers' obligations with respect to their timeshare have been terminated when Defendants know or should know the Resort does not recognize the termination;

m. Misrepresenting, directly or indirectly, that Reed Hein has made progress toward and/or performed services toward terminating a customer's obligations with respect to their timeshare when no such services have been performed;

n. Misrepresenting, directly or indirectly, that Reed Hein does not obtain proceeds from the sale of a customer's timeshare to a third party;

o. Misrepresenting, directly or indirectly, that Reed Hein would perform services toward terminating customers' obligations with respect to encumbered timeshares during periods when Reed Hein was not providing services or outsourcing services on encumbered timeshares to Vendors;

p. Misrepresenting, directly or indirectly, that Reed Hein has developed

**FIRST AMENDED COMPLAINT FOR DAMAGES - 32**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

relationships with Resorts that facilitate termination of customers' obligations with respect to timeshares;

q. Misrepresenting, directly or indirectly, that consumers will not face negative consequences if they cease making payments to Resorts with respect to their timeshares;

r. Impeding customers' communications with Resorts with respect to the customers' obligations regarding their timeshares, including payment obligations;

s. Misrepresenting, directly or indirectly, that Reed Hein's services do not present any risk to customers, including but not limited to risk of foreclosure by Resorts with respect to customers' timeshares;

t. Misrepresenting, directly or indirectly, that Defendants have expertise, trade secrets, or unique or proprietary strategies and methods that Reed Hein will employ toward terminating consumers' obligations with respect to their timeshares;

u. Misrepresenting, directly or indirectly, that Reed Hein will terminate consumers' obligations with respect to their timeshare safely, legitimately, legally, permanently, or forever;

v. Giving customers the deceptive net impression that Reed Hein has local and/or region-specific expertise;

w. Misrepresenting, directly or indirectly, that Reed Hein's fees are calculated based on the services required to terminate a customers' obligations with respect to their timeshares;

x. Misrepresenting, directly or indirectly, that Reed Hein has a 100% success rate and/or the highest success rate in the industry;

y. Creating the deceptive net impression that Reed Hein can terminate any customer's obligations with respect to their timeshare, regardless of

**FIRST AMENDED COMPLAINT FOR DAMAGES - 33**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

circumstances;

z.  Misrepresenting, directly or indirectly, that consumers who hire Reed Hein will not have to make further payments to Resorts with respect to their timeshares;

aa. Misrepresenting, directly or indirectly, the amount of time that it will take for Reed Hein to terminate customers' obligations with respect to their timeshares;

bb. Misrepresenting, directly or indirectly, or creating the deceptive net impression that Reed Hein is a law firm and/or Reed Hein performs "consumer protection" services;

cc. Misrepresenting, directly or indirectly, or creating the deceptive net impression that Reed Hein employs in-house attorneys who perform services to terminate consumers' obligations with respect to their timeshares;

dd. Misrepresenting, directly or indirectly, that no complaints about Reed Hein had been filed with the Better Business Bureau or the Washington State Attorney General's Office, or that Reed Hein had not been the subject of any other form of "action" from a U.S. or Canadian government agency;

ee. Manipulating online reviews of Reed Hein by having Reed Hein representatives pose as satisfied customers and leave fabricated reviews;

ff. Displaying an online review summary on timeshareexitteam.com which omits 1- and 2- star reviews from the summarized review sources;

gg. Misrepresenting, directly or indirectly, that terminations of a customer's obligations with respect to their timeshares were the result of services provided by Reed Hein when Defendants know that Reed Hein had not provided services resulting in the termination;

hh. Forming contracts with customers who own timeshares with Resorts on Reed Hein's internal "Do Not Take" list;

ii. Requiring customers to sign "Exit Agreement Addendums," which substantially

change the terms of the customers' contract with Reed Hein, under threat of voiding Defendants' Money-Back Guarantee;

jj. Creating the deceptive net impression that Defendants' Money-Back Guarantee entitles customers to a full refund of fees paid to Reed Hein if dissatisfied with Reed Hein's services;

kk. Offering a Money-Back Guarantee that may be voided if Reed Hein offers to terminate a customer's timeshare interest through a method rejected by the customer because the method does not correspond the methods described in Reed Hein's marketing or representations at sales presentations;

ll. Offering a Money-Back Guarantee that permits Reed Hein to refuse to refund customers' payments if Reed Hein expresses an intent to continue to attempt performance under the contract where the Money-Back Guarantee does not require Reed Hein to perform within a specified amount of time;

mm. Refusing to honor the Money-Back Guarantee in circumstances where the basis to void the Guarantee was the customer's failure to pay the Resort at Defendants' direction;

nn. Conditioning honoring the Money-Back Guarantee on a customer's withdrawal of public negative reviews or complaints to third parties;

oo. Misrepresenting, directly or indirectly, that consumers face no risk of credit damage from Reed Hein's services; and

pp. Misrepresenting, directly or indirectly, that Reed Hein provides credit repair services when Reed Hein later refuses to provide such services.

120. Defendants' practices outlined above affects the public interest and have the capacity to deceive a substantial number of consumers and are unfair or deceptive acts or practices in trade or commerce in violation of RCW 19.86.020.

121. The unfair or deceptive act or practices have harmed Plaintiffs in their business

**FIRST AMENDED COMPLAINT FOR DAMAGES - 35**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

1  or property.

2        122.    The unfair or deceptive practice act or practice proximately caused Plaintiffs'

3  injuries.

4        123.    This Court has authority to award treble damages, up to a maximum of $25,000,

5  to any person who establishes that he or she was injured because of a violation of the State

6  Consumer Protection Act. RCW 19.86.090.

7        124.    A person who establishes that he or she was injured because of a violation of the

8  State Consumer Protection Act is entitled to the reasonable attorney fees and costs he or she

incurred in bringing the suit. RCW 19.86.090.

9        125.    The Court should award treble damages to the Plaintiffs.

## COUNT FIVE
## BREACH OF FIDUCIARY DUTIES

126.    Defendants induced Plaintiffs into fiduciary relationships by asking them for power of attorney and soliciting money for services not yet performed.

127.    Defendants received money from Plaintiffs for services not yet performed, but did not hold the money in trust or escrow.

128.    Defendants immediately misappropriated the money as earned income.

129.    Defendants breached their fiduciary duties to Plaintiffs.

## VI.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court grant the following relief:

130.    That the Court issue a preliminary injunction enjoining and restraining Defendants and their representatives, officers, agents, servants, employees, and all other persons acting or claiming to act for, on behalf of, or in active concert or participation with Defendants offering or selling the Timeshare Exit Services described herein until such further order of the Court.

**FIRST AMENDED COMPLAINT FOR DAMAGES - 36**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

131.    That the Court adjudge and decree that Defendants have engaged in the conduct complained herein.

132.    That the Court adjudge and decree that the conduct complained of herein in constitutes unfair or deceptive acts or practices in violations of the Consumer Protection Act, Chapter 19.86 RCW.

133.    That the Court make such orders pursuant to RCW 19.86.080 as it deems appropriate to provide that Plaintiffs have and recover from Defendants the costs of this action, including reasonable attorney fees.

134.    That the Court order such other relief as it may deem just and proper to fully and effectively dissipate the effects of the conduct complained herein, or which may otherwise seem proper to the Court.

135.    Monetary Relief, including Damages and Treble damages.

136.    Attorney Fees and Costs.

137.    Any other monetary and nonmonetary relief the Court deems just and proper.


DATED this 19th day of May 2021.

ALBERT LAW PLLC

By: _____
Gregory Albert, WSBA#: 42673
3131 Western Ave., Suite 410
Seattle, WA 98121
Telephone: (206)-576-8044
Email: greg@albertlawpllc.com
*Attorney for Plaintiffs*

**FIRST AMENDED COMPLAINT FOR DAMAGES - 37**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

# EXHIBIT 5

**Cope, Candace**

| | |
|---|---|
| **From:** | Panda Kroll <pkroll@pandakrollesq.com> |
| **Sent:** | Thursday, August 19, 2021 11:32 AM |
| **To:** | reportclaims |
| **Cc:** | Chamberlin, Sarah; Stephanie Loosvelt |
| **Subject:** | RE: Tender of Defense and Indemnity |
| **Attachments:** | Order consolidating Isaacs & Siegrist.pdf |

> **ATTENTION:** This is an **EXTERNAL** email. Only open attachments and links after verifying the content is safe. **Original Sender: pkroll@pandakrollesq.com**

FYI – this might be more accurately characterized as a single claim given the court's order consolidating the two aforementioned cases.

---

**From:** Panda Kroll
**Sent:** Thursday, August 19, 2021 7:56 AM
**To:** 'reportclaims@rsui.com' <reportclaims@rsui.com>
**Cc:** Chamberlin, Sarah <SChamberlin@rsui.com>; Stephanie Loosvelt <stephanie.loosvelt@reedhein.com>
**Subject:** Tender of Defense and Indemnity

Dear Sirs/Madams,

Please find attached our client's request for a defense and indemnification of Brandon Reed and Trevor Hein, officers of insured, Reed Hein & Associates, LC.

We look forward to your response to these claims:

- Siegrist v Reed Hein & Associates, LLC, et al.
- Isaacs v Reed Hein & Associates, LLC, et al.

 The procedural posture of these two cases is complex, and notwithstanding their respective captions, they are both currently pending in state court. Please let me know if I can provide further details.

Sincerely,

**Panda Kroll**
Esquire

Direct Line: (805) 551-0773
pkroll@pandakrollesq.com
5999-B Ridgeview Street
Camarillo, California 93012

# EXHIBIT 6



**RSUI Group, Inc.**
Chase Brewster
945 East Paces Ferry Road
Suite 1800
Atlanta, GA  30326-1125

Phone   (404) 260-3925
Fax      (404) 262-4414

August 23, 2021

Stephanie Loosvelt                                    **Via email:  Stephanie.loosvelt@reedhein.com**
Reed Hein & Associations, LLC

| Re: | **Insured** | : | **Reed Hein & Associates, LLC** |
|---|---|---|---|
| | **Claimant** | : | **Gerald and Patricia Siegrist; Phillip and Rebecca Isaacs** |
| | **Policy** | : | **NPP687052** |
| | **Policy Period** | : | **5/16/21—22** |
| | **Aggregate** | : | **$4,000,000** |
| | **Limit of Liability** | : | **$2,000,000** |
| | **Retention/Attachment** | : | **$50,000** |
| | **Issuing Company** | : | **RSUI Indemnity Company** |
| | **RSUI File** | : | **703—161384** |

Dear Stephanie:

This will acknowledge receipt of the August 19, 2021 correspondence to the Claims Department regarding the captioned matter.  Phil Krajec has been assigned to this matter on behalf of RSUI.  This is not RSUI's definitive coverage position.  Mr. Krajec will be providing a coverage position at the earliest opportunity after full consideration of information available.  **Please direct all information, questions or concerns regarding this matter to Mr. Krajec at his direct phone (404) 504-6115 or email at pkrajec@rsui.com.**

Although a coverage determination has not yet been made, please be reminded that the captioned policy provides RSUI with a right and duty to defend claims in accordance with the policy terms and conditions.  Absent a coverage denial, and assuming a duty to defend is owed under the Policy, RSUI will be appointing counsel to defend this matter.  If there is an urgent defense issue, you must contact Mr. Krajec immediately in that regard.

Please note also that the policy's $50,000 retention applies to this matter.  Although the policy may provide for RSUI's right and duty to defend, the Insured shall be responsible under the policy for the first $50,000 of covered loss incurred in connection with this matter, inclusive of defense expenses.

Pending further investigation and its definitive coverage position, RSUI is proceeding in this matter without waiving any of its rights, privileges and defenses available under the captioned policy or at law.  Nothing stated by or on behalf of RSUI, or not stated, should be construed as a limitation or waiver on any such rights privileges or defenses.  Our full coverage position will follow at the earliest opportunity

Best regards,

**Chase Brewster**
Claims Assistant
D&O/EPL Claims

# EXHIBIT 7

# Phil Krajec

# General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.

# April 21, 2025



1325 Fourth Avenue, Suite 1840  Seattle, Washington 98101
Bellingham  |  Everett  |  Tacoma  |  Olympia  |  Yakima  |  Spokane
Seattle 206.287.9066    Tacoma 253.235.0111    Eastern Washington 509.624.3261
**www.buellrealtime.com**
email: info@buellrealtime.com

General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.                    Phil Krajec

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

_____

GENERAL CASUALTY COMPANY OF     )
WISCONSIN, a Wisconsin          )
corporation,                    )
                                )
                                )
    Plaintiff/Counterclaim      )
    Defendant,                  )
                                )
         v.                     )     No. 2:23-cv-00725-TMC
                                )
REED HEIN & ASSOCIATES, LLC,    )
d/b/a TIMESHARE EXIT TEAM, a    )
Washington limited liability    )
company; MAKAYMAX, INC., a      )
Washington corporation; BRANDON )
REED, individually; BRIAN and   )
KERRI ADOLPH, a married couple, )
                                )
    Defendants/Counterclaim and )
    Third Party Plaintiffs,     )
                                )
         v.                     )
                                )
RSUI GROUP, INC., a Georgia     )
corporation; and RSUI INDEMNITY )
COMPANY, INC., a New Hampshire  )
corporation,                    )
                                )
         Third Party Defendants. )

_____

VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION OF

PHIL KRAJEC

_____

Lawrenceville, Georgia

(All participants appeared via videoconference.)

DATE TAKEN:   APRIL 21, 2025

REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

Page 7

1    Q.  Okay.  So then in about 2002, what happened?

2    A.  Got promoted.

3    Q.  Okay.  And what was that position?

4    A.  Vice president.

5    Q.  Is that the same role that you're in now?

6    A.  No.  I've had various roles as vice president.

7    Q.  Okay.  Maybe you can give me some more context

8  there.  Can you explain your initial role as vice

9  president, and then how that has changed through today?

10    A.  Sure.  So when I was first promoted --

11  actually, I think it was probably January of the

12  following year, not 2002, but I'm not positive on that.

13  But that promotion involved being named the manager of

14  the primary liability claim team.

15    Q.  Okay.  So your first vice president role was

16  manager of primary liability claims?

17    A.  Yes.

18    Q.  Okay.  And how long were you in the role of

19  manager of primary liability claims?

20    A.  About two years.

21    Q.  Okay.  You know the next question.  What

22  happened?

23    A.  I was moved over to a nonmanagement position in

24  the excess claims area.

25    Q.  Can you explain what your role was in excess

General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.                    Phil Krajec

Page 14

1    ARM.  What's an ARM?

2         A.  Associate in risk management.

3         Q.  Okay.  Is this a certification?  Is this a

4    course?  Can you tell me more about ARM?

5         A.  It's similar to CPCU.  It's the same

6    organization that offers that particular certification.

7    This specifically dealing with risk management, loss

8    control issues.

9         Q.  Okay.  Do you recall what year you got your

10   ARM?

11        A.  I can turn around and look at the wall behind

12   me and tell you, if you need that.  '94.  Sorry.

13        Q.  Oh, no worries.  I like the desk reference.

14        Okay.  So we've got the CPCU in '92.  We've got

15   the ARM in '94.  And with the ARM, is there any required

16   continuing education, or is that still kind of a

17   one-time certification?

18        A.  No continuing ed requirement for that either.

19        Q.  Okay.  And, you know, your certification for

20   ARM similarly predates your time at RSUI as an ARM,

21   something that RSUI requires in your role?

22        A.  No.

23        Q.  Okay.

24        A.  Yes, it predated.  No, it's not required.

25        Q.  Understood.  That was on me.  Two questions at

84fe8024-9c3d-410f-94e7-e7089bd57b14

General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.                                    Phil Krajec

Page 15

1    once.

2          Okay.  Let's talk about the AMIM.  That's our

3    last one; right?

4          A.  AMIM is associate in marine insurance

5    management.

6          Q.  Okay.  This one sounds a little more fun than

7    the other two.  Was -- did you get it on a cruise ship?

8    What was the education process there, Phil?

9          A.  It wasn't all that much fun.  No, when I

10   started handling transportation claims, I thought it

11   would be a good idea to learn about marine insurance,

12   not just boats, but inland marine as well, which

13   includes cargo.

14         Q.  Sure.

15         A.  So any shipping.

16         Q.  Okay.  And since this is transportation

17   specific, I'm going to guess that this one also predates

18   RSUI.  Is that correct?

19         A.  Correct.

20         Q.  Okay.  Do you recall --

21         A.  I have to look at the date because I know

22   you're going to ask me.  Hang on a second.  That one's

23   1996.

24         Q.  Okay.  This is starting to look like Bulls

25   champion years.

84fe8024-9c3d-410f-94e7-e7089bd57b14

General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.                                                Phil Krajec

Page 17

1      Q.   Okay.  And let me start, I guess, kind of
2  fundamentally about what types of materials are in a
3  file.
4          So I'm assuming, you know, we've got claim
5  notes; is that right?  That's in the file?
6      A.   Yes.
7      Q.   Okay.  Do copies of emails that come in or go
8  out, do those get saved to the file?
9      A.   Yes.
10      Q.   Okay.  Is that automatic, or is someone, like,
11  pulling emails?
12      A.   I would have to manually put it into the file.
13      Q.   Okay.
14      A.   Well, electronically, no.
15      Q.   Understood.  You would have to take an
16  affirmative action to put an email in the file?
17      A.   Right.
18      Q.   Okay.  We've got letters that, you know, are
19  coverage determinations or anything else; right?  Those
20  are also in the file?
21      A.   Yes.
22      Q.   So in addition to the emails that we pull,
23  letters that are sent, and claims notes, can you tell me
24  what other types of documents, categories of documents,
25  are in the file?

Page 18

1    A.  Well, any pleadings; discovery, both requests

2    and responses to requests; a copy of the policy.  I

3    don't know about this file in particular, but in some

4    instances, the underwriting file might be included.

5    Q.  Is there anything else that comes to mind?

6    A.  Not offhand.

7    Q.  So I took a look at your -- some of your claims

8    notes, and we'll go through those later.  So we don't

9    have to talk about them.  But generally speaking, I'm

10   wondering if -- I'm assuming there's, you know, much

11   more action on a file that's included than what's

12   included in a claims note.

13        So I'm wondering, is there a way that you or

14   anyone else at RSUI memorializes, like, let's say, a

15   phone call?  "Called so-and-so."  But it's not, like,

16   super substantial, so it wouldn't meet the definition of

17   a claims note, but it's still an action on the claim.

18   Would that be memorialized somewhere?

19        MS. FERREIRA:  Object to form.

20   A.  Well, if it had some substance to it, I would

21   comment on it in the notes.  But if it had no substance,

22   I don't know if it's tracked electronically somewhere,

23   if that's what you're asking.

24   BY MR. MCCLURE:

25   Q.  Yeah.  I guess -- so, you know, as an attorney,

Page 20

1    I'm trying to get an understanding of this diary.

2          Is it like a -- is it like a claims management

3    software that alerts you to specific actions?  Can you

4    just give me some context of what this diary is at RSUI?

5          A.  When a claim is created, it automatically

6    generates a diary for -- I don't know how that -- I

7    think it's 30 days out.  But then after that, I can set

8    the diary to 30 days, 60 days, whenever I think it is

9    that I need to set -- to look at the file again.

10         So yes, it is system generated originally, but

11   then after that, I have control over when it's -- next

12   pops out for my review.

13         Q.  Okay.  Is that a part of your claims management

14   software?

15         A.  Yes.

16         Q.  Okay.  And what is the claims management

17   software at RSUI?

18         A.  What is it?

19         Q.  Yes.

20         A.  I'm not sure what you're asking.

21         Q.  So I've got, you know, all sorts of marketed

22   things that give me -- you know, Clio is one, or what

23   I -- is there a specific, like, brand of claims

24   management software that's used at RSUI?

25         A.  It was developed internally.

Page 21

1     Q.   Okay.  Okay.  So it's an in-house claims

2   management system?

3     A.   Yes.

4     Q.   Got it.

5          And so we've got this in-house claims

6   management system.  Part of that includes the diary, and

7   then is the -- is that how you would view the file,

8   would be through the claims management software?

9     A.   Yes.

10    Q.   Okay.  So -- and I'm just trying to get a sense

11  of this because I don't have access to your systems.  So

12  there's one component of the software that allows

13  these -- this diary aspect.  There's another that seems

14  to have, you know, document retention.

15         What other aspects exist for this claims

16  management software?

17             THE WITNESS:  And, Catarina, I think I'm

18  okay here, but stop me if you think I'm going afoul.

19    A.   But if I understand your question correctly,

20  the diary management system is separate from where the

21  documents are located in that system.

22         Does that make sense?

23    Q.   It does.

24    A.   Okay.  So the documents are located in a system

25  called ImageRight.  So that's where the documents are

General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.                    Phil Krajec

Page 25

1   the claim handling and kind of your general practice.

2   But before we do that, I just want to ask, do you have

3   an understanding of how your performance at RSUI is

4   judged?

5       A.  Yes.

6       Q.  Can you give me some context?

7       A.  We have certainly an annual review.  There's

8   also semiannual reviews, which are less formal.  And

9   then quarterly random file reviews that Scott will do.

10      Q.  Are you aware of any specific metrics for

11  performance or, you know, incentives for certain types

12  of actions within your job?

13          MS. FERREIRA:  Object to form.

14      A.  It's not quite as mathematical as a metric will

15  be.  It's much more subjective.  But the things that

16  would be looked at would be timeliness of response,

17  accuracy of positions taken, not just with respect to

18  coverage, but evaluation.

19  BY MR. MCCLURE:

20      Q.  What's your understanding of why timeliness of

21  a response regarding, you know, coverage for a claim?

22  Why is that important?

23          MS. FERREIRA:  Object to form.

24          Go ahead.

25      A.  Well, I think it -- policyholders have a right

84fe8024-9c3d-410f-94e7-e7089bd57b14

Page 26

1    to find out if the claim they submitted is covered or

2    not, and in a timely fashion.

3    BY MR. MCCLURE:

4        Q.  And in a timely fashion, what does that mean to

5    you?  Is that, you know, specific, like in your mind as

6    a -- like does a specific time period come to mind or,

7    you know, how does Mr. Phil Krajec think about

8    timeliness for a response?

9        A.  A lot depends on what we have -- what's given

10    to us in the first place.  Unfortunately, not all the

11    submissions are adequate for us to -- or contain enough

12    information for us to make a determination as to whether

13    a particular claim might be covered or not.

14        So if it's -- if all the information is there

15    from the beginning, it's fairly easy to get things

16    turned around quickly.  If, on the other hand, you have

17    to make, say, phone calls, or do some research, it could

18    take a while, and I would like to think we get these

19    turned around quickly, but as I said, sometimes you have

20    to do a little research, you might have to consult -- as

21    I said, discuss it in-house with a supervisor or a

22    roundtable, or perhaps even coverage counsel.

23        Q.  So I think maybe a good example of this would

24    be your actions for the Siegrist/Isaacs claim; right?

25    That came in August 19th.  You did a determination by

Page 55

1  So it may be helpful to -- well, it's all over a number

2  of documents, so perhaps I can start with what we've

3  identified as Exhibit 1.

4          (Exhibit No. 1 marked.)

5  BY MR. MCCLURE:

6      Q.  I will share my screen.  Hold on.  Are you able

7  to see that?

8      A.  Yes.

9      Q.  Okay.  And it looks like a September 15, 2021,

10  letter from RSUI?

11      A.  Yes.

12      Q.  Okay.  And it's addressed to Stephanie

13  Loosvelt.

14          Do you know who Stephanie is?

15      A.  I do not.

16      Q.  Okay.  And on here, we've got some information

17  about Reed Hein & Associates as the insured, RSUI as the

18  insurer, and then the claimants are the Siegrists and

19  the Isaacs.

20          Do you see that?

21      A.  Yes.

22      Q.  Okay.  And then it provides a current policy

23  period from May 16, 2021, to the same date of 2022, with

24  the prior policy period May 16, 2020, to the same date

25  the following year.

General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.                          Phil Krajec

Page 58

1      A.   Yes.

2      Q.   Okay.  And it looks like here, we've got a lot

3   of things in the header.  It looks like the insured is

4   Reed Hein.  The date of loss is May 7, 2021.  And then

5   the date of the note is August 23, 2021, created by you.

6           Does that all seem right?

7      A.   Yes.

8      Q.   Okay.  And the claim professional, which I

9   think we would call it a claims handler, is also you on

10   this case; is that correct?

11     A.   Yes.

12     Q.   So your note starts with, this matter had an

13   extensive procedural history before being reported to

14   RSUI.

15           Do you see that?

16     A.   Yes.

17     Q.   And it says, "In April, two separate purported

18   class action suits were filed in state court in

19   Washington."  Is that right?

20     A.   Yes.

21     Q.   Okay.  And this is -- this is what we talked

22   about when you were walking me through our steps, you

23   know, getting a sense of what has gone on factually in

24   this claim, to get an understanding of where RSUI's

25   coverage fits.  Is that fair?

84fe8024-9c3d-410f-94e7-e7089bd57b14

General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.                                    Phil Krajec

Page 66

1    BY MR. MCCLURE:

2         Q.  You're not aware?

3         A.  Not aware.

4              MR. MCCLURE:  Well, we've been going about

5    another hour, so before I change topics, let's go ahead

6    and take another five-minute break.

7              (Recess from 10:03 a.m. to 10:11 a.m.)

8              E X A M I N A T I O N  (Continuing)

9    BY MR. MCCLURE:

10        Q.  All right.  So I want to switch gears to the

11   Adolph claim itself.  And I think I've asked everything

12   pertinent to your recollection about the Siegrist and

13   Isaacs files, but is there anything else that comes to

14   mind on investigating these claims before making that

15   determination, or any other standout memories about

16   either Siegrist or Isaacs before we move on?

17        A.  No.

18        Q.  So let's talk about the Adolph claim.  As we

19   mentioned, you were the claims handler for Adolph;

20   correct?

21        A.  I was.

22        Q.  Okay.  And like we talked about earlier, on

23   documentation and things of that nature, there's going

24   to be the claims notes, there's going to be emails back

25   and forth, there's going to be the diary, and there's

84fe8024-9c3d-410f-94e7-e7089bd57b14

General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.                    Phil Krajec

Page 77

1              MS. FERREIRA:  Object to form.

2         A.   No.

3    BY MR. MCCLURE:

4         Q.   Okay.  Are you familiar with the Miller Nash

5    memo?

6         A.   No.

7         Q.   Okay.  So you would be unaware that the Miller

8    Nash, which is a respected law firm in this area, the

9    Miller Nash memo says it's about a 50/50 toss-up on RSUI

10   coverage in this instance.  You're not aware of that?

11             MS. FERREIRA:  Object to form.

12        A.   No.

13   BY MR. MCCLURE:

14        Q.   Is that conclusion surprising to you?

15        A.   The 50/50 toss-up?

16        Q.   Yeah.

17        A.   I would say probably not surprising, no.

18        Q.   And why is that?

19        A.   I don't know who the -- I don't -- I don't know

20   who they are and what their -- where they're coming from

21   on that.

22        Q.   Okay.  But I guess I'm more asking, why would

23   it not be surprising that some coverage counsel may

24   determine that there would be a -- you know, about a

25   50 percent chance that something like the Adolph

General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.                                    Phil Krajec

Page 82

1    that fair?

2         A.   Yes.

3         Q.   Okay.  Are there any other reasons, or things

4    that you can think of, for why there was a delay in this

5    response?

6              MS. FERREIRA:  Object to form.

7         A.   No.

8    BY MR. MCCLURE:

9         Q.   And we've talked about this, I think, but I

10   just want to make sure I understand correctly.  Your

11   investigation between the 29th of November and

12   January 4th, 2022, included reviewing the Adolph

13   Complaint and then referencing back the Siegrist and

14   Isaacs file to then make that determination; is that

15   correct?

16        A.   Yes.

17        Q.   Okay.  Understood.

18             So on the claim notes, which again are

19   Exhibit 8, I will toss these up.  So the last page we

20   had talked about was that September 15th, when that

21   disclaimer was okayed by your supervisor and then sent

22   out.

23             And then the next note that I have is this

24   January 4, 2022, date, where it says, "Received

25   inter-related suit.  Basis for disclaimer is still

84fe8024-9c3d-410f-94e7-e7089bd57b14

Page 83

1   viable.  Sent follow-up disclaimer."

2        Do you see that?

3        A.  Yes.

4        Q.  So what looks different here is, when the

5   Siegrist/Isaacs Complaints came in -- claims came in,

6   there was an initial note at length, and then a coverage

7   determination.

8        Here, we just have very briefly "Received

9   inter-related suit.  Adolph basis for disclaimer is

10  still viable, which is presumably the same basis that

11  was given in Siegrist/Isaacs, and then sent follow-up

12  disclaimer," which would be the letter we just looked

13  at; is that correct?

14        MS. FERREIRA:  Object to form.

15        A.  Yes.

16  BY MR. MCCLURE:

17        Q.  Okay.  Well, since we're on the claim notes,

18  I'll ask this.  The next claim note, so Page 4 of

19  Exhibit 8, is almost an entire year later.  It's

20  December 20, 2022.

21        Do you see that?

22        A.  Yes.

23        Q.  Okay.  This says, "Disclaimer was sent in

24  September 2021."  So that would be referencing the

25  Siegrist/Isaacs letter, September 15, 2021; right?

# EXHIBIT 8



**RSUI Group, Inc.**
Phil Krajec, JD, CPCU, ARM, AMIM
Vice President
e-mail:  Pkrajec@rsui.com
945 East Paces Ferry Road
Suite 1800
Atlanta, GA  30326-1125

Phone   404-504-6115
Fax       404-231-3755

September 15, 2021

Stephanie Loosvelt                              **Via e-mail: stephanie.loosvelt@reedhein.com**
Reed Heim & Associates, LLC
220 120th Avenue NE
Building D
Bellevue, WA 89005

RE:     **INSURED:**                  **Reed Hein & Associates, LLC**
        **INSURER:**                  **RSUI Indemnity Company**
        **CLAIMANT:**                 **Gerald & Patricia Siegrist**
                                      **Phillip & Rebecca Isaacs**
        **CURRENT POLICY NO.:**       **NPP693379**
        **CURRENT POLICY PERIOD:**    **5/16/21 to 5/16/22**
        **PRIOR POLICY NO.:**         **NPP687052**
        **PRIOR POLICY PERIOD:**      **5/16/20 to 5/16/21**
        **RSUI FILE NO.:**            **703—161384**

Dear Ms. Loosvelt:

On August 19, 2021, RSUI received notice of the suits filed In April 2021 by Gerald & Patricia Siegrist and Phillip & Rebecca Isaacs in the Snohomish County Superior Court.  The suits were removed to the U.S. District Court, Western District of Washington, before being remanded back to state court and consolidated.

We note the suits were reported under RSUI Indemnity Management Liability Policy NPP693379 with effective dates of May 16, 2021 to 2022.  RSUI also issued Management Liability Policy NHP687052 to Reed Hein & Associates, LLC effective May 16, 2020 to 2021. For the reasons that follow, determined that **there is no coverage for this matter under either RSUI policy**.  This letter is directed to you as the authorized representative of Reed and Hein & Associates d/b/a Timeshare Exit Team, Hein & Sons Industries, Inc., Brandon Reed, and Trevor Hein.  If you are not acting on their behalf for insurance coverage purposes, we ask that you forward a copy of this letter to such insurance representatives for their information and advise us with whom we should communicate in the future.

Both RSUI policies are claims made and reported policies—i.e. they apply only to those claims first made against an insured within the policy period and timely reported to RSUI.  "Claim" is defined in the policies to include, "a civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by receipt or service of a complaint or similar pleading."

RSUI Indemnity Company
RSUI American Insurance Company

*A member of Alleghany Insurance Holdings LLC*

The suits constitute a Claim made when service was perfected on or about April 30. In this respect, please see Page 4 of the COMMON POLICY TERMS AND CONDITIONS COVERAGE SECTION of the policies:

**SECTION V. – CONDITIONS**

**B.    Limit of Liability; Retention; Payment of Loss**

**4.**    All **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events, or the same or related series of facts, circumstances, situations, transactions or events, shall be deemed to be a single **Claim** for all purposes under this policy, shall be subject to the Retention stated in Item 3. of the Declarations Page for each applicable **Coverage Section**, or other applicable Retention, and *shall be deemed first made when the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period***.

*(Italics added.)*

In addition, we refer you to the AMENDED NOTICE OF CLAIM OR CIRCUMSTANCE – SPECIFIC POSITION TRIGGER endorsement to the policies:

SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

**C.    Notice of Claim or Circumstance**

**1.**    If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Claim** is first made, it shall be a condition precedent to the **Insurer's** obligation to pay, that the **Insured** give written notice of such **Claim** to the **Insurer** as soon as practicable after the Insured's <u>Chief Executive Officer, Chief Financial Officer, General Counsel, Risk Manager or Human Resources Director</u> first becomes aware of the Claim, but *in no event shall such notice be given later than <u>sixty (60)</u> days after the expiration date or any earlier cancellation date of this policy*.

*(Italics added.)*

RSUI was not notified of the suits until August 19, more than 90 days after the prior policy expired. Failure to satisfy the reporting requirement precludes coverage under the 2020-2021 policy and, because the claim was made prior to the inception of the current policy, coverage under that policy cannot be triggered.

We also refer you to the EXCLUSION – PRIOR ACTS endorsement:

The following is added to SECTION IV. – EXCLUSIONS, of the Common Policy Terms and Conditions Coverage Section:



> The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** that alleges, arises out of, is based upon or attributable to, directly or indirectly, in whole or in part, any actual or alleged **Wrongful Acts** which first occurred prior to <u>May 1, 2018</u>.

The Isaac Amended Complaint alleges the Defendants induced them into the timeshare exit agreement using materially false statements in January 2015.  The Siegrists make similar allegations relating to the contract they entered into in January 2016.  Because these wrongful acts are alleged to have occurred prior to May 1, 2018, there can be no coverage for this litigation.

Please note that this letter is not intended to be an exhaustive list of all coverage questions that could affect this claim.  Nothing contained in this letter and no any action taken by us in connection with this matter should be construed as an admission of coverage or waiver of any right RSUI might have at law or under the policy.

Our coverage position is based upon information that has been made available to us at this point.  RSUI wants its policyholders to receive all of the benefits to which they are entitled.  Accordingly, if you believe that we are not in possession of all the facts, have misunderstood the facts, or that our analysis is in some respect flawed, we stand ready to reevaluate our position upon having such matters called to our attention.

If you have any questions or comments concerning this matter, please do not hesitate to contact me.

Very truly yours,

Phil Krajec

cc (via e-mail):    Panda Kroll (pkroll@pandakrollesq.com)
                    Joseph Plotycia, RT Specialty (joseph.plotycia@rtspecialty.com)

# EXHIBIT 9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BRIAN ADOLPH, individually and on behalf of all others similarly situated; KERRI ADOLPH, individually and on behalf of all others similarly situated;

     Plaintiff,

v.

REED HEIN & ASSOCIATES d/b/a TIMESHARE EXIT TEAM; MAKAYMAX INC.; HEIN & SONS INDUSTRIES, INC.; BRANDON REED, individually; and TREVOR HEIN, individually,

     Defendants.

Case No.

COMPLAINT FOR DAMAGES

COME NOW PLAINTIFFS Brian and Kerri Adolph, individually and on behalf of all others similarly situated, by and through their attorney Gregory Albert of Albert Law PLLC, and brings this class action against the above captioned Defendants for negligent misrepresentation, common law fraud, breach of contract, breach of fiduciary duty, unjust enrichment, and

**COMPLAINT FOR DAMAGES - 1**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

numerous violations of the Consumer Protection Act, RCW 19.86 *et seq.*, associated with unfair and deceptive conduct in the marketing and sale of timeshare "exit" services offered to consumers across the United States and Canada. Plaintiffs allege the following on information and belief:

## I.    INTRODUCTION

1.    Reed Hein and Associates, doing business as "Timeshare Exit Team," is a company that had defrauded tens of thousands of customers out of tens of millions of dollars. It falsely advertises it has "specialized knowledge" and a "proprietary process" that allows it to "force" developers and vacation resorts to release customers from unwanted timeshare obligations. Using deceptive statements and false advertisements, it solicits potential customers into meetings with "client advisors," who are paid commissions and uniformly advise clients to spend tens thousands of dollars for services Reed Hein does not know how to provide. The client advisors use scripts containing objectively false statements to induce clients into purchasing Reed Hein's services. The client advisors advise customers that 1) their children will inherit their allegedly perpetual timeshare obligation, 2) real lawyers are unable to perform the work Reed Hein performs, and 3) Reed Hein is the customers' "**ONLY HOPE!**" Reed Hein then convinces customers that it will act as their "fiduciary," but rather than put its clients' money in trust or escrow Reed Hein immediately treats the money as earned revenue and spends or disburses it. Reed Hein then "processes" its customers' claims through a variety of convoluted schemes designed to look like they have legal significance they do not have. At the end of the process, Reed Hein tells customers to stop paying their bills and sends customers a letter stating it "exited" them from their timeshare obligations. For the first five years, Reed Hein relied upon the fact that timeshare developers are reluctant to take legal action against customers. However, developers have now begun interfering with Reed Hein's model, creating a backlog of tens of thousands of customers Reed Hein cannot even pretend to service. When the customers have sought refunds under Reed Hein's "100% Money-Back Guarantee), Reed Hein contrives a variety of reasons not

**COMPLAINT FOR DAMAGES - 2**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

to honor the guarantees, even after customers have waited 3-4 years for Reed Hein to provide services. Vacation resorts and developers have also begun targeting Reed Hein customers with lawsuits, which Reed Hein does not disclose to customers, despite claiming to be their agent. The only legally valid 'exits' Reed Hein customers ever achieve are exits they could, and often do, achieve on their own. The remainder receive nothing.

2.      Brian and Kerri Adolph spent $14,486.00 on Reid Hein's illusory services without receiving any results.

## II.    PARTIES

### a. Plaintiffs

3.      Plaintiff Brian and Kerri Adolph are married. They are residents of the State of North Carolina.

### b. Defendants

4.      Defendant **Brandon Reed** was, at all times material to this lawsuit, the co-founder, governor, operator or manager of Reed Hein & Associates. Brandon Reed is also a 60% owner of Reed Hein through a wholly-owned Washington corporation, Makaymax, Inc. In these roles, Brandon Reed directs, controls, participates in, and knowingly approves of the policies, activities, and practices alleged in the Complaint herein. Upon information and belief, Brandon Reed resides in Kirkland, Washington.

5.      Defendant **Trevor Hein** was, from Reed Rein's creation through at least approximately July 2016, the co-founder, governor, operator or manager of Reed Hein. In these roles, Trevor Hein directed, controlled, participated in, and knowingly approved of the policies, activities, and practices alleged in the Complaint herein. Trevor Hein is, or was, a 40% owner of Reed Hein through a wholly-owned Delaware corporation, Hein & Sons Industries, Inc. Upon information and belief, Trevor Hein resides in British Columbia, Canada.

**COMPLAINT FOR DAMAGES - 3**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

6.     On information and belief, Defendant **Hein & Sons Industries, Inc.,** is a Delaware corporation incorporated on March 20, 2012. Hein & Sons Industries, Inc., is wholly-owned by Trevor Hein and has been operated by Trevor Hein since its formation as a holding company.

7.     Defendant **Reed Hein** is a limited liability company registered with the Washington Secretary of State. Brandon Reed and Trevor Hein are the registered governing persons of Reed Hein. Reed Hein's corporate office is located at 121 3rd Ave. Suite 200, Kirkland WA. Upon information and belief, Reed Hein's principal place of business is located at 220 120th Ave NE, Bellevue, WA 98005, and the company's former principal place of business was at 3400 188th St. SW #300, Lynnwood, WA 98037. Upon information and belief, Reed Hein & Associates operates under the trade names "Reed Hein," "Timeshare Exit Team," "TET," "TSET,"and "RHA," and formerly operated under the names "Reed Hein Travel" and "World Travel Seattle." Reed Hein's primary website is timeshareexitteam.com., but Reed Hein formerly maintained a separate reedhein.com website and maintains dozens of other web domains to redirect to timeshareexitteam.com. On information and belief, Reed Hein began operation in 2012.

### III.     JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), codified in part at 28 U.S.C. §§ 1332 and 1453. This case involves a minimally diverse, nationwide prospective class of over 100 member that involves an amount-in-controversy exceeding $5 million.

### IV.     FACTUAL ALLEGATIONS

9.     The following allegations are made based on evidence, the parties' own sworn testimony, information, and belief.

10.     Unless indicated otherwise, the following allegations have been ongoing at all times relevant hereto.

**COMPLAINT FOR DAMAGES - 4**

11.     Reed Hein & Associates doing business as Timeshare Exit Team describes itself as a company that can "force" timeshare companies (resorts, timeshare brokers, etc.) to forego consumer's timeshare obligation ("timeshare exits"). The company claims to have helped tens of thousands of customers exit their timeshare contracts. In 2018, it claimed a revenue of $38 million and spent approximately $9 million in advertising.

12.     In September 2019, Brian and Kerri Adolph purchased a timeshare from Wyndham Resorts, potentially obligating them to pay approximately $510.82 per month in timeshare-mortgage payments for a period of ten years. The Adolphs sought to terminate or significantly reduce that obligation after hearing about Rein Hein's services through its extensive marketing campaign. Reid Hein's false advertising and unfair business practices described herein deceived the Adolphs into paying Reed Hein a fee. In March 2020, Mr. and Mrs. Adolph paid $14,486 to Reed Hein in exchange for the company's services.

13.     According to the power-of-attorney form Reed Hein asked Mr. and Mrs. Adolph to sign, Reed Hein had "the legal duty to act solely in the interests of [the Adolphs] and to avoid conflicts of interest," which includes keeping the Adolphs' property separate and distinct from any other property owned or controlled by Reed Hein.

14.     According to the power-of-attorney form Reed Hein asked Mr. and Mrs. Adolph to sign, Reed Hein assumed the role of Mr. and Mrs. Adolph's fiduciary and all fiduciary duties recognized under Washington State law.

15.     Reed Hein induced Mr. and Mrs. Adolph into a commercial relationship using materially false statements and omissions of material information.

16.     Reed Hein performed little or no work on Mr. and Mrs. Adolph's matter.

17.     Reed Hein ignored Mr. and Mrs. Adolph's reasonable requests for periodic updates.

18.     Reed Hein comingled Mr. and Mrs. Adolph's property with its own property.

19.     Reed Hein knowingly engaged in conflicts of Mr. and Mrs. Adolph's interests.

**COMPLAINT FOR DAMAGES - 5**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

20.      Reed Hein immediately converted Mr. and Mrs. Adolph's funds into earned revenue before performing work.

21.      Reed Hein failed to notify Mr. and Mrs. Adolph that it would be unable to process their file for greater than a year.

22.      Reed Hein never "exited" Mr. and Mrs. Adolph from their timeshare agreement.

23.      Reed Hein did not honor its money-back guarantee.

**a.  Brandon Reed's Testimony Shows he and Trevor Hein Began Soliciting Customers in 2012 without Any Plan to Provide Services**

24.      On August 21, 2011, Brandon Reed and Trevor Hein started ReedHein & Company on for the purpose of selling rain gutter protection systems.

25.      In November 2011, Brandon Reed was operating a booth selling rain gutter protection systems in British Columbia, Canada. He observed a busy booth offering to help timeshare owners exit out of their agreements with developers, resorts, and other companies brokering timeshares ("timeshare companies"). Mr. Reed observed they had a "big sign" and "people were lining up." Mr. Reed observed the company running the booth charged an upfront fee without providing an immediate service, which he believed was not honest.

26.      Mr. Reed nevertheless started a business that charged customers an upfront fee to provide timeshare exit services. Mr. Reed acknowledges he "knew nothing about timeshares" at the time. Asked why he began charging upfront fees for services he did not know how to provide, Brandon Reed had the following dialogue under oath:

> Q· Why would you collect a fee before you've done anything for
> the consumer?
> A·  Yeah. One, that's how we did it in the beginning. I mean, that's
> how we -- You know, I've been asked that before, like why do we -
> - When I've been interviewed before in the past, we've, "Why do
> you charge an upfront fee?" Well, we just -- That's how we did it in
> the beginning. I don't even remember why we started – we started
> charging upfront fees, but we did.

27.      On December 31, 2012, "[w]ithin one month" of observing the busy booth, Mr.

---

**COMPLAINT FOR DAMAGES - 6**

Reed and Mr. Hein started a company called "ReedHein Travel" in Bellevue, WA with the express purpose of selling timeshare exit services while simultaneously selling timeshares.

**b. Beginning in 2013 Defendant ReedHein & Associates Unfairly and With the Intent to Mislead, Promised Services It Did Not Provide or Know How to Provide**

28.     In 2013, ReedHein Travel changed its name to ReedHein & Associates doing business as Timeshare Exit Team ("TET"). After the experience at the Puyallup Fair Booth, Defendant Reed Hein created a website on which they falsely and misleadingly claimed customers could legally "ditch" their timeshares "forever."



29.     Also, the website falsely and misleadingly claimed that Timeshare Exit Team works with timeshare companies and developers to "dissolve" its customers' contracts.



30.     None of that is true. From 2013-2015, Reed Hein provided few if any services. It did not negotiate with timeshare companies. It did not force timeshare companies to forego contracts. Reed Hein's initial strategy was to simply tell customers to stop paying their

**COMPLAINT FOR DAMAGES - 7**

timeshares, which would induce the timeshare companies and developers to foreclose on the customer's product. At that point, Reed Hein would claim it "exited" the customers from their contract. When customers inevitably complained that they could have induced the foreclosures without Reed Hein's assistance, Reed Hein instructed its customer service representatives to make statements that avoid the issue: "they signed a contract with us and we achieved an exit." Customers complaining that Reed Hein offered no services became such a pervasive problem that Reed Hein adopted a chapter in its operations manual called: "I Could Have Just Done This on My Own, I want My Money Back."

31.    In addition to the foregoing false claims, Reed Hein began soliciting business with variations of the phrase "Safe, Legal, and Guaranteed" or "Safe. Legitimate. Guaranteed."

Ad · www.timeshareexitteam.com/ ▾    (877) 714-2857

**Timeshare Exit Team™ | Safe. Legitimate. Guaranteed.**

Give Us a Call Now To Schedule Your Free Consultation! 100% Money Back Guarantee. The most trusted **Timeshare Exit** Company in the industry–Endorsed by Dave Ramsey. Nationally Endorsed. Services: **Exit** Preparation, **Exit** Strategy, **Exit** Management, **Exit** Completion.

32.    Asked under oath how the timeshare exit services were safe and legal as advertised, Brandon Reed was unable to explain:

> Q  Those are your advertising terms, aren't they?
>
> A  I believe so, yes.
>
> Q· Okay.· Well, given that these are the advertising terms that Timeshare Exit Team uses, I would expect that Timeshare Exit Team would know what the legal and safe and permanent ways of getting somebody out of their timeshare is. So please tell me what they are.
>
> A: I'm -- I'm not a lawyer, so our partners –
>
> Q.  We understand you're not a lawyer. You do not have to keep saying that…But you're running a business that is making these advertising claims. I want to hear from you, who is the president and owner of the business --

**COMPLAINT FOR DAMAGES - 8**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

A  Yes.

Q  -- how it is you can make these claims. What is the basis for these claims?

A  Yeah. I'm going to just -- I can't -- Again, I don't know how else to say it. I'm not -- I'm not an attorney.

33.     Reed Hein instructs customers like Mr. and Mrs. Adolph not to communicate with developers at all, falsely telling them that doing so will extend the time required to dissolve their contracts. In reality, Reed Hein gives those instructions because communicating directly with the timeshare company might induce the timeshare company to allow the customer out of the contract for free, obviating the specter of a need for Reed Hein's fake services. Under oath, Reed Hein officers have given two reasons for that policy, both of which are unfair and deceptive, and neither of which is ever disclosed to the customer. In his deposition, Brandon Reed testified that Reed Hein discourages customers from speaking to timeshare companies or developers because the timeshare companies might share a negative perspective about Reed Hein:

Q· In the third paragraph, the one that starts, "If the timeshare contacts you for any reason"

A· Uhm-hm.

Q· -- "we suggest that you disregard those calls for now, as we do not want you to contact or converse with the timeshare for any reason, as it can undo and/or lengthen the exit process, unless otherwise told to do so…How -- How or why would the timeshare developer talking to its own customer exit them -- prolong the exit process?

A: Because the timeshare companies, the developers would -- again, hating what it is that we do, they – They would just -- They would actually say -- And we know this just because the customers have called on occasion or they've taken a call and are talking about -- You know, talking about us. "Oh, hey, we're working with, you know, Timeshare Exit Team."
        And it's like all of a sudden, you know, the customer is calling us and saying, "Oh, my gosh. I hear that you're a scam and blah, blah, blah."

**COMPLAINT FOR DAMAGES - 9**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

Q  Okay. So the reason is that because if they talk to the timeshare developer, the timeshare developer is going to say bad things about you?

A  They do, yes. It was because it was creating a customer service - It was creating problems in customer service. And when your customers are calling you and saying, "Hey, my timeshare just said this about you guys," it's just - Imagine having -- I mean, that's…

34.     Alternatively, former Reed Hein Chief Operating officer Thomas Parenteau testified the instructions were designed to prevent customers from obtaining an exit without Reed Hein, which he acknowledged to be a "good thing" for the customer:

A.  For a couple of different reasons. We have had experiences where the customer ends up with more than what they own, number one. And, number two, we have had also what I would call consumer confusion where the customer will call the developer and -- after they have retained – you know, they have hired us and all of a sudden, the developer will give them an exit to undermine our services. So that's happened as well.

Q.  Then the second scenario you described, the resort or the developer is offering the customer a way out of the timeshare; right?

A. Correct. Once their hear our name.

Q. What is so bad about that? Isn't that what you want?

A. Actually, yes, it is.

Q. All right. So why would you want to foreclose that possibility?

A. I think we just want to put it on paper that: Listen, if you call the developer, you're going to get confused because they're either going to upgrade you or they're going to let you out.

Q.  Okay.
    And nowhere in your advertisements or in the materials you give to your customers does it say "Don't call the timeshare resort or developer because they might offer you an exit"?

**COMPLAINT FOR DAMAGES - 10**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

A. No.
Q. Which you agree would be a good thing?
A. Mm-hm.
Q. Is that a "yes"?
A. Yes.

Q. So why would that be a justification for telling the customers not to call the timeshare resort or developer?

A. Because it creates customer confusion…Like I said, when they call the developer and as soon as the word "Timeshare Exit Team" is mentioned, the developer offers an exit.

**c. Reed Hein's Ongoing Deceptive Acts and Practices**

35.     **Misleading Inducement via False Claims on Website:** Since at least 2014, Reed Hein has posted a variety of false statements on its website in an attempt to deceive customers into purchasing its services. The website states that timeshare obligations are passed down to the customers' children after their death. It states that it "forces" timeshare companies to "take back" the timeshare obligation. It states that attorneys do not have the specialized knowledge that Reed Hein has in order to dissuade customers from hiring real attorneys. It prominently advertises a "risk free" service, owing to its "100% Money-Back Guarantee," without notifying customers that Reed Hein imposes restrictions on the guarantee it does not disclose in advance.

36.     **Misleading Inducement in Sales Presentation**: In addition to its false advertising and false claims that it can "force" timeshare companies to exit their contracts with timeshare owners, Reed Hein induces consumers into a relationship by misleadingly offering to let them meet with a "Client Advisor" about their claims. Client Advisors are salespeople trained in sales techniques and receive a commission. Reed Hein does not require them to know anything about the timeshare industry. <u>They do not reject customers based on the customers' actual ability to exit timeshares</u>. Client Advisors do not advise customers to do anything other than pay money to Reed Hein. They reiterate the false claim that Reed Hein can legally, safely, and permanently

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

get owners out of their timeshare contracts through Reed Hein's proprietary system regardless of the customer's circumstance.

37.     It also omits material information. It declines to notify customers when it has an adversarial relationship with the customers' timeshare company. It does not notify customers when it is being sued with the customers' timeshare. It declines to tell customers when the timeshare refuses to work with Reed Hein. Although Reed Hein advertises that attorneys cannot perform the work Reed Hein performs, it omits mentioning that nearly all of its work is performed through outside attorneys. Reed Hein omits telling customers that it imposes absurd restrictions on the money-back guarantee and refuses to refund their money so long as it subjectively believes that it has an "exit path" for the customer, even 3-4 years after the customer signs up.

38.     **Payments**: Reed Hein charges customers up to $58,000 for its alleged services. Despite being a fiduciary, Reed Hein does not charge that money based on the work it anticipates having to perform, but based upon a multiple of the client's future timeshare obligation, which Reed Hein exaggerates and inflates during its sales presentation. Mr. and Mrs. Adolph paid Reed Hein $14,486.00. Reed Hein accepts money from all customers, regardless of their circumstances or their legal right to "exit" their timeshare contracts. Reed Hein allows customers to pay in installments, but the contract it offers clients does not obligate it to provide any services until the installments are complete.

39.     **Unenforceable Contract:** After inducing a relationship under false auspices, Reed Hein asks clients to sign a master services agreement defining a variety of client's obligations while leaving its own obligations too vague to be enforced. According to Reed Hein, it need not honor its guarantee unless the customer fulfills vague contractual obligations the customer did not know they had, including an obligation to pay the timeshare company an indeterminate amount of money to be released. Reed Hein takes the position that the customer must pay the amount so long as Reed Hein determines the amount to be "reasonable" without regard to whether the customer agrees—a fact that it does not disclose to the customer. Since

**COMPLAINT FOR DAMAGES - 12**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

Reed Hein is unable to provide any of the services it advertises, it requires customers to enter into a separate attorney-client agreement with a third-party attorney in order to fulfill its contract, and refuses to pay any refunds if the customer does not want to enter into such an intimate relationship with an undisclosed third party. The agreement has changed over time, but Reed Hein's obligations under Mr. Adolph's agreement contained only one illusory obligation for Reed Hein: "Reed Hein shall work to secure a release from, transfer, cancellation or termination of the Owner's timeshare interest at Resort."

40. **Misappropriation of funds**: After receiving money from clients, Reed Hein immediately treats it as earned revenue without regard to services rendered or the possibility that Reed Hein can even provide the services. Although Reed Hein claims to be an agent of the customers, it does not put their money into a trust or escrow account and immediately appropriates the money to itself. In 2019 Reed Hein took in approximately $35m in customer fees, all of which it immediately treated as earned revenue.

41. **Deceptive and Materially Misleading Processes**: After accepting money, Reed Hein sends customers' claims through a variety of byzantine processes designed to deceive customers into thinking Reed Hein is earning its money and achieving results. The processes have taken a variety of forms since 2013. Initially, Reed Hein did not directly handle its customers claims, either telling customers to default or sending them to a third-party ("Vendors") for more processing. If the customer defaulted, the timeshare companies would often foreclose on their timeshare ownerships, which Reed Hein considered to be an "exit." The Vendors would achieve equally dubious exits in a variety of ways described below. Beginning in 2015, Reed Hein attempted to communicate directly with timeshare companies and developers with mixed results. Although Reed Hein claims it can "force" the timeshare companies to let customers exit timeshare contracts, Reed Hein's communications consist entirely of asking the timeshare companies to voluntarily release customers. Because Reed Hein cannot perform such negotiations without committing the unlicensed practice of law, Reed Hein hires attorney

**COMPLAINT FOR DAMAGES - 13**

Vendors to supposedly represent the customers, but the customers are not allowed to speak with the attorneys and often do not know their names. The vendors themselves are paid millions of dollars by Reed Hein and withhold information from their clients to protect Reed Hein. Attorneys have been forced to disclose thousands of pages of otherwise-privileged client communications because Reed Hein's interference in the relationship collapses the attorney-client privilege, which Reed Hein does not disclose to the affected customers or prospective customers.

42.     **False Updates**: Customers often go years without results, or even updates from Reed Hein. When customers reach out to Reed Hein for updates it occasionally responds. On those occasions, customer liaisons are instructed to give clients cookie-cutter updates that are generally untrue. The updates ordinarily suggest that Reed Hein has been working with the timeshare, even when it has absolutely no relationship with the timeshare or the relationship is so soured the timeshare refuses to work with Reed Hein. The updates usually say something to the effect of "we are working with your timeshare company to see what exactly they need to let you out," despite having made no communications to the timeshare whatsoever.

43.     **Lack of Results**: Reed Hein continues to advertise its ability to produce results, even though the purported exits are becoming more difficult and often impossible to obtain.

44.     **False Money-Back Guarantee:** Although Reed Hein ostensibly offers a money-back guarantee, the guarantee is illusory and almost never honored. Customers are only entitled to money back if Reed Hein is unable to obtain an exit, but whether Reed Hein is unable to obtain an exit is unilaterally determined by Reed Hein without any clear criteria to guide that determination. After years of processing, Reed Hein simply tells customers who demand their money back that more processing is necessary to achieve their exit. Consequently, Reed Hein has a backlog of <u>thousands</u> of pre-paid customers that it has never helped and never reimbursed.

45.     **Pyramid Scheme**: Reed Hein takes more customers than it exits, leading to a severe backlog of thousands of un-exited customers. Treating all payments as income-instantly-earned, Reed Hein does not maintain their money in trust or escrow. Instead it disburses it toward

**COMPLAINT FOR DAMAGES - 14**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

operating costs or profit for Brandon Reed, Trevor Hein, and others. Reed Hein maintains an inadequate reserve and it would become instantly insolvent if its backlog of un-exited customers demanded its money back. Instead, Reed Hein relies entirely on an influx of new customers to fund its operations and the money-back guarantees.

46.    **False Exits**: When and if the processing ends, Reed Hein sends customers a letter claiming the customers "exited" their timeshare agreements. Reed Hein's exits often do not constitute a legally cognizable rescission of the timeshare contracts. Instead, Reed Hein has historically relied on timeshare company's reluctance to sue timeshare holders, although that has now changed. With the exception of exits voluntarily granted by timeshare companies, often after the customers are left to negotiate for themselves, Reed Hein's exits have no legal significance. They range from convoluted quitclaim deed schemes to plain falsehoods about whether the client exited their contract.

## 1.    Legally Invalid Exits

47.    Reed Hein initially claimed to customers it was able to "force" developers and timeshare companies to take back timeshares, but that is false. In his deposition, Reed Hein's Chief Operating Officer was unable to coherently explain how it "forced" timeshare companies to "take back" timeshare agreements:

> Q. So back to my question: In what ways has Reed Hein forced any resort to take any timeshare back?
>
> A. By the methods that we are moving inventory back and out of the customer's name.

Parenteau eventually acknowledged that the methods do not force the timeshare companies to do anything. The only successful exits occur with the consent of the resorts.

### A.    Notices of Resignation

48.    Reed Hein falsely claims that it can force timeshare companies to rescind the agreement with "notices of resignation." That is false because 1) the timeshare company's

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

decision to accept the notice is entirely voluntary and 2) timeshare companies no longer accept notices of resignation from Reed Hein's customers. A notice of resignation is something any customer can do. It is simply a letter sent to the timeshare company stating that the customer no longer wishes to participate in the program. The timeshare company has the option whether to rescind the agreement. While Reed Hein has had some minor success with that approach in the past, timeshare companies no longer agree to rescind contracts with Reed Hein customers.

## B.  Unenforceable Quitclaim Deeds

49.    Reed Hein falsely tells customers it can exit them from their timeshares by executing and recording a quitclaim deed conveying the customer's timeshare interest back to the timeshare company. Reed Hein does that without the consent of the timeshare company and it has no legal enforceability. Again, Reed Hein simply relies on the timeshare company's reluctance to sue customers.

## C.  Quitclaim Deed/Foreclosure Hybrid

50.    Reed Hein falsely tells customers it can exit them from timeshares by a combined quitclaim-foreclosure/notice of termination approach. Reed Hein pays a vendor to execute a quitclaim deed giving the customer's interest in the timeshare to a third party who then refuses to pay. Like the quitclaim deeds to the timeshare company, the quitclaim deeds to the third party are legally unenforceable. Reed Hein simply relies on the timeshare company's reluctance to take customers to court.

## D.  Extortion of Customers

51.    Since nonconsensual quitclaim deeds are unenforceable and timeshare companies are becoming increasingly difficult, Reed Hein strong-arms its clients into signing illusory quitclaims under the threat they will lose their money-back guarantee if they do not. Reed Hein purports to locate third-parties who are willing to take the customer's interest in the timeshare. Reed Hein then has the customer execute and notarize transfer paperwork containing blank spaces for the transferees. If the customer refuses to sign the legally incognizable document,

**COMPLAINT FOR DAMAGES - 16**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

Reed Hein claims that its duty to exit the customer is discharged and the customer has waived his or her money back guarantee.

### E. False Claims of Exits

52.     Facing an enormous backlog of un-exited customers, Reed Hein resorts to telling customers outright lies. Reed Hein sends customers letters notifying them that Reed Hein received a confirmation from the timeshare company that it has agreed to exit their contract. Reed Hein then sends letters stating they have been "exited" under the terms of its service agreement. And takes no further action. Timeshare companies frequently continue to demand payments and have begun suing Reed Hein customers who believed, based on information from Reed Hein, that their timeshare obligations were rescinded. When the customer complains to Reed Hein, it claims that it received a "verbal confirmation" from the timeshare company.

### F. "Mass Exits"

53.     After discovering Reed Hein's business model, timeshare companies have stopped negotiating with any Reed Hein customers and have begun suing Reed Hein customers for damages – a material fact that Reed Hein does not disclose to new customers. From 2020-2021, Reed Hein settled three lawsuits in which it had been the defendant against major timeshare developers. It then claimed that the settlement agreements were struck on behalf of the clients, thereby extinguishing the clients' rights to refunds. Although Reed Hein has a duty to avoid conflicts of interest, Reed Hein's own attorneys struck the settlement agreements in which they bargained away the clients' rights to refunds from Reed Hein. The agreements do little more than put the client in the same position he or she would be in if they never hired Reed Hein in the first place. The agreements state that the timeshare companies will lift restrictions they specifically impose *on Reed Hein customers*. It then allows the customers to access timeshare companies' own pre-existing exit programs, about which Reed Hein never previously notified its customers. The agreements state the timeshare companies can unilaterally dictate the amount a customer must pay to get out of their timeshare contract. They also exclude Reed Hein from participating

**COMPLAINT FOR DAMAGES - 17**

in negotiations between the timeshare company and the customer—the lone service customers paid Reed Hein to provide. Often the timeshare company offers the customer out of the timeshare for the amount the customer has gone into arrears while the customer was waiting years for Reed Hein to get them out of their timeshare contract instead of refunding the customers' money. Furthermore, the agreements state that Reed Hein will "advise" its clients not to involve their lawyers in the negotiations. Based on that agreement, Reed Hein considers its duties fulfilled and keeps the customers' money.

### 2.  Exits the Customers Could Achieve on Their Own

### A.  Foreclosure or Termination

54.  Reed Hein's first strategy was to induce foreclosures or terminations. Despite stating that it can force timeshare companies to "take back" agreements, Reed Hein originally encouraged customers to default on their dues and maintenance fees in order to induce a foreclosure. Depending on the asset, the timeshare company either takes possession of the client's interest in the asset or notifies the customer that the timeshare company is terminating the contract. Then Reed Hein considers the foreclosure or notice to be an exit in satisfaction of its contract with the customer. Both outcomes can harm a customer's credit rating and create other negative financial consequences, but Reed Hein has traditionally relied on timeshare companies' unwillingness to suffer adversarial proceedings in court, where their high-pressure sales pitches might be scrutinized by a judge. At some point, Reed Hein realized it was exposing itself to claims of tortious interference with a business contract and began advising clients to continue paying their timeshare fees for Reed Hein's own benefit. In 2018, timeshare companies began suing Reed Hein for tortious interference and its customers for nonpayment. Reed Hein does not notify customers that they consider an adversarial foreclosure to be an "exit," nor do they notify customer that they might be sued, both of which are material information.

### B.  Exit Programs Already Offered by the Timeshare Company

Having numerous employees with experience in the timeshare industry, Reed Hein is

**COMPLAINT FOR DAMAGES - 18**

aware that many of the timeshare companies offer their own "exit" programs. Those programs generally require the customer to pay some fraction of their remaining mortgage or some multiple of their maintenance fees. Reed Hein charges customers tens of thousands of dollars promising that it will force the timeshare company to take back their timeshare and omits that it plans to run them through the pre-existing program the customers could already use on their own. Now that the timeshare companies are refusing to work with anyone identified as a Reed Hein customer, Reed Hein simply accepts the customers' money and then instructs them to use the program themselves.

### 3. Deceptive Claims Designed to Induce Reliance

#### A. Reed Hein Makes False Claims that Timeshare Obligations Can Be Passed to Children

55.     In Gretchen Morgensen's January 22, 2016 New York Times Article *The Timeshare Hardsell Comes Roaring Back*, Morgensen explained that the timeshare industry purposefully perpetuates the false claim that timeshare obligations and benefits can be passed down to buyers' children. Timeshare Exit Team intentionally contributes to that misunderstanding. As of the date of filing, the company's website includes the following false "answer" to the "frequently asked question" of whether an owner's heir will inherit his or her timeshare interest:

> 74% of timeshares have consumers in lifetime contracts, many of which have perpetuity commitments. While the issue of inheritance is a legal one for which you should seek legal counsel, Timeshare Exit Team understands that some timeshare interests might continue to burden an owner's heirs or estate after the owner's passing

In October 2014, the company used even less careful language following language:

> yes, your kids can inherit your timeshare when you pass away based on tenancy, whether they want it or not.

#### B. Reed Hein Acts as a Listing Company While Discouraging Clients from Using Listing Companies

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

56.      Reed Hein profited from the resale of customer's timeshares after discouraging customers to resell their so themselves, which they could have done without the additional expense of a Reed Hein agreement. Reed Hein stated in its marketing materials and its contracts that it is not a transfer or listing company. Reed Hein trained its employees to warn customers about the dangers of listing companies. It warned customers that their assets had no listing value, that listing companies would try to scam them, would collect high upfront fees, and that there was little chance of the timeshare reselling on the market. Reed Hein's sales scripts also criticize transfers to a third party as an exit method. However, the primary way in which Reed Hein customers exited their contracts was through the transferring or selling of their timeshares to third parties. Reed Hein engages in the same practices it discouraged, except that it collects fees upfront to do it.

### C. Reed Hein Creates a Hobson's Choice for Consumers So They Cannot Exit and Cannot Obtain a Refund

57.      Reed Hein tells its customers that they do not need to pay maintenance fees and other payments to their timeshare companies. However, transfer companies require Reed Hein's customers to be current on payments in order to make a transfer. If Reed Hein chooses to use a transfer company, it informs customers that they have 180 days to make their payments for a guaranteed exit. If they do not pay, they forfeit the money-back guarantee that Reed Hein advertised. However, customers opting for that method are required to sign a legally invalid "Exit Agreement Addendum." Under the addendum, Reed Hein and the transfer company have an unlimited amount of time to complete the exit while the timeshare obligations remain in the customer's name. That way, Reed Hein can force the property owners to maintain their property in perpetuity without ever receiving their money-back guarantee.

### D. After Promising to Negotiate Directly with Timeshare Companies, Reed Hein made Customers Negotiate Directly with the Timeshare Companies

58.      Facing an enormous backlog with no coherent plan to discharge its duties, Reed

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

Hein directs its customers to file complaints with the Better Business Bureau and state Attorneys General to prompt the timeshare companies to contact the customers. Reed Hein directs the customer to negotiate for their own exit using Reed Hein's talking points. Reed Hein directs them not to inform the timeshare company of its involvement. That method is contrary to Reed Hein's claims that it would "work directly" with resorts. In essence, customers pay thousands of dollars to Defendants to negotiate their own exits.

### E. Reed Hein Employees Do Not Possess the Expertise It Advertises

59.     Brandon Reed testified that he knew "nothing" about timeshares when he started Reed Hein. As early as December 2013, Defendants advertised that "[w]e are industry experts in relieving people of their timeshare commitments." Neither had any experience or training in performing timeshare exits, and they did not hire internal personnel who did. Brandon Reed has testified under oath in other litigation that Reed Hein's business model from inception was to outsource all exit work to third-party Vendors.

60.     Aside from calling timeshares and pretending to be lawyers, Defendants only began using internal processes to achieve exits in 2015, which was limited to contacting resorts about their internal voluntary surrender programs mentioned above, which the customers could have used for free. The employees making those contacts have no license to negotiate customers' rights either through a law license or a special dispensation, such as a real estate license.

### F. Defendants' Advertised Money-Back Guarantee Is Deceptive and Illusory

61.     Reed Hein looks for any way it can extinguish the customers' right to a refund, even by imposing caveats and qualifications on the money-back guarantee it never disclosed to customers. Although Reed Hein tells customers to expect to be released from their timeshare within 12-18 months, Reed Hein refuses to pay refunds so long as it subjectively concludes the customer still has "exit paths" and "avenues to exits" it still has not tried. Reed Hein has refused to pay refunds to customers on those bases three to four years after the customers engaged with

**COMPLAINT FOR DAMAGES - 21**

Reed Hein, even when the customers have asked for refunds many times. Reed Hein refuses to pay clients refunds if they give Reed Hein "inaccurate information" which often amount to nothing more than Reed Hein twisting the clients' words to extinguish their refund.

62.     As a result, the "risk-free" Money-Back Guarantee guarantees nothing at all. Reed Hein has sole discretion to pay customers their money back, which it rarely does. Reed Hein only honors the 100% Money-Back Guarantee for customers who might bring negative attention to Reed Hein. Reed Hein has even conditioned refunds on customers taking down negative reviews or complaints online.

### G. Reed Hein Creates the Deceptive Impression that Reed Hein is a Law Firm and Misrepresent that Reed Hein Performs "Consumer Protection"

63.     Reed Hein routinely advertises itself as a "consumer protection firm" and "consumer advocates" to create the false impression that Reed Hein will personally provide services through specialized legal means. Defendant's scripts and webpages routinely suggest that Reed Hein's attorneys work for the customers: "Our Attorneys – They are consumer advocate attorneys." Reedhein.com also stated that Defendants "represent consumers," who are referred to as "our firm's clients," and claim that Defendants' services included "preparing the strongest case for you." Reed Hein is either referring to its own in-house counsel, who do not represent clients, or counsel Reed Hein must pay to provide the services Reed Hein said it could personally provide. Reed Hein and Associates has no actual "associates." Reed Hein's attorneys represent Reed Hein.

### 3. Material Omissions and Active Concealment of Material Facts

### G. Reed Hein Declines to Notify Customers that Timeshare Companies Have Begun Suing Its Customers

64.     Timeshare companies have been unwilling to sue timeshare holders who default because it would expose their sales and negotiation tactics. Since 2013, Reed Hein's alleged

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

"exits" merely consisted of legally invalid quitclaim deeds and other form of nonpayment, relying on the timeshare companies' unwillingness to file suit. As late as 2018, timeshare companies began filing suit against Reed Hein customers. Reed Hein does not disclose to future customers the possibility that they might be sued or the reality that its current customers are being sued.

### 4.  Additional Unfair Acts and Practices

#### A.  Reed Hein Falsely Asserts That Communications Between Reed Hein and its Customers Are Protected by Attorney-Client Privilege

65.     Reed Hein executes Power-of-Attorney agreements with their customers. Under those agreements, Reed Hein asserted that it "acts as an agent pursuant to the POA agreements when it hires law firms or transfers companies . . .  and when it communicates and interacts with the law firms on behalf of the Reed Hein customers." Reed Hein further asserted that "If Reed Hein decides to hire a law firm for a customer, Reed Hein and the law firms specifically intend to create a relationship under privileged material is freely exchanged. As such, the law firms, customers, and Reed Hein all intend that the attorney-client and work product privileges and protections apply to all three parties in this agency relationship – the law firms, the customers/clients, and Reed Hein."

66.     However, Reed Hein knows a federal court in 2018 held that the communications and work product between those entities were not subject to attorney-client privilege or the work product doctrine. After that ruling, Vendors for Reed Hein were required to disclose thousands of pages of communications that would have otherwise been privileged but for Reed Hein's interference with the attorney-client relationship. Reed Hein did not tell the customers that their private information had been disclosed to their own adversaries. Instead, Reed Hein continued to assert after the ruling that those communications and work product were subject to attorney-client privilege and work product privileges.

#### B.  Reed Hein Refuses to Disclose Other Material Developments

67.     In two separate cases before the middle district of Florida, Reed Hein and its

COMPLAINT FOR DAMAGES - 23

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

1  vendors were ordered to disclose thousands of documents that would have been privileged but
2  for Reed Hein's interference with the attorney-client privilege. Reed Hein failed to disclose to
3  the customers that their private information had been disclosed to an adversary.

4     68.    Reed Hein's law firm-vendors stopped taking referrals from Reed Hein in summer
5  2018. Reed Hein was unable to find another law firm to service customers until summer 2019—
6  creating a massive backlog of customers. Mr. Reed falsely testified under oath that the customers
7  had been told they were in a "holding pattern," although no such disclose was made.

### V.    CLASS ACTION ALLEGATIONS

8     69.    Plaintiffs bring this action pursuant to Civil Rule 23(a) and 23(b)(1), (b)(2) and/or
9  (b)(3) on behalf of the following Class for the maximum time period allowable by law:

> **Class 1:** all persons who received legally invalid exits from their timeshare agreements or were not exited from their timeshares at all ("**non-exits**").
>
> **Class 2**: all persons who had to obtain their own exits after paying Reed Hein to do so for them ("**self-exits**").
>
> **Class 3**: all persons who obtained 'harmful' exits by either paying additional money to the timeshare companies or suffering other negative repercussions ("**harmful exits**").

10    70.    The Class is so numerous that joinder of all members is impracticable.
11    71.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.
12    72.    Plaintiffs' claims are typical of the claims of each member of the Class.
13    73.    There are questions of law and fact common to the Class, the answers to which will advance the resolution of the claims of all the Class' members and that include, without limitation:

> a.  Whether Defendants misappropriated client funds in violation of their contracts, duties, and fiduciary duties
>
> b.  Whether Defendants induced customers into contracts with promises of being able

**COMPLAINT FOR DAMAGES - 24**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

to legally stop making payments on their timeshares;

c.  Whether Defendants asserted that their conversations with customers and legal counsel were privileged when they knew or should have known of a court order stating that those communications were not privileged;

d.  Whether the Defendants breached the implied covenant of good faith and fair dealing;

e.  Whether Defendants made materially false representations to Plaintiffs and the Class;

f.  Whether Defendants made materially false representations about their knowledge and experience in the timeshare industry;

g.  Whether Defendants failed to abide by the statutes and regulations for crediting organizations;

h.  Whether Defendants materially misled consumers in performance of debt adjustment services;

i.  Whether Defendants made material misrepresentations about the speed of exit services;

j.  Whether Defendants failed to provide exit services for Plaintiffs and the Class;

k.  Whether Defendants' business practices alleged herein are deceptive acts or practices;

l.  Whether Defendants breached their fiduciary duty to Plaintiffs and members of the Class;

m.  Whether Defendants are liable to Plaintiffs and the Class for damages and, if so, the measure of such damages;

n.  And whether Plaintiffs and the Class are entitled to declaratory, injunctive, and other equitable relief.

74.  Plaintiffs are members of Class 1 and will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no claims antagonistic to those of the Class. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

75.  Class action status is warranted under CR 23(b)(1)(A) because the prosecution of

**COMPLAINT FOR DAMAGES - 25**

separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

76. Class action status is warranted under CR 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

77. Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

78. Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

79. **Class Counsel –** Plaintiffs have retained counsel who have been interviewing witnesses and researching these underlying issues for 18 months before filing suit. Counsel have already recovered greater than $300,000 from Reed Hein on behalf of Reed Hein customers in dozens of lawsuits and arbitrations. Counsel are experienced in plaintiffs' litigation and will represent the Class fairly, adequately, and zealously.

## VI. CLAIMS FOR RELIEF

### COUNT ONE
### BREACH OF CONTRACT INCLUDING BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

80. Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

81. Every contract contains an implied covenant of good faith and fair dealing.

**COMPLAINT FOR DAMAGES - 26**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

82.     Through methods described above, Defendants induced customers into contracts unfairly and in bad faith by using false claims and promises.

83.     Defendants breached the terms of the spirit of its contracts with customers.

84.     As a direct, proximate, and legal result of the breaches, Plaintiffs and members of the Class have suffered damages in an amount to be proven at trial.

### COUNT TWO
### COMMON LAW FRAUD

85.     Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

86.     Through methods described above, Defendants induced customers to spend money on its services by making materially false representations and omitting material facts with the intent that the false statements and omitted facts be acted upon.

87.     Plaintiffs, including the Class, were ignorant of or would not be expected to know the truth of the material misrepresentations and material omissions.

88.     Plaintiffs relied on the truth of Defendants' misrepresentations and trusted that there were no material omissions.

89.     Plaintiffs suffered damages as a result of their reliance.

### COUNT THREE
### NEGLIGENT MISREPRESENTATION

90.     Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

91.     Through the methods described above, Defendants induced customers to spend money on its services by making negligent misrepresentations and negligently omitting material facts from the Plaintiffs.

92.     Plaintiffs relied on the truth of Defendants' misrepresentations and trusted that there were no material omissions.

93.     Plaintiffs suffered damages as a result of their reliance.

**COMPLAINT FOR DAMAGES - 27**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

**COUNT FOUR**
**UNJUST ENRICHMENT/DISGORGEMENT**

94.     Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

95.     Plaintiffs and Class have conferred a substantial benefit upon Defendants derived from the fees paid by Plaintiff and the Class.

96.     Those payments were accepted and retained by Defendants under circumstances such that it would be inequitable for Defendants to retain the benefit without payment to Plaintiff and members of the Class.

97.     As a result of Defendants' unjust enrichment, Plaintiffs and the Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

98.     Plaintiff and the Class also seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful, and/or deceptive practices.

**COUNT FIVE**
**VIOLATION OF CONSUMER PROTECTION ACT, RCW 19.86 *et. seq.***

99.     Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

100.    Plaintiffs can prevail on a claim for damages under the State Consumer Protection Act by establishing (1) an unfair or deceptive act or practice, (2) that occurred in the conduct of trade or commerce, (3) that has an impact on the public interest, (4) that results in injury to the plaintiffs in their business or property, and (5) causation. *Klem v. Washington Mut. Bank*, 176 Wash.2d 451 (1992).

101.    Defendants commits an unfair or deceptive act or practice by promising to hold customers funds separate and apart from company's funds, when the company in fact converted Plaintiffs' funds into its own funds.

102.    Because Defendants committed the unfair or deceptive acts or practices as part of

**COMPLAINT FOR DAMAGES - 28**

a transaction, the acts or practice occurred in the conduct of trade or commerce.

103.   Because Defendants have presented the same power-of-attorney form to tens of thousands of customers, and because the company has in fact converted the funds of all those customers into its own funds, the company's unfair or deceptive act or practice as an impact on the public interest.

104.   Defendants engaged in the foregoing acts or practices constituting unfair or deceptive acts in trade or commerce.

105.   Defendants' practices outlined above affects the public interest and have the capacity to deceive a substantial number of consumers and are unfair or deceptive acts or practices in trade or commerce in violation of RCW 19.86.020.

106.   The unfair or deceptive act or practices have harmed Plaintiffs and the Class in their business or property.

107.   The unfair or deceptive practice act or practice proximately caused Plaintiffs' and the Class' injuries.

108.   This Court has authority to award treble damages, up to a maximum of $25,000, to any person who establishes that he or she was injured because of a violation of the State Consumer Protection Act. RCW 19.86.090.

109.   A person who establishes that he or she was injured because of a violation of the State Consumer Protection Act is entitled to the reasonable attorney fees and costs he or she incurred in bringing the suit. RCW 19.86.090.

110.   The Court should award treble damages to the Plaintiffs and each member of the Class.

### COUNT SIX
### BREACH OF FIDUCIARY DUTIES

111.   Defendants induced Plaintiffs, including the Class into fiduciary relationships by asking them for power of attorney and soliciting money for services not yet performed.

**COMPLAINT FOR DAMAGES - 29**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

112.    Defendants received money from Plaintiffs and the Class for services not yet performed, but did not hold the money in trust or escrow.

113.    Defendants immediately misappropriated the money as earned income.

114.    Defendants breached its fiduciary duties to Plaintiffs and the Class.

## VII.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court grant the following relief:

115.    Injunctive relief ordering Reed Hein to stop providing the services described herein.

116.    Adjudication and decree that Reed Hein has engaged in the conduct complained herein.

117.    Adjudication and decree that the conduct complained of herein constitutes unfair or deceptive acts or practices in violations of the Consumer Protection Act, Chapter 19.86 RCW.

118.    That the Court make such orders pursuant to RCW 19.86.090 as it deems appropriate to provide that Plaintiffs have and recover from Defendants the costs of this action, including reasonable attorneys' fees.

119.    That the Court order such other relief as it may deem just and proper to fully and effectively dissipate the effects of the conduct complained herein, or which may otherwise seem proper to the Court.

120.    Monetary Relief, including Damages and Treble damages.

121.    Attorney Fees and Costs.

122.    Any other monetary and nonmonetary relief the Court deems just and proper.

**COMPLAINT FOR DAMAGES - 30**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DATED this 9th day of October, 2021.

ALBERT LAW PLLC

By: _____
Gregory Albert, WSBA#: 42673
3131 Western Ave., Suite 410
Seattle, WA 98121
Telephone: (206)-576-8044
Email: greg@albertlawpllc.com
*Attorney for Plaintiffs*

**COMPLAINT FOR DAMAGES - 31**

# EXHIBIT 10

# Cope, Candace

**From:**        Savadians, Erik <Erik.Savadians@rtspecialty.com>
**Sent:**        Monday, November 29, 2021 7:54:40 PM
**To:**        Claims, RT-Roseville <CAClaims@rtspecialty.com>
**Cc:**        Plotycia, Joseph <Joseph.plotycia@rtspecialty.com>;Coontz, Max <max.coontz@rtspecialty.com>;pgajic@bbofcal.com <pgajic@bbofcal.com>;reportclaims <reportclaims@rsui.com>
**Subject:**        FW: (EXTERNAL) Loss Notice Reed Hein NPP693379
**Importance:**        High

> **ATTENTION:** This is an **EXTERNAL** email. Only open attachments and links after verifying the content is safe. **Original Sender: Erik.Savadians@rtspecialty.com**

RT Claims,
See below and attached.
Thank you,
Erik Savadians
Inside Broker - Calnon Team
Management/Professional Liability
R-T Specialty, LLC / RT ProExec
3900 W. Alameda Ave Suite 2000
Burbank, CA 91505
818-239-4815 Direct
818-237-7335 Cell
Erik.Savadians@rtspecialty.com

**From:** Philip Gajic <pgajic@bbofcal.com>
**Sent:** Monday, November 29, 2021 4:51 PM
**To:** reportclaims@rsui.com
**Cc:** Savadians, Erik <Erik.Savadians@rtspecialty.com>; Coontz, Max <max.coontz@rtspecialty.com>
**Subject:** (EXTERNAL) Loss Notice Reed Hein NPP693379

Please process claim for Reed Hein per attached complaint policy # NPP693379

Thank you,
Philip Gajic, WCIP
Commercial Account Manager
Brown & Brown Insurance Services of California, Inc. (NYSE: BRO)

1001 Mark Avenue, Suite 201, Carpinteria, CA 93013

Ph: 805.690.2637 Fax: 805.690.3200 | pgajic@bbofcal.com
Main: 805.965.0071 800.350.6328 | www.bbinsurance.com
License Number: 0D04053
**We are pleased to announce the launch of InsurLink. This is a client portal that will provide you access to previously issued certificates, a format for requesting certificates, auto ID cards, policy summaries and more. The client portal also offers a secure platform for sharing large and/or sensitive documents.**

**If you would like to learn more about the client portal, I would be happy to assist.**

BROWN & BROWN IS AMONG THE TOP 10 LARGEST INSURANCE BROKERS WORLDWIDE, SPECIALIZING IN

WORKERS' COMP • GENERAL LIABILITY • PROPERTY • EMPLOYEE BENEFITS • MEDICAL MALPRACTICE • E&O • HOME • LIFE • AUTO

IMPORTANT NOTICE REGARDING COVID-19

Our team is currently working remote, however our business remains open and we are available to provide support for any questions or concerns you may have regarding your insurance. Your primary contact remains the same, and can be reached via phone or email.

We are also pleased to offer several resources including live stream events to help guide you through these uncertain times which are available through this link:

https://www.bbinsurance.com/covid19/

Please be advised that any and all information, comments, analysis, and/or recommendations set forth above relative to the possible impact of COVID-19 on potential insurance coverage or other policy implications are intended solely for informational purposes and should not be relied upon as legal advice. As an insurance broker, we have no authority to make coverage decisions as that ability rests solely with the issuing carrier. Therefore, all claims should be submitted to the carrier for evaluation. The positions expressed herein are opinions only and are not to be construed as any form of guarantee or warrantee. Finally, given the extremely dynamic and rapidly evolving COVID-19 situation, comments above do not take into account any applicable pending or future legislation introduced with the intent to override, alter or amend current policy language.



*Two convenient ways to pay! PayNow for online payments or US Mail. Payments made through US Mail should be sent only to the Lockbox or Overnight Payment addresses listed below. Please update your records.*

| Pay Online Now | Lockbox Payments | Overnight Payments |
|---|---|---|
| PayNow ePayPolicy | Brown & Brown Insurance Services of CA Inc.<br><br>P.O. Box 743053<br>Los Angeles, CA 90074-3053 | Brown & Brown Insurance Services of CA Inc.<br><br>Lockbox Services 743053<br>2706 Media Center Drive<br>Los Angeles, CA 90065-1733 |

*Please note, our mailing address has changed. Payments made through US Mail should be sent only to the Lockbox or Overnight Payment addresses listed above*

🖨 please consider the environment before printing this email

**Confidentiality Notice:** The information contained in this communication, including attachments is privileged and confidential. It is intended only for the exclusive use of the

addressee. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. Insurance coverage cannot be bound, amended or changed via an e-mail message without knowledge or consent from the insuring carrier. If you have received this communication in error please notify us by telephone immediately at (805) 965-0071 or email support@bbofcal.com. Thank You..

# EXHIBIT 11



**RSUI Group, Inc.**
Phil Krajec, JD, CPCU, ARM, AMIM
Vice President
e-mail:  Pkrajec@rsui.com
945 East Paces Ferry Road
Suite 1800
Atlanta, GA  30326-1125

Phone   404-504-6115
Fax      404-231-3755

January 4, 2022

Panda Kroll, Esq.                                       **VIA E-MAIL: pkroll@pandakrollesq.com**
Law Offices of Panda Kroll
5999-B Ridgeview Street
Camarillo, CA 93012

| | Re: | **Insured** | **Reed Hein & Associates, LLC** |
|---|---|---|---|
| | | **Insurer** | **RSUI Indemnity Company** |
| | | **Claimant** | **Various** |
| | | **Policy** | **NPP687052** |
| | | **Policy Period** | **5/16/20—21** |
| | | **RSUI File** | **703—161384** |

Dear Ms. Kroll:

We previously acknowledged receipt of the suits filed by Gerald & Patricia Siegrist and Phillip & Rebecca Isaacs.  We have reviewed the recently received suit filed by Brian Adolph in the U.S. District Court, Western District of Washington, Case Number 2:21-cv-01378.  Because the suit arises from the same or interrelated wrongful acts alleged in the earlier suits, we will consider them a single claim under RSUI File 703—161384.

As this is a single claim, RSUI must also decline coverage for the most recent suit, incorporating here by reference and attached for your convenience our September 15, 2021 disclaimer letter.  Nothing contained here is intended to supersede, limit or eliminate any coverage defenses asserted in that letter, nor should any action taken by us in connection with this matter be construed as an admission of coverage or waiver of any right RSUI might have at law or under the policy.

Please do not hesitate to contact me if you have any questions regarding this matter.

Very truly yours,

Phil Krajec

cc (via e-mail):    Stephanie Loosvelt, Reed Hein (stephanie.loosvelt@reedhein.com)
                    Joseph Plotycia, R-T Specialty (joseph.plotycia@rtspecialty.com)
                    Erik Savadians, R-T Specialty (erik.savadians@rtspecialty.com)

# EXHIBIT 12

# William Brockett

# General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.

# March 12, 2025



1325 Fourth Avenue, Suite 1840  Seattle, Washington 98101
Bellingham | Everett | Tacoma | Olympia | Yakima | Spokane
Seattle 206.287.9066    Tacoma 253.235.0111    Eastern Washington 509.624.3261
**www.buellrealtime.com**
email: info@buellrealtime.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____

GENERAL CASUALTY COMPANY OF WISCONSIN,  )
a Wisconsin corporation,                )
                                        )
      Plaintiff/Counterclaim Defendant, )
                                        )
v.                                      )
                                        )
REED HEIN & ASSOCIATES, LLC d/b/a       )
TIMESHARE EXIT TEAM, a Washington       )
limited liability company; MAKAYMAX     )
INC., a Washington corporation;         ) Case No.
BRANDON REED, individually; BRIAN       ) 2:23-CV-00725-TMC
and KERRI ADOLPH, a married couple,     )
                                        )
      Defendants/Counterclaim and       )
      Third-Party Plaintiffs,           )
                                        )
v.                                      )
                                        )
RSUI GROUP, INC., a Georgia             )
corporation; and RSUI INDEMNITY COMPANY,)
INC., a New Hampshire corporation,      )
                                        )
      Third-Party Defendants.           )

_____

* VIDEOCONFERENCE *

DEPOSITION UPON ORAL EXAMINATION OF

WILLIAM BROCKETT

_____

Witness located in Atlanta, Georgia

(All participants appeared via videoconference.)

DATE TAKEN:  March 12, 2025

REPORTED BY:  Ryan Ziegler, RPR, CRR, WA CCR #20107870

Page 5

1    know what RSUI stands for.  What does it stand for?

2        A.   Well, we used to be owned by Royal Sun & Alliance,

3    so it's Royal Specialty Underwriting, Incorporated.

4        Q.   Mr. Brockett, I understand that you are an

5    underwriter.  Is that right?

6        A.   Yes.

7        Q.   For RSUI?

8        A.   Yes.

9        Q.   Many of us don't know what underwriting is, and

10   I'll have to explain it to a jury, potentially, at some

11   point.  Help me understand, if you would, what underwriting

12   is.

13       A.   It's sort of like loan underwriting, so you're

14   looking at a particular profile of a company: their

15   financials, their board makeup, employee count, the

16   industry they're in.  It's a number of different factors

17   that you're looking at, and then you're figuring out a

18   price to charge, what retentions to put on the account, and

19   things like that.

20       Q.   So you were able to shorthand a lot of concepts

21   and information, but I'll probably break that down here

22   over the course of the -- of the morning a little bit more.

23           Explain just to the extent that you can,

24   understanding that it'll be a summary of this, what is the

25   business of RSUI.

1b12b5a2-8251-450b-80e8-b2c98ff36e8a

Page 6

1      A.   We are a commercial insurance company, so we

2   primarily insure businesses, no personal insurance, no --

3   so no house or health, anything like that.  So we insure

4   businesses.  We do everything from professional liability

5   to property insurance, casualty insurance.

6      Q.   Walk me through those.  If you're an insurance

7   company that insures a business for professional liability,

8   what is that?  What does that mean?  What do you cover?

9      A.   If a business screws up on their product, somebody

10  gets hurt in a -- I guess, in the course of their business,

11  they can get sued for it, and so our policy kicks in to pay

12  for, you know, their legal liability.

13     Q.   For example, if somebody -- and I won't give you

14  any specific example, but if a business screws up and they

15  create a product or something that injures people, is that

16  the type of insurance that RSUI provides for a business?

17     A.   Yes.  Yes.  That's medical malpractice liability.

18     Q.   And understanding, of course, that there are

19  probably lots of different policies that cover lots of

20  different situations.

21     A.   Right.

22     Q.   Some cover more; some cover less.  I get that.  I

23  assume that to be true.  Is that right?

24     A.   Right.

25     Q.   And does the -- does the function of underwriting

General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.                    William Brockett

Page 7

1    in an insurance company help to figure out, for any given

2    policy, what the insurance company is willing to cover for

3    that business?

4        A.    Correct.

5        Q.    All right.  How long have you been with RSUI?

6        A.    Almost -- it'll be five years in October, so four

7    years in a couple months.

8        Q.    Four years in a couple months.  So you were right

9    there in the heart of COVID, I guess.  Huh?

10       A.    Yeah.  October 19th, 2020.

11       Q.    October of 2020.  And had you been in the

12    insurance industry, if you will, prior to that point?

13       A.    Yes.  Since 2003, so about 22 years.

14       Q.    So I'll have you walk me through.  You probably

15    graduated from college in 2003-ish or '2-ish or something?

16       A.    2001.

17       Q.    2001.

18             Where'd you go?

19       A.    Wake Forest.

20       Q.    Demon Deacons?

21       A.    Yep.

22       Q.    All right.  And what did you graduate with for a

23    degree?  Business?

24       A.    Economics.

25       Q.    And so in 2003 you started with which company

1b12b5a2-8251-450b-80e8-b2c98ff36e8a

Page 8

1    within the insurance industry?

2        A.    AIG.

3        Q.    And did you go right into underwriting with AIG?

4        A.    I mean, technically, yeah.  I was a, I guess,

5    underwriting assistant.  Yeah.

6        Q.    And were you -- Wake Forest is in North Carolina

7    or something.  Right?

8        A.    Right.  Yeah.  Winston-Salem.

9        Q.    Did you start working in the Winston-Salem area

10   for AIG?

11       A.    Charlotte.

12       Q.    Charlotte.

13             How long did you stay with AIG?

14       A.    I believe eight years.

15       Q.    So '03-ish to '11-ish.

16       A.    Right.

17       Q.    Then where'd you head after that?

18       A.    Atlanta.  So I started working with -- which

19   was -- what was ACE at the time.

20       Q.    ACE.  So around 2011, you started working with

21   ACE, but let me back up for a second.

22             So with AIG, you started as an underwriting

23   assistant, and --

24       A.    Mm-hmm.

25       Q.    -- then did you become an underwriter at some

1b12b5a2-8251-450b-80e8-b2c98ff36e8a

Page 9

1    point with --

2        A.    Yeah.   When I --

3        Q.    -- AIG?

4        A.    When I left AIG, I was a senior underwriter.

5        Q.    So let's start with underwriting assistant.   What

6    does that position typically have for responsibilities?

7        A.    It's -- I mean, not to be funny, but you're

8    assisting the underwriters with, you know, the more mundane

9    things: following up with brokers for information in the

10   underwriting process, putting files together, putting

11   underwriting worksheets together, you know, just kind of

12   learning the ropes.

13       Q.    Serving your apprentice time.   Right?

14       A.    Right.

15       Q.    And then, by the time you're a senior underwriter,

16   explain for us what kind of the day-to-day responsibilities

17   are for that position.

18       A.    I mean, you actually have underwriting authority.

19   You're more involved with marketing to brokers.   You know,

20   you just have more leeway to do stuff, and you actually

21   have authority to quote and bind accounts.

22       Q.    So I was just looking on RSUI's website the other

23   day trying to get a little sense of the company, and

24   brokers, using brokers or interacting with brokers, was a

25   common theme in the website materials I was reading.

1b12b5a2-8251-450b-80e8-b2c98ff36e8a

Page 11

1    A.   Yeah.  Gall- -- yep.  Yep.  Gallagher.  Yeah.  So

2    Gallagher, they have relationships with the actual insured,

3    and then Gallagher, when they have, you know,

4    tough-to-place risks, risks they can't find any, you know,

5    companies to write, they go to a wholesale broker.  So the

6    wholesale broker comes to us, and so we deal with, you

7    know, the harder-to-place, tougher risks.

8    Q.   All right.  So tell me -- but tell me what's

9    the -- what's the business of the wholesale broker.

10    A.   It's a -- so we market to the wholesale broker, so

11    they bring us the business.  So they give us the

12    applications.  They go get the information, the

13    underwriting information.  We underwrite.  We charge a

14    premium.  They get us the premium from the insured.  We --

15    and we give them a commission for bringing in the business.

16    Q.   So give me some examples of a wholesale broker

17    just so I can go study up, teach myself about it.

18    A.   RT Specialty, Amwins --

19    Q.   Whoops.  Hang on.  So RT Specialty.  What's the

20    other one?

21    A.   Amwins.

22    Q.   How do you spell that?

23    A.   A-M-W-I-N-S.

24    Q.   Amwins.  Got it.

25    A.   CRC.  Those are the main three.

Page 12

1    Q.   Yeah.  Those are good examples.

2         So -- and I'm -- just tell me what you know about

3    it, if you know about it.  So CRC, for example, is a

4    wholesale broker.

5    A.   Mm-hmm.

6    Q.   What do they say that they do?

7    A.   What --

8    Q.   Does that make sense?  Like, I mean, if they're

9    saying, "Hey, here's our business.  We're at" --

10   A.   Yeah.

11   Q.   -- "CRC, and we do, 'Eh,'" what is it?

12   A.   They -- so they provide solutions to retail

13   brokers.  So the retail broker is their client.  Retail

14   brokers go to them.  They market to -- market to retail

15   brokers.

16        So, I mean, like Gallagher, they're -- those are

17   the big national retail brokers, but you have mom-and-pop

18   shops.  There's thousands of mom-and-pop shops around,

19   so -- and they don't have the expertise, so they'll go to a

20   retail broker.  The retail broker goes to the wholesaler.

21   The wholesaler comes to us.

22        And so a wholesale broker would say, "Yeah.  We

23   foster a relationship with these retail brokers in order to

24   bring business in so we can go to the -- to companies and,

25   you know, provide your insured with insurance."

General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.                                    William Brockett

Page 16

1    industry it is.  For example, health care's always going to

2    be a higher-risk industry.  Hospitality/restaurants, that's

3    going to be a high-risk industry, and it's mostly due to

4    your claims.  Right?

5           So that's our product.  Claims are our product.

6    So we pay claims when they come in if and when it makes

7    sense, and so, you know, you look at claims trends for the

8    industry, and then that's how you underwrite the account.

9    Q.   So take me through the workflow, the life of a

10   particular policy, and I'll throw dumb stuff out, and you

11   explain to me how it really is.

12          So there's an industry that's brand new.  A

13   wholesaler comes to RSUI and says, "Hey, I've got a -- I've

14   got a retail broker who's got a client who needs a policy

15   written for their business, and I want you to take a look

16   at it."  So kind of take us through what happens at RSUI

17   from this underwriting process to actually sending the

18   policy out, then to kind of overseeing the policy.  Kind of

19   take us through the life cycle.

20   A.    Okay.  Yeah.  So, first, our wholesale broker will

21   send us an email with a submission which includes an

22   application, financials.  Primarily an application and

23   financials is the bulk of what we need.  We look at that.

24   We log it into our system.  We look at that information,

25   plug it into our underwriting systems, look at the account,

Page 19

1    happen if it's reported to RSUI?

2         A.   So they have an email address that they can send

3    all claims to.  So they would send in an email to that

4    address with the -- with the situation, and then it goes to

5    our claims department.

6         Q.   Claims department separate from underwriting?

7         A.   Yes.

8         Q.   And I know that you're not working in the claims

9    department, but RSUI kind of typically -- give me a sense

10   of what happens when it gets to the claims department.

11        A.   It's logged in by the claims team, and then it's

12   assigned to a claims representative.

13        Q.   Does it ever come back at that point?  If there's

14   a claim made and it's in the claims department at RSUI,

15   does it ever come back to underwriting for some perspective

16   on the policy?

17        A.   No.

18        Q.   Okay.  What if they're --

19        A.   No.  Once it's -- once it's in claims, they handle

20   it.  We might go to them and ask them about, you know,

21   what's going on with it, but they don't come for us for --

22   if they do, it's -- if it's a named insured or something

23   like that, like, so if they have clarification on just a

24   misspelling of the named insured or something like that,

25   but no, you know, claims decisions or anything like that

Page 20

1    comes to underwriting.

2        Q.    And you mentioned that underwriting might go to

3    the claims department and say, "Hey, what's going on?"

4    Would that be in a situation where you were looking at

5    whether to renew the policy or --

6        A.    Exactly.  Exactly.  Yeah.  Yeah.  So as a -- so I

7    was the renewal underwriter on this one, so yeah.  So what

8    I do is I pull up our loss runs for the account.  You know,

9    if we have any open claims, that's when we go to the -- you

10   know, the claims adjuster and say, "Hey, how's this claim

11   coming?  Do you think -- have they been cooperative?  You

12   know, do you think we're going to pay out on this, and, you

13   know, what do you -- what do you think we should do about

14   the claim?"

15           So if there's -- if there's an issue, they will

16   let us know, and then we would go from there.

17       Q.    What about the situation where there's a claim

18   made and there is some ambiguity about whether a particular

19   exclusion that was written into it applies or doesn't

20   apply?  Does that come back to underwriting?

21       A.    Not -- 99 percent of the time, no.  I've never had

22   a claims person come to me and say, "Hey, does this

23   exclusion apply?"  They usually take their own liberties.

24       Q.    And so what would the claims guys typically do to

25   figure that out?  To resolve the question of whether there

1b12b5a2-8251-450b-80e8-b2c98ff36e8a

General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.                                                                 William Brockett

Page 23

1    guess you could say, for an insurance contract.  So you

2    have -- you know, I guess you have the general terms and

3    conditions.  You have the dec page and then individual

4    policy forms, you know, then endorsements.  So they're

5    all -- they're all similar across, you know, the industry.

6         Q.    So because you're the very first witness, at

7    least, in this trial, I'm going to task you with explaining

8    some of these terms.  So I appreciate your patience with

9    me, because I know this is all basic stuff for you.

10             But, like, a dec page, what is -- what's the

11   significance of a dec page in an insurance policy?

12        A.    Yeah.  The dec page is just the basic bare-bones

13   information of who the insured is, policy dates, you know,

14   the name of the insurance company, premium, retentions,

15   name of the wholesaler, and they have a listing of the

16   endorsements.

17        Q.    Tell us about what an endorsement is.

18        A.    Yeah.  An endorsement is just an amending to the

19   basic contract.  So you have the general terms and

20   conditions, which is, you know, the bare-bones form that we

21   have with just the general, you know, statements of what --

22   you know, what the policy is, what we're -- what we're

23   covering in a general sense.

24             So then you'll have a, you know, directors and

25   officers form, which will be saying, "Hey, this is what

1b12b5a2-8251-450b-80e8-b2c98ff36e8a

General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.                                    William Brockett

Page 26

1      Q.   What are the -- what are some of the minor
2  differences that you can think of?
3      A.   They may look at a different industry differently
4  than we do.  So they may require, you know, a certain price
5  that we don't require.  They may require certain retention,
6  you know, that we don't require.  It all depends on the
7  company.
8      Q.   And by "retention," by the way --
9      A.   Deductible.
10     Q.   Yeah.  Right.  So for all of us who've got car
11  policies, we might have -- whatever -- a $1,000 deductible
12  or $500, whatever it is; but for a commercial business, you
13  might have much higher deductibles or retentions.  Right?
14     A.   Exactly.  Exactly.
15     Q.   And how do you figure out what that is for a
16  commercial business?
17     A.   Depends -- it depends on the size of the company,
18  financial condition, underwriter experience.
19     Q.   And does the premium come down, by the way, if a
20  company elects to have a higher retention or deductible?
21     A.   That's usually how it works.
22     Q.   So the underwriting guideline manual for RSUI is
23  how big, roughly?
24     A.   I mean, I don't know.  10 pages.  I don't know.
25     Q.   Oh.  I thought you were going to say 10,000 pages.

1b12b5a2-8251-450b-80e8-b2c98ff36e8a

General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.                                    William Brockett

Page 31

1    Q.   Oh, thousands.

2    A.   I'm sorry.

3    Q.   I thought you were -- I thought you were

4    calculating it out on your piece of paper.

5    A.   Oh, no.  No.  No.  I said -- no.  No.  At any

6    given time, we have, like, thousands of policies on the

7    books.

8    Q.   All right.  So let's just take --

9    A.   I don't know the -- I don't know the specific

10   number.

11   Q.   All right.  How many do you handle in a particular

12   year?

13   A.   Hundreds.

14   Q.   Hundreds.

15        How many people are in the management liability

16   unit for RSUI?

17   A.   I'd say about 25.

18   Q.   And is your position underwriter, or are you a

19   senior underwriter?  Where are you at?

20   A.   Me, we're in the underwrit- -- my title's

21   assistant vice president.

22   Q.   Of underwriting?  Is it assistant vice president

23   of something in particular or just assistant vice

24   president?

25   A.   No.  Assistant vice president, management

General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.                                                    William Brockett

Page 32

1   liability.  Yeah.  I would say -- I mean, we're in the

2   underwriting department, but yeah.

3        Q.   Because RSUI writes management liability policies

4   in every state in the United States, is there information

5   that RSU provides to the underwriters about particularized

6   statutes or policies that are within a given state that you

7   have to consider as you underwrite a policy?

8        A.   Yeah.  Because each policy will have specific

9   state amendatories, and so we have a regulatory department

10  that keeps up with all of that.  So they'll put a bulletin

11  up, you know, on our -- on our internal website and let us

12  know if there needs to be any changes made, what specific

13  state endorsements need to be attached to each policy in

14  that state.

15       Q.   So there might be a bulletin that comes out that

16  says, "Hey, here we are in April, and Washington State just

17  passed a something-or-other, so consider that," or what

18  does the --

19       A.   Yeah.

20       Q.   -- bulletin sound like?

21       A.   Yeah.  Exactly what you just said.

22       Q.   Okay.  And so if, for example, a wholesaler comes

23  to you and says, "Hey, I've got a policy I want to write in

24  Oregon," what do you go into internally with RSUI to figure

25  out what RSUI -- or, yeah, what considerations there are

General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.                                    William Brockett

Page 34

1      Q.   Right.  I'm just trying to get -- trying to have

2   an understanding of what types of exclusions frequently go

3   into policies no matter what the business is.

4      A.   It depends -- it depends on the business line,

5   what -- it depends on the industry.  So, for example, a

6   restaurant business/hospitality business, we're always

7   going to have, you know, sexual abuse/sexual molestation

8   exclusions, absolute bodily injury, property damage

9   exclusions.  Those are pretty much uniform across those

10  industries.

11     Q.   Let's take the restaurant industry.  It's nice and

12  distinct from what we're talking about.  What does RSUI's

13  management liability policy cover for a restaurant, say, in

14  Seattle?

15     A.   So it depends on what -- so if we -- if it's an

16  EPL, employment practices liability, coverage --

17     Q.   Slow down.  EPL is what now?

18     A.   Employment practices liability.

19     Q.   Okay.

20     A.   So it covers anything from retaliation to

21  harassment, discrimination, all types of discrimination.

22     Q.   But not sexual abuse or molestation?

23     A.   If it's -- if we add that exclusion.

24     Q.   Okay.  So that's -- so that's one thing, this

25  employment practices liability.  What else?  I'm just

1b12b5a2-8251-450b-80e8-b2c98ff36e8a

General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.                    William Brockett

Page 41

1    Q.   That's kind of --

2    A.   Yeah.  So hold up.  So, yeah, it looks like I

3    quoted it on May 12th, 2021.  Sorry.  So no.  So I first

4    quoted it on May 4th, 2021.  Then the broker asked for a

5    different -- an amended quote with higher retentions,

6    because we went out with a premium increase due to their

7    high turnover and their financial condition.

8         So they were losing money.  Their balance sheet

9    was not good, so we went out with an increase.  The broker

10   came back to us, and we offered an option with a higher

11   retention, which would bring the premium down slightly, and

12   that was on May 12th.  On May 17th, the broker came back to

13   us and asked us to bind it, and so we bound it on May 17th.

14   Q.   And just so we understand it right here, binding

15   it on May 17th meant what?

16   A.   It means that we booked the premium in the system

17   and they were officially bound for the new policy period.

18   Q.   And, conversely, RSUI was bound to carry out its

19   responsibilities under the policy.  Right?

20   A.   Yeah.  So we're still -- let me see what the

21   X-date is.  So, yeah, once -- yeah.  So once -- yeah.  Once

22   the effective date commences, then, yeah, we are, yeah,

23   bound to keep up our part of the deal.

24   Q.   And does the actual policy, including the

25   declaration page and the conditions and exclusions, all

1b12b5a2-8251-450b-80e8-b2c98ff36e8a

General Casualty Company of Wisconsin v. Reed Hein & Associates LLC, et al.                                    William Brockett

Page 45

1    wouldn't have factored in.

2        Q.    Denied the -- denied what?

3        A.    The claim.

4        Q.    And the claim being the claim of defending or

5    paying for the loss that was occasioned by the attorney

6    general's investigation?

7        A.    Correct.

8        Q.    How did RSUI determine that it was going to deny

9    that claim?  Do you know?

10       A.    Claims did.

11       Q.    Claims.

12             And when you are looking at renewing a policy, do

13   you evaluate whether claims did it right in terms of

14   excluding something?  Or do you just --

15       A.    That's what claims do.

16       Q.    Right.  I'm wondering, though, as the -- as the

17   underwriter determining what the premium --

18       A.    No.  I don't determine whether they deny a claim.

19   They don't exclude anything.  They just -- they either

20   accept the claim, deny it, say they're going to pay it, or

21   what -- that's their issue.

22       Q.    Got it.  I understand.

23             What I'm wondering, though, is, as the -- as the

24   underwriter, you're looking at, "Where am I going to peg

25   this premium at given their -- given their risk exposure?"

1b12b5a2-8251-450b-80e8-b2c98ff36e8a

Page 63

1    Let me see if I can see what is on here.  Yeah.  So it

2    looks like we -- in '18, we offered an option with and

3    without the prior acts exclusion, and so they probably got

4    the one with the prior acts exclusion, because the premium

5    was less.

6         Q.    From that point forward, though, in the renewals

7    in 2019, 2020, and 2021, RSUI required the prior acts

8    exclusion to --

9         A.    Right.  Exactly.

10        Q.    All right.  And knowing that there were challenges

11   to Reed Hein & Associates' business practices in each of

12   those following years based on your underwriting research,

13   did RSUI offer an explanation about how the policy would

14   work given the prior acts exclusion language in the event

15   that a particular claim was made in that 2021-'22 time

16   period which might also involve events happening in --

17        A.    No.  We never -- no.  We never -- we never gave an

18   explanation.  We were never asked for an explanation.

19        Q.    And just to be clear, RSUI never offered that

20   explanation.  Right?

21        A.    No.

22        Q.    Did you -- strike that.

23              Let me do it this way.  Do you have an

24   interpretation now about how that prior acts exclusion

25   should be interpreted or is interpreted by RSUI?

1b12b5a2-8251-450b-80e8-b2c98ff36e8a

# EXHIBIT 13

HON. BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BRIAN ADOLPH, individually and on behalf of all others similarly situated; KERRI ADOLPH, individually and on behalf of all others similarly situated; | Case No. 2:21-cv-01378-BJR |
| Plaintiff, | CONFESSION OF JUDGMENT AND JUDGMENT WITH COVENANT NOT TO EXECUTE |
| v. | |
| REEDHEIN & ASSOCIATES d/b/a TIMESHARE EXIT TEAM; MAKAYMAX INC.; HEIN & SONS INDUSTRIES, INC.; BRANDON REED, individually; and TREVOR HEIN, individually, | |
| Defendants. | |

## I.    PARTIES

The parties to this Agreement are Brian Adolph and Kerri Adolph, both individually and on behalf of all others similarly situated (hereinafter "Plaintiff Class"), ReedHein & Associates (hereinafter "ReedHein"), Makaymax, Inc. (hereinafter "Makaymax"), and

**CONFESSION OF JUDGMENT - 1**

Brandon Reed (hereinafter "Reed"). ReedHein, Makaymax, and Reed are collectively referred to as "Defendant Parties."

## II.  PURPOSE OF THE AGREEMENT

The purpose of this Agreement is to secure a judgment against Defendants ReedHein, Makaymax, and Brandon Reed for the benefit of the Plaintiff Class and to protect the assets, earnings and individual liability of Defendant Parties from claims by the Plaintiff Class that might result in a substantial excess verdict. This Agreement is made pursuant to the CR2A agreement executed between the parties on April 11, 2022.

## III.  RECITALS

The Adolphs filed this action against the Defendant Parties on behalf of the Plaintiff Class. The Plaintiff Class alleges that the undersigned Defendant Parties committed acts and omissions that sound in tort and statutory violations. The Plaintiff Class alleges that it suffered greater than $200,000,000 in damages as a result of those acts and omissions. Its allegations were tested in fourteen arbitrations adjudicated before the American Arbitration Association. The arbitrations have resulted in awards of actual damages, treble damages, attorney fees, and costs. Including treble damages, the Plaintiff Class claims $630,187,204 in damages.

The Defendant Parties tendered the Adolph complaint to their insurers in October and December 2021. The insurers did not provide a defense. Without a defense, the Defendant Parties executed a CR2A settlement agreement on April 11, 2022. The CR2A agreement requires that the parties execute a (covenant) confession of judgment for the full amount of damages claimed. This confession of judgment is executed pursuant to that agreement.

**CONFESSION OF JUDGMENT - 2**

## IV. TERMS AND CONDITIONS

### A.     This Document Does Not Constitute a Release

Reed Hein and Associates, Makaymax, and Brandon Reed agree that the terms and conditions of this agreement do not constitute a release of the Plaintiff Class's claims against them. Rather, Reed Hein and Associates, Makaymax, and Brandon Reed acknowledge they shall be deemed parties against whom judgment is taken.

### B.     Assignments

The Defendant Parties assign all rights to claims that can be made on their own behalf for breach of fiduciary duty, breach of insurance contract, breach of good faith, and any other claims arising under the common law, the Washington Insurance Fair Conduct Act, and any other potential claims, against any insurance carrier to Brian Adolph in his individual and representative capacities, and to any additional representatives of any additional classes that are certified by the Court. In the event that more than one class proves necessary, that the rights herein will be held in trust by Gregory W. Albert (Albert Law PLLC), until such a time as a new class representatives are chosen, the class or classes is/are certified, and the rights can be transferred to the new class representatives in their representative capacities.

The Defendant Parties and Brandon Reed assign all rights to any claims of any kind that can be made on their own behalf against Mitchell Sussman, Kenneth Privett, and Schroeder Goldmark Bender, any principals of the same, and any entities in which the foregoing have any interest, no matter how derivative, to Brian Adolph in his individual and representative capacities and to any other class representatives for any other classes that are certified by the Court. Reed Hein and Associates and Brandon Reed will waive any privileges and will make available any communications with the foregoing, even if those communications included one of the attorneys named above. Provided further, to the extend this provision calls for the assignment of any legal malpractice claim and that legal

**CONFESSION OF JUDGMENT - 3**

malpractice claim ins not assignable, than the assignment of claims will be partially void, only to the extent that it will not include non-assignable claims; the remainder of the assignment, as well as the remainder of this agreement, will remain in full force and effect. In the event that more than one class proves necessary, that the rights herein will be held in trust by Gregory W. Albert (Albert Law PLLC), until such a time as a new class representatives are chosen, the class or classes is/are certified, and the rights can be transferred to the new class representatives in their representative capacities.

The Defendant Parties assign all rights to any claims of any kind that can be made on its own behalf against Ardent Law Group, Granite Spire Law Group, any owners or former owners of the same, and any entities in which the foregoing have any interests, no matter how derivative, to Brian Adolph in his individual and representative capacities, and to any additional representatives of any additional classes that are certified by the Court. In the event that more than one class proves necessary, that the rights herein will be held in trust by Gregory W. Albert (Albert Law PLLC), until such a time as a new class representatives are chosen, the class or classes is/are certified, and the rights can be transferred to the new class representatives in their representative capacities. Reed Hein will make available all communications with the foregoing, provided that Defendant Parties are not waving any privilege in connection with Corr Cronin or any other attorney other than those named above, even if those communications included one of the attorneys named above.

The Defendant Parties hereby assign all rights to any claims of any kind that can be made on their behalf against Trevor Hein, Hein and Sons, or any entity owned by Trevor Hein or in which Trevor Hein has any interest, include derivative interests, to Brian Adolph in his individual and representative capacities, and to any additional calls representatives of any additional classes that are certified by the Court. In the event that more than one class proves necessary, that the rights herein will be held in trust by Gregory W. Albert (Albert Law PLLC), until such a time as a new class representatives are chosen, the class or classes

**CONFESSION OF JUDGMENT - 4**

is/are certified, and the rights can be transferred to the new class representatives in their representative capacities.

The Defendant Parties hereby assign all rights to any claims of any kind that can be made on their own behalf against any timeshare developer or timeshare company, any owners or former owners of the same, and any entities in which the foregoing have any interests, no matter how derivative, to Brian Adolph in his individual and representative capacities, and to any additional calls representatives of any additional classes that are certified by the Court. In the event that more than one class proves necessary, that the rights herein will be held in trust by Gregory W. Albert (Albert Law PLLC), until such a time as a new class representatives are chosen, the class or classes is/are certified, and the rights can be transferred to the new class representatives in their representative capacities.

**C.     Stipulated Judgment**

Reed Hein and Associates, Makaymax, and Brandon Reed agree that pursuant to the CR2A Stipulations and Settlement Agreement between the Defendant Parties and the Brian Adolph in his personal and representative capacities, and subject to the limitations set forth herein, judgment may be taken against them in the sum of $630,187,204 in favor of the Plaintiff Class, which shall bear interest at the rate of 12% per annum simple interest from the date of execution of this Stipulated Judgment.

**D.     Covenant Not to Execute or Enforce Judgment**

In consideration of the above covenants and settlement, plaintiff Brian Adolph in his individual and representative capacities hereby agrees, covenants, and warrants that he will never execute upon or attempt to enforce any judgment against the assets of the Defendant Parties beyond the insurance assets, legal claims, and other claims or assets referenced and described above in Term B. The assets of Defendant Brandon Reed may not be used to

**CONFESSION OF JUDGMENT - 5**

satisfy this judgment and this judgment may not be recorded against or used as a lien on any assets of Brandon Reed.

Rather, plaintiff Brian Adolph and the Plaintiff Class shall execute upon and enforce this judgment only against: (1) insurance carriers who are liable for the damages, including insurance agents, to the assigned claims, policies of insurance, and remedies identified in this Agreement; (2) Mitchell Sussman, Kenneth Privett, and Schroeder Goldmark Bender, any principals of the same, and any entities in which the foregoing have any interest, to the extent claims against those parties are assigned to the Plaintiff Class by this Agreement; (3) Ardent Law Group, Granite Spire Law Group, any owners or former owners of the same, and any entities in which the foregoing have any interests, to the extent claims against those parties are assigned to the Plaintiff Class by the Agreement; (4) Trevor Hein, Hein and Sons, or any entity owned by Trevor Hein or in which Trevor Hein has any interest, including derivative interests, to the extent claims against those parties have been assigned to the Plaintiff Class by this agreement; and (5) against any timeshare developer or timeshare company, any owners or former owners of the same, and any entities in which the foregoing have any interests, to the extent those claims have been assigned to Plaintiff Class by this Agreement.

**E.     Covenant to Enter Full Satisfaction of Judgment in Favor of ReedHein, Makaymax, and Brandon Reed**

Plaintiff Brian Adolph agrees, in his individual and representative capacities, to execute and file a full satisfaction of judgment in favor of Defendant Parties upon final resolution of the assigned claims. Plaintiff Brian Adolph agrees, upon request and through Class Consul Gregory W. Albert of Albert Law PLLC, to issue written confirmation to any third-party designated by Defendant Parties that the Plaintiff Class shall not execute on this judgment beyond the insurance assets, legal claims, and other claims or assets referenced

**CONFESSION OF JUDGMENT - 6**

and described above in Term B.

**F.     Warranty of Authority**

The parties and attorneys listed below hereby warrant that they have the authority to enter into this agreement and that they do so with the full knowledge of the consequences in an attempt to commit themselves to the obligations set forth above.

**G.     Execution of Document**

The parties agree that this Agreement may be executed in counterpart and by faxed signature pages.

**CONFESSION OF JUDGMENT - 7**

## JUDGMENT SUMMARY

The Court hereby enters judgment in this matter. The Clerk shall enter the following information in the Clerk's execution docket:

| | | |
|---|---|---|
| 1. | Judgment Creditor: | Adolph Class<br>c/o Albert Law, PLLC<br>3131 Western Ave., Ste. 410<br>Seattle, WA 98121 |
| 2. | Judgment Creditor's Lawyer: | Gregory Albert<br>Albert Law, PLLC<br>3131 Western Ave., Ste. 410<br>Seattle, WA 98121 |
| 3. | Judgment Debtors: | Reed Hein & Associates, LLC<br>Brandon Reed<br>121 Third Ave., Ste. 200<br>Kirkland, WA 98033 |
| 4. | Judgment Debtor's Lawyer: | None |
| 5. | Principal Amount of Judgment: | $630,187,204 |
| 6. | Award of Attorney Fees: | _____ |
| 7. | Costs: | _____ |
| 8. | Total Judgment: | $630,187,204 |
| 9. | Interest to Date on Judgment: | 0 |
| 10. | Post-Judgment Interest: | 12% per annum |

Interest shall begin to accrue on this judgment on the date of entry of this judgment at 12% per annum.

**CONFESSION OF JUDGMENT - 8**

1

## CONFESSION AND STIPULATION OF JUDGMENT

Defendant Brandon Reed, individually and on behalf of Reed Hein & Associates and Makaymax confesses judgment in favor of plaintiffs in the principal amount of $630,187,204, plus attorneys fees and costs, with interest on all judgment amounts at 12% per annum from date of entry. The confession judgment is for $630,187,204.

I, Brandon Reed, verify under oath that the above confession of judgment with covenant not to execute is authorized by me and that the acts set forth above are true to the best of my knowledge and belief.

DECLARED UNDER PENALTY OF PERJURY OF THE LAWS OF THE STATE OF WASHINGTON AT _____, WASHINGTON THIS ____ DAY OF September, 2022.

_____

Brandon Reed

_____

Notary Public

Plaintiff class assents to entry of the above confession of judgment with covenant not to execute authorized by defendant Brandon Reed, and agrees not to execute on the unsatisfied portion of the judgment prior to pending completion of settlement.

**CONFESSION OF JUDGMENT - 9**

1    DECLARED UNDER PENALTY OF PERJURY OF THE LAWS OF THE STATE

2    OF WASHINGTON AT _____, WASHINGTON THIS _____ DAY OF

3    September, 2022.

4

5

6                                        _____

7                                        Brian Adolph, Class Representative

8

9

10

11                                       _____

12                                       Gregory Albert, Class Counsel

13

14

15

16

17

18

19

20

21

22

23

24

25

**CONFESSION OF JUDGMENT - 10**

# JUDGMENT AND COVENANT NOT TO EXECUTE

THIS MATTER having come before the Court for entry of judgment upon confession of judgment of the parties, with a covenant not to execute on the judgment prior to completion of settlement, it is therefore ORDERED, ADJUDGED AND DECREED as follows:

1.      Plaintiff is granted judgment against defendants Brandon Reed, Reed Hein & Associates and Makaymax Inc. in the sum of $630,187,204 principal, with interest on all unpaid amounts at 12% per annum from date of entry until satisfied in full.

2.      Plaintiff shall hereafter take no action to collect on the above judgment against defendants Brandon Reed, Reed Hein & Associates and Makaymax Inc.

DATED this 15th day of June, 2023.


_____
Barbara Jacobs Rothstein
U.S. District Court Judge



Presented by:


_____
Gregory Albert, WSBA No. 42673
Albert Law PLLC
3131 Western Ave, Ste 410
Seattle, WA 98121
greg@albertlawpllc.com
206-576-8044

**CONFESSION OF JUDGMENT - 11**